Aetna Ins. Co. *et al.* v. Robertson, State Revenue Agent.

[94 South. 7.    No. 22671.]

1. Equity. *Laches cannot be imputed to state and invoked as de-
   fense in suit for violation of anti-trust laws.*
   Laches cannot be imputed to the state and invoked as a defense
   in ·a suit brought by the State Revenue Agent to collect pen-
   alties that have been incurred because of a violation of the
   state's anti-trust laws. (Affirmed by equally divided court.)

2. Constitutional Law. *Criminal law. One hundred ninety-five
   thousand eight hundred and seventy-five dollars imposed on in-
   surance company for conspiracy to fix rates, held not constitu-
   tionally excessive.*
   A penalty of one hundred ninety-five thousand eight hundred and
   seventy-five dollars imposed on an insurance company for con-
   spiring with other insurance companies to fix and maintain the
   rates of insurance throughout a state, which conspiracy was
   continuous for a period of fourteen years, is not excessive in
   the constitutional sense, and therefore does not violate the due
   process of law clauses of the state and federal Constitutions,
   nor section 28 of the state Constitution of 1890, which pro-
   vides that excessive fines shall not be imposed.

3. Appeal and Error. *Judgment of trial court not reversed except
   by majority of participating judges of supreme court holding
   specific supporting ruling erroneous.*
   Before a judgment or decree of a trial court can be reversed by
   the supreme court, a majority of the judges thereof partici-
   pating in the decision must concur in holding that a specific
   ruling of the trial court on which the judgment or decree is
   based is erroneous.  ·

4. EQUITY. *Motion to file cross-bill made after final decree should be overruled.*

   A motion by a defendant in a suit in equity for leave to file a cross-bill should be overruled when made after a final decree has been rendered in the cause.

5. EQUITY. *Motion to file cross-bill which presents no ground for relief should be overruled.*

   A motion by a defendant in a suit in equity for leave to file a cross-bill should be overruled when the cross-bill sought to be filed presents no legal ground for the relief therein prayed for.

6. MONOPOLIES. *Contracts made by insurance companies with agents, not part of agreement to fix rates, held valid.*

   The contracts made with a member of a trust and combine, which are void under the provisions of section 5003, Code 1906 (Hemingway's Code, section 3285), are such as are in furtherance of the agreement by which the trust and combine was formed, and not such as are merely collateral thereto. Consequently contracts made by an insurance company with its local agents which are not part of an agreement entered into by the company with other companies to fix and maintain rates are not affected by that statute.

7. RECEIVERS. *Insurance agents joined in attachment suits with companies held not entitled to notice of receiver's appointment to collect companies' dues.*

   The agents of insurance companies having in their hands funds collected by them for the companies from persons to whom the companies had issued insurance policies, and who have been joined as codefendants with the companies in an attachment in chancery under section 536, Code of 1906 (Hemingways Code, section 293), by the State Revenue Agent are not entitled to notice of the appointment at the request of the Revenue Agent of a receiver to collect all money due the companies, and hold the same subject to the orders of the court.

8. RECEIVERS. *Receiver under attachment in chancery where resident defendant about to remit funds to nonresident defendant held proper.*

   When it is made to appear in an attachment in chancery, under section 536, Code of 1906 (Hemingway's Code, section 293), against a nonresident with whom a resident of the state who is indebted to him has been joined as a codefendant, that the resident defendant is about to remit to the nonresident defendant the money due him, it is not error for the court, at the request of the complainant, to appoint a receiver to collect from the resident defendant the money due by him to the nonresident defendant, and to hold it subject to the orders of the court.

ON SUGGESTION OF ERROR.

[95 South 137.]

1. APPEAL AND ERROR. *Judgment reversed by majority of supreme court, although not concurring in reasons therefor.*

   A judgment or decree of a trial court will be reversed, when a majority of the judges of the supreme court concur in holding that a ruling of the trial court on which the judgment or decree is based which could be assigned for error is erroneous, although they do not concur in the reasons which led them to so hold.

2. APPEAL AND ERROR. *Error in judgment or decree imposing penalties for membership in trust and combine for day or days may be separately assigned on ·appeal.*

   If the error in the judgment or decree imposing the penalties provided by chapter 222, Laws 1910, Hemingway's Code, section 3286, for membership in a trust and combine, is that it imposes penalties for a day or days for which the appellant claims not to be liable therefor, such error may be separately assigned for error in the supreme court.

3. APPEAL AND ERROR. *Test of supreme court's right to review ruling of trial court is whether it could be assigned for error.*

   Under its rule of practice No. 6 (72 So. vii), the test of the supreme court's right to review a ruling of the trial court is not whether such ruling was, but whether it could have been, assigned for error.

   ETHRIDGE and COOK, JJ., dissenting.

*J. B. Harris,* for appellants.

While it is true that the amount in dollars and cents involved in this case is enormous, that fact does not in any way affect the legal principles which underlie the case and which must determine the correctness of the decree in the court below; but where the effect of the judgments is so disastrous to the parties against whom they are rendered and other innocent persons who are affected and involved, and which affect so seriously the public at large, the court will necessarily scrutinize the facts with the greatest care and apply the law with equal strictness.

The rule could not be better stated than it is by Mr. Justice GRAY in the case of the *United States* v. *Reading Company,* 183 Fed. 427: "The things herein charged are

violations of law, and constitute the crimes denounced by the act." The court will bear in mind that the offense charged in the case at bar is made a felony, and punishable as such in addition to the enormous pecuniary penalties prescribed.

Continuing the quotation from Mr. Justice GRAY in the case cited above: "We refrain from saying that on that account, the degree of proof of their commission should be that required upon trial, of indictments therefor. It suffices to say that the evidence should be such as to convince the mind of the tribunal to which it is addressed that the acts denounced by the law have been committed. The consequences attending the finding of the defendants guilty of the act charged in the petition in this proceeding are certainly very serious, not only to the defendants, but to a large portion of the public and to many innocent persons involved in this transaction. As we have said before, this consideration can only be pertinent to a more careful consideration of the testimony adduced in support of the charge made in the petition." *Continental Tobacco Company* v. *State,* 75 S. W. 737; *United States Mutual Association* v. *Barry,* 131 U. S. 100, 32 L. Ed. 60.

### BURDEN OF PROOF.

The crux of the case, 'the vital and essential fact to be proved, was an agreement, contract, combination, association or confederation to fix or limit in the state of Mississippi the price of premium to be paid for. insuring property against loss or damage by fire, etc., in the state of Mississippi or that the defendants had placed the conduct of their business in the hands of a rating company, and the burden was on the state to prove this.

There was a total failure of any proof of an agreement, combination, or conspiracy of any kind. The existence of any agreement, express or implied, was denied by the pleadings, and by the sworn testimony, as the court will see, of every one of the defendants and by every insurance agent in the state of Mississippi, from every possible point of view. Vol. IV, sec. 2491, page 3534; *Alabama & Vicks-*

*burg Railroad Company* v. *Thornhill,* 106 Miss. 386; 30 Cyc. page 358; 21 R. C. L., page 230; *Atchison T. & F. Ry. Co.* v. *U. S.,* 172 F. R. 194; Wigmore on Evidence, pages 3531-3532; 12 C. J., paragraph 234, page 639.

Conspiracies cannot be established by mere suspicions nor does the evidence of mere relationship between the parties or associations show a conspiracy. 12 C. J. 639.

### PRESUMPTION OF INNOCENCE.

But there is another important aspect of the case which must be determinative and that is it is a case in which the state is depending entirely upon circumstantial evidence, and that being so there are certain well settled rules of law governing it which this court must apply, and we confidently submit that when these rules are applied the court must hold that the state has failed to make out a case, has failed to meet the burden.

### CIRCUMSTANTIAL EVIDENCE.

As we have said above there are certain presumptions which must be indulged in favor of the defendants and the rule applies in civil cases as well as in criminal cases; the rule is thus stated in 22 C. J., page 144. *White* v. *Bates,* 234 Ill. 276, 84 N. E. 906; *Hendicks* v. *Calaway,* 211 Mo. 536, 111 S. W. 60; *Cooper* v. *Springs Valley Water Company,* 16 Cal. 17, 16 Pac. 298; *Bowman* v. *Little,* 101 Maryland, 237, 61; *Insurance Company* v. *Virginia,* 108 Va. 832, 128; *Wilkis* v. *Collins,* 48 Miss. 496; 16 Cyc. page 1082; 17 Cyc. page 817; *Banks* v. *Banks,* 118 Miss. 787, 7 Cyc. page 817; 23 C. J., section 1792, page 49; *Haywood* v. *State,* 90 Miss. 461; 124 La. 256, 50 So. 30; 12 C. J., par. 234, page 639; *Mooney* v. *Mooney,* 224 Mo. 327; *Blides* v. *Chicago Railroad Company,* 89 Neb. 689; *Asbach* v. *Chicago Railroad Company,* 74 Iowa, 248; *Lopez* v. *Campbell,* 163 N. Y. 340; *American Mortgage Company* v. *Whalley,* 63 Fed. 743; 12 C. J., page 639; *Ballantins* v. *Cummins,* 220 Pa. 621, 70 A. 546; 22 C. J., page 84; *Osborn* v. *Ramsey,* 191 Fed. 114; *U. S.* v. *Ross,* 91 U. S. 281, 284, 23 L. Ed. 707; *Manning* v. *Insurance Co.,* 100 U. S. 693, 25 L. Ed. 761.

### THE PRINTERS OF RATES WERE NOT AGENTS OR EMPLOYEES OF THE SOUTHEASTERN TARIFF ASSOCIATION.

Competent and relevant testimony of unimpeached witnesses should not be held to be contradicted by inference and circumstantial evidence unless the circumstances and the natural inference to be deduced therefrom cannot in reason be reconciled to the conclusion that the direct evidence is true. *Blyde* v. *Chicago R. R. Co.*, 89 Neb. 689; *Asbac* v. *Chicago R. R. Co.*, — Iowa, 248; *Lopez* v. *Campbell*, 163 N. Y. 340; *American Mortgage Co.* v. *Whalley*, 63 Fed. 743.

### THE MISSISSIPPI RATING COMPANY NOT THE EMPLOYEE OR AGENT OF THE DEFENDANTS.

The book of general basis schedules was not the property of the defendants.

### RATES NOT ILLEGAL.

*Hugh B. Miller* v. *Fidelity Insurance Company, et al.*, 88 So. 711.

### RATING BUREAU LAWFUL AND NECESSARY.

*Miller* v. *The Fidelity Insurance Company, supra; Banks* v. *Banks,* decided by this court, 118 Miss., *supra.*

### RATES NOT DRIVEN FROM THE STATE.

There is no law in this state or elsewhere against uniformity of rates for insurance unless that uniformity is brought about by agreement among the companies. *Insurance Companies* v. *Lewis*, 233 U. S. 389, 58 L. Ed. 1012; *Hugh B. Miller, District Attorney, etc.*, v. *Fidelity Union Fire Insurance Company, et al.*

### ONE AGENT REPRESENTING SEVERAL COMPANIES NOT EVIDENCE OF AGREEMENT.

*Searles* v. *Y. & M. V. R. R. Co.*, 85 Miss. 420; *Mooney* v. *Mooney*, 244 Mo. 372, 17 Cyc. 817; 10 R. C. L., page 1007; *Banks* v. *Banks,* 118 Miss. 787.

THE USE OF THE GENERAL BASIS SCHEDULES COMPILED BY
THE TARIFF ASSOCIATION NOT A VIOLATION
OF THE ANTI-TRUST LAW.

*State of Arkansas* v. *Lancashire Fire Insurance Company* 45 L. R. A. 348; *United States* v. *Reading Company,* 182 Fed. 427; *Mutual Association* v. *Barry,* 131 U. S. 100, 35 L. Ed. 60.


CONCLUSION.

We have dwelt upon all this, as we have said before, to show the court that no presumption can be indulged in favor of the decree of the chancellor in this case. We think we have demonstrated that he has not only distorted and ignored the facts, but has misapplied the law, or ignored it. It seems to us that it would strike this court as being rather remarkable that, out of the vast amount of evidence which is embraced in the enormous record before this court, that with all the resources of the state behind it, that over all the years covered by the suit, the chancellor should have been unable to find some substantial evidence in the case upon which to base his conviction of the defendants. It isn't there, and in order to fasten upon these defendants a decree of guilty, he has been forced to go far afield and render a decree based upon a theory, imagination and suspicion. His strong language, his appeals to prejudice, his florid rhetoric, cannot supply the facts which are wanted.

We are satisfied that in the pure and clear atmosphere of this tribune we can rest with confidence in the assurance that this case will be tried upon its merits and the protection, which the well settled rules of law extend to these appellants, will be respected, and that being done, we submit with confidence that the decree of the court must be reversed.

Respectfully submitted.

*William Thompson, R. L. McLaurin* and *W. H. Watkins,* for appellants.

The decree of the chancellor is manifestly wrong as to the appellants and each of them, in that the decree is contrary to the law and not supported by the testimony. *Mississippi Cotton Oil Company* v. *Starling,* 23 So. 648; *Jones* v. *Jones,* 88 Miss. 247, 41 So. 373; *Rice* v. *Robinson Lumber Company,* 110 Miss. 607; *McDaniel* v. *Inzer,* 52 So. 359; *Harrington* v. *Harrington,* 2 How. 701; *Mosby* v. *Wall,* 23 Miss. 81, 55 Am. Dec. 71; *Gillis* v. *Smith,* 114 Miss. 665; *Studdard* v. *Carter,* 120 Miss. 246; *Biles* v. *Walker,* 121 Miss. 98; *Buckley* v. *The State,* 121 Miss. 66; *Mobile & Ohio Railroad* v. *Bennett,* 90 So. 113; *Clark* v. *Moyse,* 48 So. 721; *McFadden* v. *Buckley,* 98 Miss. 29, 53 So. 351; *Fore* v. *Railway,* 87 Miss. 218, 39 So. 493, 600; *McQueen* v. *Bostwick,* 12 Smedes & M. 604; *Sims* v. *McIntyre,* 8 Smedes & M. 327; *Barbee* v. *Reese,* 60 Miss. 906; *Silver King Coalition Mines Company* v. *Conlin Mining Company* (C. C. A.), 255 Fed. 745; *Coder* v. *Arts,* 152 Fed. 943, 946, 82 C. C. A. 91, 94, 15 L. R. A. (N. S.) 372; *United States* v. *Reading Company,* 183 Fed. 427; *State* v. *Continental Tobacco Company* (Mo.), 75 S. W. 737; *United States Mutual Association* v. *Barry,* 131 U. S. 100, 35 L. Ed. 60; *North Carolina Railroad Company* v. *Zachary,* 232 U. S. 261, 58 L. Ed. 591; *Carlson* v. *State of Washington,* 234 U. S. 103, 58 L. Ed. 1237; *Southern R. Co.* v. *Schuyler,* 227 U. S. 601, 611, 57 L. Ed. 662, 669, 43 L. R. A. (N. S.) 901, 33 Sup. Ct. Rep. 277, and cases cited; *Interstate Amusement Company* v. *Albert,* 239 U. S. 360, 60 L. Ed. 439; *Bank* v. *Banks,* 118 Miss. 783.

(D) The appellants are not guilty merely for the purchase and use of the rates of the rating company. *Traux* v. *Raich,* 209 U. S. 33, 60 L. Ed. 131; *Butchers' Union S. H. & L. S. L. Co.* v. *Crescent City L. S. L. & S. H. Co.,* 111 U. S. 746, 762, 29 L. Ed. 585, 588, 4 Supt. Ct. Rep. 652; *Barbier* v. *Connolly,* 113 U. S. 27, 31, 29 L. Ed. 923, 924,

5 Sup. Ct. Rep. 357; *Yick Wo* v. *Hopinis, supra; Allegeyer* v. *Louisiana,* 165 U. S. 578, 589, 590, 41 L. Ed. 832, 835, 836, 17 Sup. Ct. Rep. 427; *Coppage* v. *Kansas,* 236 U. S. 1, 14, 59 L. Ed. 441, L. R. A. 1915C, 960, 35 Sup. Ct. Rep. 240; *Fong Yue Ting* v. *United States,* 149 U. S. 698, 713, 37 L. Ed. 905, 913, 13 Sup. Ct. Rep. 1016; *People of the State of Illinois* v. *Steele et al.,* 231 Ill. 340, 14 L. R. A. (N. S.) 361; *Wiggins Ferry Co.* v. *East St. Louis,* 102 Ill. 560; *H. B. Miller, District Attorney* v. *The Fidelity Union Fire Insurance Company,* 78 So. 716; *Fire Ins. Co.* v. *State,* 75 Miss. 24, 22 So. 99; *Railroad Co.* v. *Searles,* 95 Miss. 520, 37 So. 939; *Cumberland Telephone Co.* v. *State,* 100 Miss. 116, 54 So. 670, 39 L. R. A. (N. S.) 277; *Railroad Co.* v. *Crawford,* 107 Miss. 355, 65 So. 462, L. R. A. 1915C; *Frey & Son* v. *Cudahy Packing Company,* Advance Sheets, May 15, 1921, No. 13,523; *United States* v. *Colgate & Company,* 63 L. Ed. 992; *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, 41 L. Ed. 1007, 17 Sup. Ct. Rep. 540; *Eastern States Retail Dealers Ass'n* v. *United States,* 234 U. S. 600, 58 L. Ed. 1490, L. R. A. 1915A. 788, 34 Sup. Ct. Rep. 951; See, also, *Standard Oil Co.* v. *United States,* 221 U. S. 1, 44 L. Ed. 619, 34 L. R. A. (N. S.) 834, 31 Sup. Ct. Rep. 502, Ann. Cas. 1912D, 734; *United States* v. *American Tobacco Co.,* 221 U. S. 106, 55 L. Ed. 663, 31 Sup. Ct. Rep. 632; *Boston Store* v. *American Graphaphone Co.,* 246 U. S. 8, 62 L. Ed. 551, 38 Sup. Ct. Rep. 257, Ann. Cas. 1918C, 447; *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.; United States* v. *Schrader,* 64 L. Ed. 471.

(F) Presumptions as to innocence, fairness and honesty. *Wherry* v. *Latimer,* 60 So. 563, 103 Miss. 524; *Wilkins* v. *Reilly,* 47 Miss. 306; *Clay* v. *Allen,* 65 Miss. 426; Benjamin on Sales (4th Ed.) secs. 82, 93, and 542, and authorities there cited; *Irwin* v. *Willair,* 110 U. S. 499; *Rountree* v. *Smith,* 108 Ib. 269; *Gregory* v. *Wendell,* 40 Mich. 432; *Gregory* v.*Wendell,* 39 Ib. 337; *Pixley* v. *Boynton,* 79 Ill. 351; *Orrell* v. *Bag Manufacturing Company,* 87 Miss. 632.

Our statutes subject to reasonable construction. *Stand-*

*ard Oil Company* v. *U. S.,* 221 U. S. 1, 55 L. Ed. 619, 34 L. R. A. (N. S.) 831-834; Ann. Cases 1912D, 734, and in the case of *U. S.* v. *American Tobacco Company,* 221 U. S. 106, 55 L. Ed. 663; *Houck & M. Company* v. *Wright,* 77 Miss. 476; *Telephone Company* v. *The State,* 100 Miss. 102; *State* v. *Duluth Board of Trade,* 107 Minn. 506, — N. W. 395, 23 L. R. A. (N. S.) 1260; *Hopkins* v. *U. S.,* 171 U. S. 593, 19 Sup. Ct. 40, 43 L. Ed. 290; *Central Trans. Co.* v. *Pullman,* 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55; *St. Louis Drayage Co.* v. *L. & N. R. R. Co.* (C. C.), 65 Fed. 465; *U. S.* v. *Addison Pipe & Steel Co.,* 85 Fed. 271, 29 C..C. A. 141, L. R. A. 134; *L. & N. R. R. Co.* v. *West Coast Stores Co.,* 198 U. S. 497, 24 Sup. Ct. 745, 49 L. Ed. 1135; *Y. & M. V. Railroad Company* v. *Crawford,* 65 So. 462, 107 Miss. 355; *Houck* v. *Wright,* 77 Miss. 483, 27 So. 617; *Telephone & Telegraph Co.* v. *State,* 100 Miss. 116, 54 So. 670, 39 L. R. A. (N. S.) 277; *Railroad Co.* v. *Searles,* 85 Miss. 520,. 37 So. 938, 68 L. R. A. 715; *Siveley* v. *Cramer,* 61 So. 653; *Covington Stock Yards Co.* v. *Keith,* 139 U. S. 128, 11 Sup. Ct. 469, 35 L. Ed. 73; *Railroad Company* v. *Searles,* 85 Miss. 520; *Minnesota* v. *Duluth Board of Trade,* 23 L. R. A. (N. S.) 160; *Insurance Company* v. *State,* 75 Miss. 24; *Queen Insurance Company* v. *State,* 86 Texas, 250, 22 L. R. A. 483; Chancellor's Findings of Fact and Conclusions of Law; *Pass* v. *New England Mortgage Security Company,* 66 Miss. 365, 6 So. 239; *Security Co.* v. *Townes,* 1 So. 242; *B. Lowenstein Brothers* v. *Goodbar,* 69 Miss. 808; 2 Words & Phr., 2d Series, pp. 1034, 1035, 1036, 1037; *Chicago, R. I. & P. Ry. Co.* v. *Bennett,* 128 Pac. 705, 706, 36 Okl. 358 (Quoting 4 Words & Phrases, p. 3542); *Pottorff* v. *Fidelity Coal Mining Company,* 122 Pac. 120, 122, 86 Kan. 774; *Harmon* v. *Ferguson Contracting Co.,* 74 S. E. 632, 634, 159 N. C. 22; *Johnson* v. *Carolina C. & O. R. Co.,* 72 S. E. 1057, 1058, 157 N. C. 392; *Francis* v. *Johnson,* 101 N. W. 878, 879, 127 Iowa, 391 (citing *Humpton* v. *Unterkircher,* 66 N. W. 776, 87 Iowa 509; *Hughbanks* v. *Boston Inv. Co.,* 60 N. W. 640, 92 Iowa, 267; *Overhouser*

v. *American Cereal Co.*, 92 N. W. 74, 118 Iowa, 417) ; *Alabama Western R. Co.* v. *Talley-Bates Const. Co.*, 50 So. 341, 344, 162 Ala. 396; *Pearsons* v. *M. M. Potter Co.*, 101 Pac. 681, 682, 10 Cal. App. 245; *Alexander* v. *R. A. Sherman's Sons Co.*, 85 Atl. 514, 515, 86 Conn. 292; *McGrath* v. *City of St. Louis*, 114 S. W. 611, 617, 215 Mo. 191; *O'Hara* v. *Laclede Gaslight Co.*, 110 S. W. 642, 643, 131 Mo. App. 428 (quoting and adopting definition in *Crenshaw* v. *Ullman*, 20 S. W. 1078, 113 Mo. 639) ; *Stephenville, N. & S. T. Ry. Co.* v. *Couch*, 121 S. W. 189, 190, 56 Tex. Civ. App. 336; *Messmer* v. *Bell & Coggeshall Co.*, 117 S. W. 346, 133 Ky. 19, 19 Ann. Cas. 1; *Keys* v. *Second Baptist Church*, 59 Atl. 446, 447, 99 Me. 308; *Kipp* v. *Oyster*, 114 S. W. 538, 133 Mo. App. 711; *Moore* v. *Savage & Kopplin* (Tex), 135 S. W. 1033, 1039; *Glover* v. *Richardson & Elmer Co.*, 116 Pac. 861, 863, 64 Wash. 403; *Edmundson* v. *Coca-Cola Co.* (Tex.), 150 S. W. 273, 274; *Engler* v. *City of Seattle*, 82 Pac. 136, 138, 40 Wash. 72; citing *Casement* v. *Brown*, 13 Sup. Ct. 672, 148 U. S. 622, 37 L. Ed. 582; *Rogers* v. *Florence R. Co.*, 9 S. F. 1059, 31 S. C. 378; citing of *Erie* v. *Caulkins*, 85 Pa. 247, 27 Am. Rep. 644; *Kelly* v. *Mayor, etc., of City of New York*, 11 N. Y. 432; *German Alliance Insurance Company* v. *Hale*, 219 U. S. 307, 55 L. Ed. 229; *German Alliance Insurance Company* v. *Lewis*, 233 U. S. 59, 58 L. Ed. 1011.

(I) Our anti-trust statutes will have no ex-territorial effect. *State of Arkansas* v. *Lancashire Fire Insurance Company* (Ark.), 45 L. R. A. 348; *Chicago Wall Paper Mills* v. *General Paper Co.*, C. S. (C. C. A. 7th Cir.) 147 Fed. 491; S. A. & E. Ann. Cas. 889; 19 R. C. L., page 111; *Allgeyer* v. *The State of Louisiana*, 165 U. S. 578, 41 L. Ed. 832; *Milliken* v. *Pratt*, 125 Mass. 374, 28 Am. Rep. 241; *Tildon* v. *Blair*, 88 U. S. 21, Wall, 241 (22:632) ; *State of North Carolina* v. *Cutshall* (N. C.), 16 L. R. A. 130, 11 Am. & Eng. Enc. Law, p. 440, 1 Lewis Sutherland, Statutory Construction, par. 13; Cooley's Constitutional

131 Miss.—23

Limitation (7 Ed.) 176; Storey, Conflict of Laws, p. 1834, par. 620; *Ascher* v. *Moyse,* 101 Mass. 36, et seq.

(J) Our anti-trust laws should receive a reasonable construction, and should be construed in reference to and subject to well known economic laws. *Standard Oil Company* v. *The State,* 104 Miss. 886; *Dawson* v. *Shaw,* 28 Pa. Sup. Ct. 563; *Crow, Attorney General of Missouri,* v. *Firemen's Fund Insurance Company* (Mo.), 45 L. R. A. 363.

Variations by agents from advisory rates, evidencing their independence of judgment, manifested in their daily transactions. *Meredith* v. *New Jersey Zinc & Iron Company* (N. J.), 37 Atl. 539; *United States* v. *United States Steel Corporation,* 251 U. S. 417, 64 L. Ed. 343; *United States* v. *United States Steel Corporation,* 223 Fed. 55; *Anderson* v. *United States,* 171 U. S. 604, 43 L. Ed. 300; *United States* v. *Jellico Mountain Coal and Coke Company,* 46 Fed. 432; *United States* v. *Coal Dealers Association,* 85 Fed. 252; *United States* v. *Addysson Pipe and Steel Company,* 85 Fed. 271; *Garard* v. *State,* 50 Miss. 147; 1 Greenl. Ev., 126, sec. 111; *Browning* v. *The State,* 30 Miss. 656; *Street* v. *State,* 43 Miss. 1; *Jayne* v. *Loder,* U. S. (C. C. A. 3rd Cir.), 9 Ann. Cas. 294; 7 L. R. A. (N. S.) 984; 3 Genl. Ev. (Lewis' Ed.), sec. 93; 8 Cyc. Law & Proc., p. 658; *Howard* v. *Union Traction Co.,* 195 Pa. 391, 45 Atl. 1076; *Weist* v. *Electric Trac. Co.;* *Weist* v. *Philadelphia,* 200 Pa. 149, 58 L. R. A. 666, 49 Atl. 891; *Rowland* v. *Philadelphia,* 202 Pa. 50, 51 Atl. 589; *United States* v. *Reading Co.,* 183 Fed. 427; *Bullion* v. *Aetna Insurance Company,* 237 S. W. 716; *Adams* v. *Standard Oil Company,* 97 Miss. 879, 16 Cyc. 870; 17 Am. & Eng. Ency. of Law (2 Ed.), 915; Note 8 at page 915 of 17 Am. & Eng. Ency. of Law; *Caha* v. *U. S.,* 152 U. S. 211; *State* v. *Candland* (Utah), 140 A. S. R. 834, 24 L. R. A. (N. S.) 1260; *New York Tenement House Department* v. *Moeschen,* 179 N. Y. 325, 70 L. R. A. 704, 1 Ann. Cas. 439; *Gray* v. *Reclamation District* (Cal.), 163 Pac. 1024; *Railroad Company* v. *State* (Wis.), 145 N. W. 216; *Trans-Missouri Freight Companies,* 41 L. Ed.

1007; *The United States* v. *The Joint Traffic Association,* 43 L. Ed. 259; *Northern Securities case,* 48 L. Ed. 679, et seq.

### EVERY INFERENCE OF GUILT, IF ANY THERE WAS, WAS OVERCOME BY THE POSITIVE DENIALS OF THE INTERESTED PARTIES.

On the foregoing proposition, we submit the following authorities: *Empire State Cattle Co.* v. *A. T. & S. F. R. R. Co.,* 210 U. S. 1, 2 L. Ed. 931; *Chicago, St. L. & N. O. R. E. Co.* v. *Packwood,* 59 Miss. 280; *Young* v. *Wilson,* 24 Miss. 694; *Supreme Lodge, Knights of Pythias,* v. *Fletcher,* 78 Miss. 337.

### Point II

None of the appellants have placed the management or control of their business in the hands of the rating company. *Railroad Company* v. *Searls,* 85 Miss. 520; Section 198, Constitution 1890; *Insurance Company* v. *State,* 75 Miss. 24, 22 So. 99; TERRAL, J., in *Houck* v. *Wright,* 77 Miss. 483, 27 So. 617; *Y. & M. V. R. R. Co.* v. *Crawford,* 107 Miss. 355; *Miller* v. *Fidelity Fire Insurance Company, supra.*

### Point III

The penalties imposed were excessive and violated the Constitution of the United States and violated the Constitution of Mississippi. *Grenada Lumber Company* v. *State,* 98 Miss. 536, 54 So. 8; *State of Mississippi* v. *Jackson Cotton Oil Co.,* 95 Miss. 6; *Parks* v. *Railroad Co.,* 13 Lea (Tenn.) 1; *Sturgis* v. *Spofford,* 45 N. Y. 446; *Porter* v. *Dawson Bridge Company* (Pa.), 27 Atl. 730; *Friedeborn* v. *Com.,* 113 Pa. St. 242, 6 Atl. Rep. 160; *State, ex rel. Barton Company* v. *Railroad Co.* (District Court of Missouri), 32 Fed. 722; *Fisher* v. *Railroad Co.,* 46 N. Y. 644;

*Parks* v. *Railroad Co.,* 13 Lea 1; *Murray* v. *Railroad Co.,* 63 Tex. 407; *Gulledge* v. *Railroad Co.,* 46 N. Y. 644; *Parks* v. *Railroad Co.,* 13 Lea 1; *Murray* v. *Railroad Co.,* 63 Tex. 407; *Gulledge* v. *Railroad Co.* (not reported), Tex. Ct. App.; *Griffin* v. *Street Railway Company,* 72 N. E. 513; *People* v. *New York Central R. R. Co.,* 13 N. Y. 78; *Suydam* v. *Smith,* 52 N. Y. 383; *Fisher* v. *N. Y. C. & H. R. R. Co.,* 46 N. Y. 644; *Jones* v. *Rochester Gas & Electric Co.,* 168 N. Y. 65, 60 N. E. 1044; *Cox* v. *Paul,* 175 N. Y. 322, 67 N. E. 586.

(B) Statutes unconstitutional as construed as to individual companies. *Traux* v. *Corrigan,* decided by supreme court of the United States, January 16, 1922, advance Sheets No. 5, L. Ed.; *Waters-Pierce Oil Company* v. *State of Texas,* 212 U. S. 86, 53 L. Ed. 417; *Coffey* v. *Harlan County,* 204 U. S. 659, 51 L. Ed. 666, 27 Sup. Ct. Rep. 305.

## Point IV.

### MISCELLANEOUS ASSIGNMENTS OF ERROR.

(B) The court below committed error in using the fact that the companies ceased and left the state of Mississippi as evidence of an agreement to arrive at and maintain the price of fire insurance in the state of Mississippi.

## Point V.

### LACHES

The appellee should be barred from recovery in this case on account of laches. This record makes a very strong case, rendering applicable the doctrine of laches. *Chase* v. *Chase,* 20 R. I. 202, 37 Atl. 804; I Pomeroy's Equitable Remedies, sec. 21, and authorities there cited, particularly *Wilson* v. *Wilson,* 41 Or. 459, 69 Pac. 923; *Lindsey Petroleum Co.* v. *Hurd,* L. R. 5 P. C. 221; *Naddo* v. *Bardon,* 51 Fed. 493, 2 C. C. A. 335; *Pyason* v. *Dunten,*

164 Ind. 85, 73 N. E. 74; *Neppach* v. *Jones,* 20 Or. 491, 26 Pac. 569, 849, 23 Am. St. Rep. 145; 21 *Corpus Juris,* page 212; *Newberry* v. *Wilkinson* (C. C. A.) 199 Fed. 673; *Frees* v. *Waldron,* C. C. A. 212 Fed. 193; *Walshe* v. *Dwight,* (Ala.), 59 So. 630, 179 Ala. 310; *Chatfield* v. *Land Co.* (Arkansas), 114 S. W. 473; *Miller* v. *Ash* (Cal.), 105 Pac. 600; *Murrell* v. *Peterson* (Fla.), 49 So. 31; *Veneer* . v. *Chicago City Ry. Co.* (Ill.), 86 N. E. 266; *Hughes* v. *Wallace* (Ky.), 118 S. W. 324; *Adams* v. *Gossom* (Mo.), 129 S. W. 16; *Leslie* v. *Carter* (Mo.), 144 S. W. 797; *Riley* v. *Blacker* (Mont.), 152 Pac. 758; *Kenny* v. *McKenzie* (S. D.), 127 N. W. 597; *Hogge* v. *Shield* (Va.), 76 S. E. 934.

## AS TO THE QUESTION OF THE IMPORTANCE OF TIME.

21 Corpus Juris, page 219; and as to the evidentiary value of delay see 21 Corpus Juris, pages 226 to 228. Upon the question of knowledge of the right of action, we refer the court to the case of *Ater* v. *Smith,* 19 A. & E. Cases, page 105; *Wood* v. *Carpenter,* 101 U. S. 135, 25 U. S. (L. Ed.) 807, quoted with approval from *Kennedy* v. *Green,* 3 Myl. & K. (Eng.) 722; *Johnston* v. *Standard Min. Co.,* 148 U. S. 380, 13 S. Ct. 585, 37 U. S. (L. Ed.) 480; 18 A. & Eng. Enc. of Law (L. Ed.), 114; *Miller* v. *Ash* (Cal.), 105 Pac. 600; *Crawford* v. *Lees,* 93 Atl. 201; *Myer's Case,* 69 N. J. Eq. 793, 796, 64 Atl. 138; *Wm. G. Plant* v. *Humphries,* 26 U. S. (L. R. A.) (N. S.) 558; *Lafferty* v. *Lafferty,* 42 W. Va. 783, 26 S. E. 262; *Thompson* v. *Whitaker Iron Co.,* 41 W. Va. 574, 23 S. E. 795; *Redford* v. *Clarke,* 100 Va. 115, 40 S. E. 630; *Foster* v. *Mansfield, C. & L. M. R. Co.,* 146 U. S. 99, 36 L. Ed. 903, 13 Sup. Ct. Rep. 28; 21 Corpus Juris, page 231; *Tatum* v. *Arkansas Lumber Co.,* 148 S. W. 135; *Weniger* v. *Success Mining Co.,* 227 Fed. 549, C. C. A.; *Gayle* v. *Pennington* (Ala.), 64 So. 572; *Jackson* v. *Becktold* (Ark.), 112 S. W. 161; *Blackford* v. *Heman* (Mo.), 112 S. W. 287; *Harrison* v. *Rice,* 114 N. W. 151; 21 Corpus Juris, at page

234; 21 Corpus Juris, page 235; *Bargamin* v. *Clarke*, 20 Gratt. (61 Va.) 544, 553; *Potter* v. *Potter*, 101 S. W. 905, 907, 31 Ky. L. 137; *Hunt* v. *Smith*, 24 S. C. (Eq.) 465, 499; *Hawley* v. *Von Lanken*, 75 Neb. 597, 600, 106 N. W. 456; *Lutjen* v. *Lutjen*, 64 N. J. Eq. 773 A., 625 (quoting *United Boxboard, etc., Co.* v. *McEwan Bros. Co.* (N. J. Ch.), 76 A. 550, 555).

### PRESUMPTION OF LOSS OR OBSCURATION OF EVIDENCE.

*U. S.* v. *Beebee*, 17 Fed. 36, 38, 4 McCrary 12 (Aff. 127 U. S. 338, 8 S. C. T. 1083, 32 L. Ed. 121); *United Boxboard, etc., Co.* v. *McEwan Bros. Co.* (N. J. Eq.), 76 A. 550; *Lutjen* v. *Lutjen*, 64 N. J. Eq. 773, 53 A. 625.

(B) Loss of defense. The efficiency of the defense of laches does not depend on proof that lapse of time has resulted in the actual loss of testimony through death or otherwise, but it is generally sufficient that the court cannot feel competent of its ability to ascertain the truth as well as it could when the subject of investigation was recent. *Swinley* v. *Force*, 78 N. J. Eq. 52, 78 A. 249; *United Boxboard, etc., Co.* v. *McEwan Bros. Co.* (N. J. Ch.), 76 A. 550; *Evans* v. *Steele*, 125 Tenn. 483, 145 S. W. 162; *Segers* v. *Ayers*, 128 S. W. 1045 (Ark.); *Davis* v. *Harrell*, 142 S. W. 156 (Ark.); *Birdschell* v. *Seale*, 36 App. D. C. 586; *Geter* v. *Simmons*, 49 So. 131 (Fla.); *Riley* v. *Blacker* (Mont.), 152 Pac. 758; *Boxboard, etc., Co.* v. *McEwan Bros.* (N. J.), 76 Atl. 550; *Evans* v. *Steele*, 145 S. W. 162; *Mackall* v. *Casilear*, 137 U. S. 556, 11 Sup. Ct. 178, 34 L. Ed. 776. We respectfully submit that laches is applicable against the state of Mississippi. *Caruth* v. *Gillespie*, 109 Miss. 679; *Pittsburg Rys. Co.* v. *Borough of Carrick* (Pa.), 103 Atl. 106; *In Re Bailey's Estate* (Pa.), 88 Atl. 428; *Com.* v. *Turnpike Co.*, 153 Pa. 47, 25 Atl. 1105; *Commonwealth* v. *Turnpike Co.* (Pa.), 25 Atl. 1105; *State* v. *Livingston*, 145 N. W. 91; *State* v. *Des Moines*, 96 Iowa, 543, 65 N. W. 818, 31 L. R. A. 186, 59 Am. St. Rep. 381; *State of Iowa* v. *Carr*, 191 Fed.

257, 112 C. C. A. 477; *State of Indiana* v. *Milk* (C. C.), 11 Fed. 389; *United States* v. *McElroy* (C. C.), 25 Fed. 804; *State of Michigan* v. *Jackson*, 69 Fed. 116, 16 C. C. A. 345; *State* v. *Northern Pac. Ry. Co.*, 147 N. W. 219; *Atty. Gen.* v. *Railroad Cos.*, 35 Wis. 425; *State, etc.* v. *Johnson*, 103 Wis. 591, 79 N. W. 1081, 51 L. R. A. 33; *State, etc.*, v. *Helms*, 136 Wis. 432, 118 N. W. 158; Section 2465, Hemingway's Code; *Westerlund* v. *Black Bear Mining Co.*, 203 Fed. 599; *Rodgers* v. *Thomas* (C. C. A.), 193 Fed. 925; *Woodlawn Realty & Delevopment Co.* v. *Hawkins*, 63 So. 183 (Ala.), *In re Fis*, 71 Atl. 559.

Wherefore: The appellants, and each of them, pray that this cause be reversed, and that the original and amended bills of complaint be dismissed at the cost of the appellee. If, however, the court should be of opinion that said original and amended bills of complaint should not be dissmissed, then these appellants and each of them pray that said cause be remanded to the lower court for a new trial, to be proceeded with in accordance with the principles of law to be announced by this court.

*Clayton D. Potter* and *Chalmers Potter,* for appellees.

Before a judgment of decree of a trial court can be reversed by the supreme court a majority of the judges thereof participating in the decision must concur in holding that a specific ruling of the trial court on which the judgment or decree is based is erroneous.

The primary question propounded by the court is therefore, what is the effect of the vote and what judgment should be rendered when three of the judges are of the opinion that there is sufficient evidence upon which to sustain the finding of fact by the lower court but these three judges also reached the conclusion that laches can be imputed to the state and should be so imputed in this case while the three other members of the court are of the opinion that laches cannot be imputed to the state

but do not think that the evidence is sufficient to sustain the finding of fact by the chancellor. We will endeavor to demonstrate to the court that in all of the cases except two, that is the Florida case and the case from the United States supreme court, rule has prevailed as announced in the *per curiam* opinion of this court in this case, and that this has been the rule in Mississippi since the rendition of the decision in *Bell* v. *Morrison,* 27 Miss. 68, which rule has been followed in the *Browning case,* 33 Miss. 47, and the case of *B. M. & N. R. R. Co.* v. *Dossett,* 118 Miss. 327.

Thus for sixty-nine years, that is, from 1854, we find the settled law in Mississippi to be that a majority of the court must concur in holding that one particular assignment of error is well taken before a case can be reversed.

And in addition, the text of Corpus Juris has declared the Mississippi rule to be that a majority of the judges participating in a case must concur in holding that a specific assignment of error is well taken. The text in 4 Corpus Juris, page 1121, par. 3112, is as follows: "As to how many concurring votes shall be necessary to a decision by an appellate court is a question depending largely on statutes or constitutional provisions. Ordinarily a majority of the judges sitting is necessary and sufficient provided that the concurrence of a majority of the whole court shall be necessary to decide any question and in other jurisdictions a concurrence of a specified number of judges is necessary for the reversal of a judgment while an affirmance may be rendered by a majority of a quorum. The United States supreme court will not, except in cases of absolute necessity, deliver any judgment in cases where constitutional questions are involved, unless a majority of the whole court concurs. Where a majority, or other required number, of the judges agree to affirm the judgment of the lower court, it is not material that their conclusions are based on different rea-

sons, and in some cases the same rule has been applied, where the required number of judges agree on a reversal; but other cases are to the effect that in order for a judgment to be reversed a majority or other required number of the judges must agree on some one error, otherwise the judgment must be affirmed."

The text is supported by a note that quoted copiously from *In re McNaughton,* 138 Wis. 190, 120 N. W. 288, in which case the Mississippi rule as laid down in the Browning case, was followed and approved. *State ex rel. Howe* v. *Brantley,* 113 Miss. 786, and that of *McNutt* v. *Lancaster,* 9 Smedes & Marshall, 570. We do not think that the McNutt case is authority against us.

In the McNutt case all of the judges participating agreed that, a particular, assignment of error as well taken and all agreed that the judgment was excessive, in that judgment was rendered in excess of the penalty of the bond. In the case at bar there is no such concurrence; three of the judges holding that there is liability, and three of the judges holding that if there is liability, the chancellor was correct in his assessment of penalties.

But if this case should be held authority against us it has been overruled by the Bell case, Browning case and the Dossett case. In so far as the case of *Howe* v. *Brantley,* 113 Miss. 786, is concerned on the point in question, we submit that a final decision was never rendered and that the case is not authority. In addition to the foregoing authorities from Mississippi we find that this question has been passed upon by six other courts of last resort and at least four of these courts have adopted the same rule as that adopted in Mississippi. These courts are Wisconsin, Alabama, Pennsylvania and Kentucky which have adopted as the true rule, the rule here contended for by us and adopted in Mississippi in the Bell, Browning and Dossett cases; and Florida and the United States supreme court where a different rule seems to prevail.

This question was passed upon by the supreme court of Alabama in the case of *Cook* v. *Drew,* 3 Stewart and Porter 392. *Browning* v. *State,* 33 Miss. 47 (crim. case) ; *Bell* v. *Morrison,* 27 Miss. 68; *Legal Tender cases,* 52, Pa. 9.

The rule adopted is the most pronounced of these cases and highly recommended as sound in *Lipscomb* v. *State,* 75 Miss. 559, 23 So. 210 (crim. case) seems to be the only logical one, though one case found in the books (*Smith* v. *U. S.,* 8 L. Ed. 130), proclaims a different doctrine but without assigning any reason therefor or without its having been subsequently followed by the federal court so far as we can find. The view which we adopt is that a majority must agree on some one specific ground of error fatal to the judgment or it must be affirmed. Otherwise there would be a reversal without any guide for a trial court upon a new hearing. Unless the trial judge changed his mind the result would be the same as before and a like result would happen on a second appeal, and as said by HANDY, J., in his opinion in *Browning* v. *State, supra,* and highly recommended as before indicated in *Lipscomb* v. *State, supra*; "Such would be a strange anomalous attitude of the cause *ad infinitum* as often as it should be tried below and brought here on the same state of facts."

This same question has been recently presented to the supreme court of Wisconsin twice in the case of *Grogan* v. *Wisconsin Sugar Company,* 146 N. W. 491, 156 Wis. 406, and *Harland* v. *Wisconsin Sugar Company,* 146 N. W. 492, 156 Wis. 407, where the rule announced in the *McNaughton case, supra,* was followed. *Legal Tender case,* 52 Pa. 9; *Reed* v. *Penrose,* 12 Casey 214; *Mississippi Valley case,* 81 So. 801.

On both questions this court has found the chancellor's decision was correct by a divided court. It, therefore, becomes a judicial precedent and should be followed by and is binding upon this court and every trial court in Mississippi; first, that laches cannot be imputed to the

state; and second, that should a case subsequently arise
with an identical state of facts as are presented by the
record the defendant in that case would be guilty of a
violation of the anti-trust laws.  It would be indeed an
anomalous situation to carry a case involving two ques-
tions through the supreme court, have both of those ques-
tions decided in one's favor, not only have these questions
decided in one's favor, but to establish thereby a rule
of decision, which would be binding upon every trial court
in Mississippi and upon this court, and yet to have the
case that establishes these rules, that establishes these
judicial precedents, reversed.

Although we are bound to answer the second question,
that is, that this court, if it should reverse as to the pen-
alties, should render final judgment itself and not remand
the case to the court below; it is by virtue of section 4919
of the Code of 1906 that we so answer.  If this section
of the Code had never been passed by the legislature it
would be necessary for this court to reverse and remand
this cause, should they decide that the same should be
reversed as to penalties.

Appellants in their brief on the suggestion of error con-
ceded that in so far as the question of the division of the
vote is concerned, the liability of the companies is fixed
for two years.  It is true that they contend that on other
points the case should be reversed and argue such points
at length, but the interrogatories propounded show that
this court is of the opinion that there is no merit in any
point of error assigned unless it is Point One, which is
the one having reference to the divergent views of the
judges.

### DISCUSSION OF APPELLANTS' AUTHORITIES.

We will now discuss and attempt to distinguish the
authorities cited by opposing counsel.  We have already
discussed the Mississippi cases, that is the McNutt case,

the Dossett case, and the first opinion in the Brantley case.

Taking up the cases from other jurisdictions cited by counsel, we find they have cited the *Smith case,* 8 L. ed. 130, the *Finnegan case,* 149 S. W. 612, the *Crawford case,* 65 Fla. 1, and the *Pollock case,* 46 S. W. 185. The Crawford case is the only one hopelessly in conflict with the overwhelming weight of authority, and we will point out that this case, as to this point was decided without benefit of argument and brief of counsel as were most of the others.

As to the Finnegan case, counsel misconceives the decision of the court therein, for counsel states: "It held that where a majority of the court votes to reverse, a part of whom constituting a minority of the court to reverse outright, the other part to reverse and remand, it is proper to remand the cause for trial instead of calling in a special judge." Page 14 of the suggestion of error.

In this case four of the members of the court constituting a majority thereof were of the opinion that the facts adduced at the trial below on behalf of the complainant were not sufficient to sustain a verdict against the defendant; there was, however a concurrence of opinion by a majority of the court that this state of facts existed. Three of the members voted to reverse and dismiss the case, but one of the judges was of the opinion that the case should be reversed and remanded and plaintiff allowed to prove if he should be able so to do, whether or not one of the rules of the railway company had been waived by the defendant's acquiescence. This judge together with the other three concurred in holding that there was not sufficient facts in the record to sustain a verdict for the plaintiff. The only disagreement being as to what course the case should take upon reversal, three voting to reverse and dismiss, one voting to reverse and remand, and therefore the cause was reversed and remanded.

Nor is the case of *Pollock* v. *Niccke,* 45 S. W. 185, authority 'for the appellants on this point.   In that case a majority of the court were of the .opinion that the case should be affirmed.   Every intendment is in favor of the validity of the decree on appeal.   The error complained of must be expressly pointed out to the court and a majority of the court must concur in holding that some one assignment of error is well taken.   Let us suppose that with a three judge bench the question of the correctness of an instruction should be urged as error.   Let us suppose that one judge is of the opinion that the case should be reversed and remanded because of the error · complained of. That another member of the bench was of the opinion that the instruction was correct and the third member of the bench that the instruction .was incorrect but that premptory instruction should have been given the appellee.   Certainly under such a state of facts the case should be affirmed because no two would concur in holding that any assignment of error was well taken.   In the Pollock case the court did not hold as contended by counsel:

"That though the judges differ as to the grounds or reasons of their opinion nevertheless when a majority agree that the judgment is right or wrong, this majority controls, although the conclusion is reached as to the particular grounds without concurrence of their minds."

They did not hold that although the judges may differ as to the grounds or reasons, that if .a majority agree that the judgment should be affirmed this majority controls. And necessarily so and this is a· necessary corollary to the rule contended for by us and announced in the three Mississippi cases above quoted; for in the Pollock case, a majority of the court did not agree that any particular assignment of error was well taken.

Counsel also cites as authority for his position, the case of *Smith* v. *U. S.,* 5 Peters, 292, 8 L. Ed. 130, and it is true that· the court announced in that case:   "Although on each of the principal objections relied on as showing error

in the proceedings of the district court, a majority of the members of this court think there is no error, yet the judgment of the district court must be reversed as on the question of reversal, the minorities united and constitutes a majority of the court."

But in truth and in fact this case is not authority against the position contended for by us in the instant case.    In the Smith case there were two principal questions to be determined, it being assigned that the lower court erred first because the United States neglected to enforce its claim against Kingsley, and second, because the court erred in admitting the transcript as evidence and by instructing the jury that it conducted to prove that the defendant was a district pay master.    The opinion of the court proceeds then to hold that both these points are not well taken, holding that the United States did not neglect its claim against Kingsley or rather that the government could not be charged with this neglect, and second, the opinion stated that the court was correct in instructing the jury that the transcript complained of conduced to prove the defendant a district pay master. Although they did reverse and remand the case, the court, however, issued the following instruction to the lower court:

This cause came on to be heard on the transcript of the record from the district court of the United States for the District of Missouri and was argued by counsel; on consideration whereof it is ordered and adjudged by the court that the judgment of said district court be and the same is hereby reversed and that this cause be and the same hereby remanded to the district court for further proceedings to be had therein as to law and justice may appertain, and in conformity to the opinion of this court.

In other words, although the cause was remanded because minorities united on the question of reversal, yet it was remanded to the lower court with instructions to find for the plaintiff on all points.

DID A MAJORITY OF THE COURT CONCUR THAT ANY PAR-
TICULAR ASSIGNMENT OF ERROR WAS WELL TAKEN?

The appellants do not stand on any particular propo-
sition or true standard. For a while they half-heartedly
argue that the rule, as laid down by this court in every
case, from the Bell case on, to the effect that a majority of
the court must concur in holding that a particular assign-
ment of error is well taken before a case can be reversed,
is an incorrect rule. Later, 'on page 18 of their brief,
they beg the question by urging that all of the judges con-
cur in holding that the decree which was rendered was
erroneous. There was never such an assignment. The
first assignment of error is that the court below committed
error in rendering a decree against appellants, and each
of them. (See page 154, Watkins' Original brief.) Did
a majority of the court concur in holding that this as-
signment was well taken? Judges ETHRIDGE, COOK and
HOLDEN were emphatic that the court did not err in ren-
dering a decree against the appellants. Each one of these
three judges held that under the law and evidence a decree
should have been entered against them restraining them
from further violating the anti-trust laws of the state,
and in addition thereto, a penalty should have been as-
sessed.

The second assignment is that the court erred in fail-
ing to render a decree in favor of the appellant; or merely
another statement of the first assessment. These same
three judges, to-wit: Judges HOLDEN, ETHRIDGE and
COOK—again say that this assignment is not well taken
and that the court did not err in failing to render a de-
cree in favor of appellants. The third assignment is that
the decree is unsupported by the testimony. Again, the
same three judges vote that this assignment is not well
taken and there was sufficient testimony to sustain the
decree against the appellant.

The third assignment is that the decree is unsupported by the testimony. Again, the same three judges vote that this assignment is not well taken and there was sufficient testimony to sustain the decree against the appellant.

The fourth assignment of error condemns as unconstitutional section 5002 of the Code of 1906. All judges concurred in overruling this, as a matter of fact, no mention at all being made of it in the opinion. This section is the section of the Code defining trusts.

A fifth assignment of error likewise condemned section 3282 of Hemingway's Code as being violative of the fourteenth amendment to the Federal Constitution. This section makes it unlawful for insurance companies to agree on rates. All judges again concur in holding that this assignment was not well taken.

The sixth assignment of error perhaps might be said to raise the question of laches, this assignment being: "(6) The decree rendered against the appellants, and each of them, but the court below violated the Fourteenth Amendment to the Constitution of the United States, in that the same deprived the appellants, and each of them of their property without due process of law, and denied them, and each of them, the equal protection of the law, by reason of the imposition of cumulative and excessive penalties."

Assuming that under this assignment they raised the question of laches by these words: "The judgment rendered against the appellants deprived them of their property without due process of law and denied them the equal protection of the law, by reason of the imposition of cumulative and excessive penalties;" on this assignment three of the judges, to-wit, Judges SMITH, SYKES and ANDERSON voted that it was not well taken. There is therefore a lack of concurrence on the part of the majority of the court that this assignment is well taken.

Assignments seven and eight again raise constitutional objections to the validity of section 5002, Code of 1906,

and again all judges concurred in holding that they were not well taken. The ninth assignment condemns the decree in that the same violates section 28 of our state Constitution. Again all judges concurred in holding that this assignment was not well taken. Assignments ten to twenty inclusive, all being exceptions to the introduction of evidence, are not material here.

The only assignment under which the question of laches can properly be said to have been raised was on the twenty-first one. That assignment directly raised the question, it being as follows: "The decree as to each of the appellants is excessive."

As Judges SYKES, ANDERSON and SMITH say that laches cannot be imputed to the state, they have therefore concurred in holding that the penalties assessed against these appellants are not excessive and therefore there is lack of concurrence of the majority of the court in finding that this assignment is well taken. The other assignments are immaterial. The court in its *per curiam* opinion in the case at bar states: "The several assignments of error by the appellant companies may be reduced in substance to four, and stated as follows: (1) The court below erred in holding that the companies had agreed, each with the other as set forth in the allegations of the bill. (2) The court below erred in imposing any penalties at all on the companies."

The third and fourth are for the purpose of this brief immaterial. The court then stated: "The question presented by the second assignment of error, as hereinbefore set out, is: "Can the state be charged with laches, and if so, should it be charged therewith here?'" Manifestly the court was correct in holding that a majority had not united in holding any particular assignment well taken.

Under the rule of the supreme court the appellant is required to set out separately and particularly such error asserted and intended to be urged (6th Sup. Ct. Rule). They have done so in this case and on each particular as-

signment there has not been the concurrence of the majority of the court that that particular assignment is well taken and under the authorities, this being so, it necessarily follows that the suggestion of error must be overruled.

ANSWER TO SECOND QUESTION, TO-WIT: In event the decree should be reversed, should the cause be remanded for the imposition of the proper penalties by the court below, or should this court render final judgment and impose such penalties as it deems proper?

The authorities cited by us in the foregoing part of our brief, together with the unanswerable logic of the brief of Mr. Harris and Judge COOPER have convinced us that this together with the third question becomes almost a moot matter. But if we must assume that the case is to be reversed, then it would seem to us by virtue of section 4919, Code of 1906, section 3195, Hemingway's Code, that this court should render final judgment in the cause and not reverse and remand the case to the lower court for imposition of penalties.

The section above referred to reads as follows: "The supreme court shall hear and determine all cases properly brought before it at the return term unless cause be shown for a continuance; and in case the judgment, sentence, or decree of the court below be reversed, the supreme court shall render such judgment, sentence or decree as the court below should have rendered, unless it be necessary, in consequence of its decision, that some matter of fact be ascertained, or damages be assessed by a jury, or where the matter to be determined is uncertain; in either of which cases the suit, action or prosecution shall be remanded for a final decision; and when so remanded shall be proceeded with in the court below according to the direction of the supreme court, or according to law in the absence of such directions." Section 4919, Code of 1906, section 3195, Hemingway's Code.

Under the provisions of the above section there is nothing that can be done by the court below which cannot be disposed of to a better advantage by the supreme court itself.   Every matter of law and every matter of fact has already been decided by this court, as we understand, except the question of the divided vote.   We further call the court's attention to the fact that in so far as the damages are concerned they are fixed for a period of at least two years under any view of the case.   The violation of the law for each and every day constituted a separate and distinct offense against the anti-trust laws, for which a separate suit could have been maintained, and in so far as any penalty accruing within the two-year period is concerned there is no vote to reduce or change the same because of laches.   We, therefore, submit that at all events since liability is established the penalties should be imposed in the supreme court as it will avail nothing to remand the case to the court below.

If the cause were remanded to the chancellor without direction as to the period of time to be covered by his findings he would, in the first place, be bound by the law of the case and in the second place, by his own views of the law as already expressed, and would enter the same judgment as he has already entered.   And if on the other hand, the chancellor is to be directed to reduce the damages on any basis, the damages can be assessed by the supreme court as easily as the directions may be given.

ANSWER TO THIRD QUESTION, TO-WIT:   In the event this court should hold that the decree of the court below should be reversed in so far as it imposes penalties and final judgment should be rendered here, what limitation, on the penalties to be imposed, should the court adopt, that is, the two years as held by Judge HOLDEN, or the six years as held by Judges COOK and ETHRIDGE, or is there another limitation which the court in that event could and should adopt?

All that we have said in regard to question two being in our opinion a moot question applies to this question. But if we have to assume that the case is to be reversed the Code itself supplies an answer to question number two. However, in regard to the third question we can find no such answer contained in the code or in the authorities. If liability is fixed by the vote of the judges and the sole question arises as to what damages shall be assessed, we suggest to the court that none of the judges have voted for less than two years and therefore we cannot see how any period of less than two years can be adopted.

Coming to the position assumed by Judge Holden that is, that appellee should be barred from recovery beyond the two-year period on account of laches, we respectfully submit that if this view is adopted, it would in effect be the imposition of penalties by the vote of one judge when the six other judges who have passed upon the case say that this period of time on which to limit the recovery of penalties is too small.

Coming to the six-year period, we only have two votes for that period, and if we add Judge Holden's vote, three judges out of the seven who have passed on this case would fix the rule although the other four judges say that this is not the true rule.

From all of the authorities and from all of the statutes on the subject we are unable to find any guide which, in our opinion, when tested by the law, can aid the court in a determination of this question. But over and above all is the question as to whether this court will overrule and annul the long line of decisions in Mississippi, and disregard an unbroken line of authority, except for the Crawford case in Florida, and declare that minorities can unite so as to constitute a majority of the question of reversal.

We respectfully submit that the suggestion of error should be overruled.

SMITH, C. J., delivered the opinion of the court.

PER CURIAM.   This is an attachment in chancery under section 536, Code of 1906 (section 293, Hemnigway's Code), by the state revenue agent against about one hundred and forty foreign fire insurance companies and their resident-agents, for the collection from the companies of the penalties provided for violations of the state's anti-trust laws by section 5004, Code of 1906 (chapter 222, Laws of 1910; Hemingway's Code, section 3286), because of an alleged violation of the anti-trust laws by the companies continuously since the 1st day of January, 1908. Some of the questions that arose during the progress of the cause through the court below were decided by this court on interlocutory appeals, as will appear from *Eure* v. *Taylor,* 126 Miss. 155, 88 So. 514; *Aetna Insurance Co.* v. *Robertson,* 126 Miss. 387, 88 So. 883; *Nugent* v. *Robertson,* 126 Miss. 419, 88 So. 895.

The allegation of the bill of complaint setting forth wherein the companies had violated the anti-trust laws is:

That "each of them, appointed the Mississippi Inspection & Advisory Rating Bureau a corporation chartered under the laws of the state of Mississippi, domiciled at Vicksburg, Miss., to declare and fix what was the rate to be paid by the public for insuring property against loss or damage by fire in the state of Mississippi, and that the defendant foreign fire insurance companies, and each of them, entered into and became a party to an agreement and combination with each other and every other fire insurance company in the state of Mississippi to charge the public as the price to be paid for insuring property against loss or damage by fire, in the State of Mississippi, whatever price the Mississippi Inspection & Advisory Rating Bureau should from time to time declare and fix, and that the defendant fire insurance companies did, in pursuance of such combination and agreement, from and after the 1st day of January, 1908, charge the public in the First judi-

cial district of Hinds county, Miss., and throughout the
state, whatever price or premium covering property sit-
uated in the state of Mississippi against loss or damage by
fire, the amount of premium fixed by the said Bureau."

Soon after the suit was begun practically all of the de-
fendant companies withdrew from the state, whereupon an
amended bill was filed by the appellee, setting forth the
withdrawal of the companies from the state, and that they
had instructed their agents to remit to them all money in
the hands of the agents belonging to the companies, and
praying for the appointment of a receiver to take charge
of the effects of and collect all money due the companies,
and to hold the same to await the final decision of the
case. Three receivers were appointed pursuant to this
prayer, and without notice to the agents of the defendant
companies, "to take charge of all the effects, accounts,
choses in action, and all other assets of the defendants to
be found in Mississippi, and to hold the same and to ad-
minister the same subject to the orders of the court." An
order was also made directing the agents to pay to the
receivers all money due by them to the companies, which
order the agents obeyed.

The defendant companies answered the bill and its
amendments, denying that they had entered into the agree-
ment or conspiracy set forth therein. The cause was con-
tinued as to some of the companies, but was submitted as
to the remainder of them on bill, answer, and proof result-
ing in a decree in favor of and discharging some of the de-
fendant companies, on the ground that the evidence failed
to sustain the allegations of the bill as to them, but against
the remaining defendant companies, the appellant com-
panies here, reciting that they "did enter into the above-
mentioned agreements, confederations, combinations, and
understandings on the dates set opposite the name of each
defendant respectively, and did continue in said agree-
ments, confederations, combinations, and understandings.
With each and every other defendant found guilty herein,

from said date up and including December 2, 1920, unless some other date and periods of time be stated below." After setting forth the date on which each of the companies became a party to the agreement, the decree proceeds as follows:

"And the court doth further order, adjudge, and decree that the complainant, Stokes V. Robertson, State Revenue Agent, for the use of and benefit of the state of Mississippi, for the offense aforesaid, do have and recover of each of the defendants the amounts set opposite the names of each of the following defendants respectively, to-wit: [Setting forth again the name of each appellant and the amount of the penalties imposed on it, the smallest being for the sum of one thousand, three hundred and fifty dollars, and the greatest being one hundred and ninety-five thousand, eight hundred and seventy-five dollars, aggregating eight million, fifty-five thousand, seventy-five dollars.]"

The money in the hands of the receivers appointed pursuant to the prayer of the amended bill was directed to be paid by them to the appellee.

After this decree was rendered the agents of the companies, or some of them, filed a motion for leave to file a cross-bill, alleging, in substance, that, since the companies had been adjudged guilty of having formed a trust and combine for the purpose of controlling the fire insurance business in Mississippi, the contracts made by the companies with the agents under which these agents represented the companies in writing fire insurance in Mississippi are void under section 5003, Code of 1906 (Hemingway's Code, section 3285) ; that the money here claimed to be due by the agents to their companies consists of premiums on insurance policies collected by the agents from the holders thereof under their contracts with the companies, and since these contracts are void, this money could not be collected from the agents by the companies, and consequently cannot be collected for them by the

revenue agent in this proceeding, and applied to the payment of the judgments therein rendered against the companies. The prayer of the proposed cross-bill is that the receivers be directed to return to the agents all of the money that had been paid to them by the agents under the order of the court.

This motion was overruled.

The cause comes to us on a direct appeal by the defendant companies who were found guilty in the court below and their agents, and on a cross-appeal by the complainant. The assignment of error in the cross-appeal is that the court below erred in discharging the defendants hereinbefore referred to, with reference to which assignment it will be sufficient to say that all of us concur in holding that there is no merit therein.

The several assignments of error by the appellant companies may be reduced in substance to four, and stated as follows: (1) The court below erred in holding that the companies had agreed each with the others as set forth in the allegation of the bill hereinbefore referred to. (2) The court below erred in imposing any penalties at all on the companies. (3) The penalties imposed are so excessive as to violate the due process clauses of the state and federal Constitutions, and also Section 28 of the state Constitution, which provides that excessive fines shall not be imposed. (4) The court erred in admitting and excluding certain testimony not necessary to be here set out.

The question presented by the second assignment of error, as hereinbefore set out, is: Can the state be charged with laches, and, if so, should it be charged therewith here?

Judges COOK, ETHRIDGE, and HOLDEN are of the opinion that the evidence is sufficient to support the finding of the court below that all of the appellant companies are guilty of having entered into a trust and combine, as alleged in the bill of complaint, except those who are shown by the evidence not to have been members of the Southeastern Tariff Association, to-wit: The Columbia National Fire

Insurance Company, Continental Insurance Company, St. Paul Fire & Marine Insurance Company, Union Insurance Society of Canton, and Fidelity Phenix Insurance Company—that as to those companies the decree of the court below should be reversed, and the bill dismissed.

Judges ANDERSON, SYKES, and SMITH are of the opinion that the evidence is insufficient to support the finding of the court below that any of the appellant companies are guilty of having entered into a trust and combine, as alleged in the bill of complaint, and that the decree of the court below should be reversed, and the bill dismissed as to all of the appellant companies.

Judges ANDERSON, SYKES, and SMITH are of the opinion that the state cannot be charged with laches. Judges COOK, ETHRIDGE, and HOLDEN, are of the opinion that the state can be charged with laches, and should be charged therewith here to the extent that the appellee should not be permitted to collect penalties for the full period of time that the court below found the companies had been doing business under the agreements alleged in the bill of complaint; Judges COOK and ETHRIDGE being of the opinion that he should be permitted to collect penalties for the last six years, and Judge HOLDEN being of the opinion that he should be permitted to do so for only the last two years.

All of us concur in holding that the aggregate of the penalties imposed on each of the appellant companies is not so great as to violate either the due process of law clauses of the state and federal Constitutions, or section 28 of the state Constitution, and, conceding for the sake of the argument that the court below erred in admitting and excluding the testimony complained of, the prejudice, if any, resulting therefrom to the appellant companies is not sufficient to require a reversal of the decree.

It thus appears that a majority of us are unable to concur in holding that there was error in any specific ruling or decision of the court below, except that we all concur in holding the evidence is not sufficient to support the

finding that the Columbia National Insurance Company, Continental Insurance Company, St. Paul Fire & Marine Insurance Company, Union Insurance Society of Canton, and the Fidelity Phenix Insurance Company were members of the alleged trust and combine, from which it follows that as to these companies the decree must be reversed, and the bill dismissed, but as to the other appellant companies the decree must be affirmed. *Browning* v. *State,* 33 Miss. 47.

The assignments of error by the agents of the appellant companies are, in substance, that the court below erred: First, in overruling the motion of the agents for leave to file a cross-bill; second, in appointing the receivers, without notice to the agents; and, third, in directing the agents to pay the money due by them to their companies to the receivers before a judgment had been rendered against the companies adjudging them liable for the penalties here sought to be recovered.

The court below committed no error in overruling the motion for permission to file the cross-bill for two reasons: First, the motion not having been made until after a final decree had been rendered in the cause, came too late; and, second, the proposed cross-bill presents no legal ground for the relief sought by it.

The contracts made by the companies with their agents for the writing of insurance form no part of the agreement as to the rates to be charged for insurance which the court below held had been made by the companies, but are collateral thereto; and such contracts were held valid in *McCall Co.* v. *Hughes,* 102 Miss. 375, 59 So. 794, 42 L. R. A. (N. S.) 63, and *McCall Co.* v. *Parson,* 107 Miss. 865, 66 So. 274, which holding is in accord with the rule of the common law in similar cases. *Connolly* v. *Union S. P. Co.,* 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679; *International Harvester Co.* v. *Smith,* 163 Mich. 55, 127 N. W. 695, 30 L. R. A. (N. S.) 580, Ann. Cas. 1912A, 1022.

The agents of the companies were not entitled to notice before the appointment of the receivers, for they were not appointed to collect debts due the agents, but debts due the companies. These agents, in so far as this question is concerned, were simply debtors of the companies, and it will hardly be contended that all persons who are indebted to a litigant must be notified before a receiver can be appointed to collect the debts that may be due such litigant.

The order directing the agents to pay to the receivers all money due by them to the companies was proper, though made before liability had been adjudged against the companies in order to prevent the agents from remitting the money to the companies, and was affirmed on appeal by the companies in *Aetna Insurance Co.* v. *Robertson,* 126 Miss. 387, 88 So. 883.

COOK, J. The State Revenue Agent exhibited in the chancery court of the First judicial district of Hinds county an original bill of complaint against all the stock fire insurance companies doing business in the state of Mississippi for violations of the anti-trust laws of the state of Mississippi, seeking to restrain the defendants from further violations of these laws, and to recover penalties for such alleged violations. The local fire insurance agents of the defendant companies in the state of Mississippi were made parties defendant to the bill of complaint for the purpose of subjecting to the demand of the complainant any and all sums of money owing by these local agents to any of the defendants, and on final hearing a decree was entered discharging all the reinsurance companies and certain direct writing companies which had not subscribed for or purchased the rates of the Mississippi Inspection & Advisory Rating Bureau, and also awarding judgment against such of the defendants as had subscribed for the rates of said bureau, the penalties assessed against such defendants being imposed from the date each company entered the state of Mississippi and subscribed for the rates of said bureau, and being fixed at two hundred dollars per day

from June 15, 1908, up to the time of the passage of chapter 222 of the Laws of 1910, in which the minimum penalty was reduced to twenty dollars per day, the penalties thereafter being fixed at twenty-five dollars per day, and from the decree assessing these penalties defendants have prosecuted an appeal, while the complainant has prosecuted a cross-appeal from the decree discharging other defendants.

The bill of complaint as amended charged that, on or about the 1st day of January, 1908, and since that date, the insurance companies named in the bill, and each of them, did enter into and become a party to an agreement and combination with each other to regulate and fix within the state of Mississippi, and the First judicial district of Hinds county, the price or premium to be paid for insuring property located therein against loss or damage by fire, and that such agreement and combination constituted a conspiracy to defraud, and was and is contrary to the provisions of chapter 145, Code of 1906, and the amendments thereto, and had the effect and did injure the insuring public of the district, county and state. The bill further charged that this combination and agreement was carried out in the following manner, to-wit:

"That each and every insurance company did appoint and authorize the Mississippi Inspection & Rating Bureau, a corporation chartered under the laws of the state of Mississippi, with its principal place of business at Vicksburg, to declare what was the rate to be paid by the public for insuring the above-mentioned property against loss or damage by fire; that said insurance companies, and each of them, did enter into and become a member of an agreement, combination, and understanding with each and every other insurance company to charge the public as the price to be paid for insuring the said property whatever price the said bureau should declare; that said bureau would from time to time declare what price or premium should be paid by the public to the said insurance companies for insuring said property, which rate

or premium was that which had been previously agreed upon by the said insurance companies, and complainant here charges that said rate or premium was so agreed upon in advance by said insurance companies before being promulgated by said bureau; that said insurance companies, and each of them, have daily since the 1st day of January, 1908, throughout the state of Mississippi, issued policies and collected premiums thereon, which premiums were those as promulgated by the said Bureau in conformity with the said agreements, combinations, and frauds."

The bill as amended further charged that:    ,

"Said insurance companies, and each of them, did enter into and become a member to an agreement, understanding, and combination with each and every other insurance company to maintain the price or premium to be charged for insuring the said above-mentioned property within the said district, county, and state, and throughout the said state, after the price to so insure had been promulgated by the said bureau, and each and every insurance company has daily, since on or about the 1st day of January, 1908, maintained the said price or premium to so insure said property in said district, county, and state, and throughout the state, as promulgated by the said bureau in pursuance to said agreement, combinations, and conspiracies to defraud."

The bill further charged that each of the said insurance companies did agree with the others to place the control of their business of insuring property within the First judicial district of Hinds county, Miss., and throughout the state, in the power and control of the Mississippi Inspection & Advisory Rating Bureau to the extent of fixing the price or premium to be paid by the public for insuring property within the state, and, further, that the said insurance companies had agreed one with the others that persons other than their proper officers, agents and employees, to-wit, the Mississippi Inspection & Advisory

Rating Company, should dictate and control, and have power to dictate and control, the management of their business in the matter of fixing the price or premium to be paid for insuring property throughout the state of Mississippi; and, further, that the said insurance companies, and each of them, did enter into an agreement and combination each with the others to maintain the premiums to be charged for insuring property throughout the state, after the price or premium to so insure had been fixed by the said bureau, and that each and every defendant insurance company has daily, since the 1st day of January, 1908, maintained the price to so insure Misssisippi property as fixed and determined by said bureau in pursuance to said combinations, agreements, and conspiracies; and, further, that each and all of the said combinations, agreements, and conspiracies, and all acts done by the defendant companies in pursuance thereto, were and are inimical to the public welfare, unlawful and criminal conspiracies, and did destroy competition in the matter of insurance rates to be paid by the public throughout the state of Mississippi.

The amended bill further charges that each of the said defendants did become a party to an agreement, combination, and conspiracy, each with the other, on or about the 20th day of December, 1920, in that they, and each of them, did combine and agree each with the other to cease further writing of policies of insurance throughout the state of Mississippi, and that on or about the 20th day of December, 1920, and in pursuance of the said conspiracies, each of the said defendants did cease writing fire insurance throughout Mississippi, and that since said date said defendants have written no policies of insurance within the state of Mississippi.

The bill prayed that each of said defendants be penalized for violating the anti-trust law, and that they be restrained and enjoined from further continuing and maintaining the conspiracies set forth in the bill.

The answer of the defendants was a direct and comprehensive denial of each and every charge of combination, conspiracy, or unlawful agreement charged in the bill of complaint, and a denial of every charge of wrongdoing or violation of law therein contained, as well as a denial that they had entered into any agreement, or done anything, which was inimical to the public welfare, which was unlawful, or a criminal conspiracy, or that they had ever, at any time, destroyed competition in the matter of rates to be paid by the public for insuring property against loss or damage by fire. After separately denying the various charges contained in each paragraph of the amended bill of complaint, the denials of the answer are summarized by a denial in one paragraph of all charges and allegations in the bill of complaint and amendments thereto, charging them or any of them with any combination, agreement, or conspiracy, either expressed or implied, with each other, or with any other insurance company or insurance companies in Mississippi or elsewhere, to fix the rates of premium or price to be paid within the state, or at any other place, for insuring property against loss or damage by fire, or agreeing to accept the rates fixed or declared by the Mississippi Inspection & Advisory Rating Company or any other party whatsoever, or to place the control or the power to dictate and control or manage their business or the business of any of them to any extent in the power of the said rating bureau or any other company or any other party than themselves, their proper officers, agents, or employees, or to cease writing insurance and issuing policies in the state of Mississippi, or to cancel policies, or to create a monopoly, or to do any act in restraint of trade or any other act inimical to the public welfare or violative of the laws of the state of Mississippi. The answer of defendants then contained the following statement:

"Defendants admit that the rates and premiums charged by them in Mississippi were substantially uniform as to such risks or property which each undertook to in-

sure against loss or damage by fire or otherwise, but the defendants aver that the fact that the rates were thus practically and substantially uniform arose not by reason of any agreement, combination, or conspiracy whatsoever among them, or with each other, or with any party whatsoever, to fix rates or premiums, but from the necessities and exigencies of conducting their business efficiently and economically for the benefit of the insuring public, as well as themselves.

"Defendants would show that rates and premiums charged for insurance, to be reasonable and fair, must be more or less uniform; in other words, that what is a reasonable rate for one insurance company must necessarily be a reasonable rate for all other insurance companies acting under similar circumstances and conditions, and therefore uniform. Long experience has shown that uniformity of rates is essential to the proper conducting and carrying on of the business of fire insurance, as it is for all other kinds of business which affect the public generally."

The answer of defendants then set up affirmatively that some of them—in fact, most of them—during the time they had done business in the state of Mississippi had subscribed to or made contracts with the said Mississippi Inspection & Advisory Rating Bureau to furnish them or their agents in Mississippi from time to time with rates and other information pertinent to and which might be of assistance to defendants in fixing reasonable and fair rates for insurance; that said rating bureau was incorporated under the laws of the state of Mississippi, and was authorized by its charter as follows:

"To inspect risks, classify and promulgate advisory rates of insurance for the public on all classes of property subject to insurance, both fire and marine, and to suggest a proper means of construction and maintenance and protection to buildings so as to prevent as far as possible waste from fires, and to reduce the price of insurance on same for the benefit of all parties interested; and for said

purpose shall be authorized to print and sell in printed form rates and suggestions so made and to otherwise charge reasonable fees for its services."

The answer further averred that the Advisory Rating Bureau was incorporated in 1903; that it was not an insurance company in any sense; that it was not organized, or suggested, or controlled, now or at any time, by the defendants, or any of them; that none of the defendants have any interest in said company as stockholders or otherwise; that the defendants, and none of them, in any way, or to any extent, control the Advisory Rating Bureau, and that said bureau does not, to any extent, control the defendants, or any of them, in the matter of their business carried on in the state of Mississippi, but that each of the defendants, acting independently, use these rates, and that in using the advisory rates of the rating bureau such of the defendants as did use them acted independently, and the use of the rates was purely advisory. The answer then contained the following statement:

"Defendants would show that the rates advised by said Advisory Rating Company are not provided alone for the benefit of the defendants or other insurance companies, but are provided for the general public; in other words, for all parties interested. Defendants are informed and believe, and so charge the fact to be, that the primary purpose of the establishment of the said rating company was to protect the public against unjust discrimination in rates, and to prevent, as far as possible, waste and expense, and to reduce the price of insurance to all parties interested to its actual value. In other words, the primary purpose of this rating company was for the protection of the insured, and for the purpose, as far as possible, of providing for just, reasonable, and uniform rates under similar conditions, and that the services of said rating company are to a large extent used by the public, the insured, and have been largely instrumental in harmonizing the dealings of the insurance companies, your defendants, with the insured, and reducing rates and lessening risks."

131 Miss.—25

The defendants then alleged that the amount of insurance that can be written on any particular risk by any one of them is limited in amount, and that, in a large number of cases, in order to give the proper protection to a particular piece of property, it becomes necessary for two or more insurance companies to write insurance on the same property, and in many cases the insured enlisted the services of the said rating bureau to determine for them what the rate should be, and to advise them how their property should be provided with proper fire protection in order to secure the lowest rate, and that it was the general custom throughout the state of Mississippi for the insured to demand of the defendants the rates advised by the rating bureau; that, in order to meet the requirements of the insuring public, it was necessary for the defendants to use the rates and information furnished by the said rating bureau, and that their rates should be practically uniform, but that this was due to the necessities of the case, and not to any agreement or conspiracy on the part of defendants to use the said rates or have uniform rates.

The answer then averred that experience had shown that the said rating bureau was reliable and efficient, and that rates advised by it were just, reasonable and fair; that it was not practicable, except at great expense, for them to employ each its own experts to determine the character of the risk and the rate to be charged, and that such practice would tend to confusion, uncertainty, inequality of rates, waste, and useless expense to them and to the public; that the use of the rates promulgated by the said rating bureau had given general satisfaction to the public; that the fact that the agents of many of the defendants throughout the state of Mississippi have been using rates advised or information given by said rating bureau has resulted in practical and general uniformity of rates, but that the use of these rates by them or their agents was not by reason of any agreement, combination, or conspiracy on their part to fix rates or the price to be

paid for insurance; that they were acting at all times upon their independent judgment, for the purpose of adjusting their rates to a fair and proper standard, and stabilizing, as far as possible, the insurance business, and giving the public the protection for which it paid at a fair and reasonable price.

The answer further averred that during all the years that they had been in business in the state their practice and methods of doing business with the public had been without concealment on their part, but were well known to the public generally, and to the officers of the state, and especially to the Insurance Commissioner; and it also contained the following statement:

"Defendants would show that the Insurance Commissioner is clothed by the statute with broad and sweeping powers to investigate the affairs of all insurance companies, and to issue and revoke licenses of all insurance companies guilty of any violation of any of the laws of the state of Mississippi obligatory upon them; that through all these years the Insurance Commissioner knew and approved the use of uniform rates of insurance companies insuring property in the state of Mississippi, and approval of the use by them of the rates and information furnished by the rating company; that the rates charged by the defendants and their method of business and their practices were known to the Insurance Commissioner, and were known, or could be known, to the public generally, and that at no time has the Insurance Commissioner objected to the defendants using uniform rates or using rates furnished by said rating company, which rates were on file in his office."

The answer also contained the following allegation:

"The defendants aver that in the use of the rates and information furnished by the Mississippi Rating Bureau, and the endeavoring to have their rates fair, just, and reasonable, they were at all times on their own initiative and their own judgment in the conduct of their business, as they had a perfect right to do, and the defendants aver that

to deny them the right to .use the rates furnished by the said Advisory Rating Company, or any other company, or the use of such information as they could obtain in the fixing of just and reasonable rates while the said rates were sold under the authority of the state of Mississippi, and were purchasably by and available to the public generally, and to subject the defendants, or any of them, to cumulative penalties for all the years mentioned in the bills of complaint, or to any penalty, for carrying on their business in the manner in which they were conducting it, with the sanction of the officers of the state, the Insurance Commissioner, clothed with special powers and the duty to enforce, as to the defendants, any and all of the laws of the state of Mississippi obligatory upon them, and to revoke their licenses, would be against good conscience, unreasonable, unjust, and grossly oppressive to your defendants, and would also be violative of the Constitution of the United States, in that it would be depriving your defendants, and each and every one of them, of their liberty and property without due process of law, and to deny to them, and to each of them, the equal protection of the law."

The answer of defendants admitted that they had ceased to write fire insurance in the state of Mississippi, but denied that such action was taken in pursuance of any agreement, understanding, combination, or conspiracy with each other or among themselves for the purpose of monopolizing, or tending to monopolize, the insurance business in the state of Mississippi, or any part thereof, but that such action upon the part of the defendants as had been taken was done independently, and on behalf of each company on its own independent judgment and discretion, and not as the result of or in pursuance of any combination, understanding, or agreement among the said defendants, or any of them, that they would cease to write insurance, or to cancel policies already issued, in the state of Mississippi.

The reinsurance companies likewise filed a joint and separate answer, in which each and every charge of agreement, conspiracy, combination, or wrongdoing was specifically denied; and, in addition thereto, the reinsurance companies, defendants, alleged that they did not enter into or make any contract of insurance in the state of Mississippi; that they had at no time been engaged in business in the state of Mississippi; that all of their transactions were with insurance companies, and took place outside of the state of Mississippi; the allegation in respect thereto being as follows:

"Your defendants would show that they have no agents in the state of Mississippi except such as they are required by the law of the state of Mississippi to have for the service of process, but they have no agents engaged in the state of Mississippi, and never have had any, writing policies of insurance or collecting premiums; that all of their transactions are with the insurance companies, and all take place out of the state of Mississippi; that they have nothing whatever to do with the fixing of rates or premiums to be paid for insuring property in the state of Mississippi; that they have no connection with or never had any connection with the Mississippi Advisory Rating Bureau, or any other rating company, by contract or otherwise; that they have taken out licenses as other insurance companies in the state of Mississippi, but that was owing to the fact that they were required to do so by the laws of the state, for the reason that they were dealing with insurance companies which issued policies upon property situated in the state of Mississippi."

Within the limits of this opinion it is impracticable to make a detailed statement of all of the testimony contained in the thirty-five bound volumes of the record, as well as the numerous and voluminous original depositions and exhibits filed in this court. Many of the facts which we consider important and controlling in the decision of this cause are undisputed, and the facts necessary to be here stated may be summarized as follows ·

In the year 1882, there was organized in the state of Georgia an association of fire insurance companies known as the Southeastern Tariff Association, the purpose of which was "to organize and maintain local boards and to establish and enforce adequate rates." This association adopted and promulgated a "tariff of rates," as well as a schedule of uniform commissions of local agents, to be applied and enforced in the territory included within the jurisdiction of the association. The members of this association bound themselves by agreement to observe and enforce the rates adopted and promulgated through this association, and since that date rates agreed upon and adopted by the insurance companies have been used and enforced within the territory served by this association. The jurisdiction of this association was extended to include the state of Mississippi in July, 1890, and from that date to the year 1900 these agreed rates of the insurance companies were used and enforced in the state of Mississippi through the medium of the Southeastern Tariff Association. Prior to the year 1900, there was instituted in the courts of the state of Mississippi certain litigation charging this association with violations of the anti-trust laws of the state. In the year 1900 certain additional antitrust legislation was enacted by the Mississippi legislature, and thereafter, in settlement of the litigation against it, this association entered into an agreement with the attorney-general to withdraw from Mississippi, and pursuant to this agreement it retired from the state during the year 1900.

After the withdrawal of the Southeastern Tariff Association in 1900, and until the Mississippi Inspection & Advisory Rating Bureau began operations in 1906, the local agents in Mississippi had no rates except records of former policies issued, the specific ratings, the schedules, rules for construction, etc., previously furnished and still remaining in their hands, and also the schedules of the Southeastern Tariff Association occasionally distributed among the local agents by individual insurance companies,

and, since there was no system in force for the enforcement
of rates, there was no uniformity of rates in Mississippi,
and the condition prevailing during that period in ref-
erence to rates is described by the witness Weille as
chaotic.

It appears that the idea of inspection bureaus for states
in which compacts were prohibited was first conceived by
the Southeastern Tariff Association in the year 1901, as
shown by a resolution adopted by the association providing
for the organization of such bureaus in noncompact states,
but providing that such work should not be undertaken
in Mississippi until allowed by the officers of the law. In
1903 A. A. Weille, of Vicksburg, Miss., and three other
citizens, obtained a charter of incorporation from the
state of Mississippi for the Mississippi Inspection & Ad-
visory Rating Bureau, the purpose for which this cor-
poration was formed being stated therein to be as follows:

"Section 2. The purpose for which said corporation is
formed are as follows:  To inspect risks, classify and pro-
mulgate advisory rates of insurance, both fire and marine,
and to suggest a proper means of construction and main-
tenance and protection to buildings so as to prevent as
far as possible waste from fires, and to reduce the price
of insurance on same for the benefit of all parties interest-
ed; and for said purposes shall be authorized to print and
sell in printed form the rates and suggestions so made and
to otherwise charge reasonable fees for its services."

Although this rating bureau was organized by Mr.
Weille in 1903 he secured no subscriptions from insurance
companies for several years.  On September 15, 1906, in
response to an inquiry addressed to him by the Insurance
Commissioner, the attorney-general gave it as his opinion
that information compiled and printed by the said rating
bureau could not be construed into a violation of the Miss-
issippi statute against trusts and combines, unless there
was some combination, contract, understanding, or agree-
ment, expressed or implied, among the companies, either
directly or indirectly, or through the medium of the

rating bureau, or between the companies so purchasing and the rating bureau, to adopt and use the rates and data so purchased as an agreed basis upon which the cost of insurance should be regulated, and that, as long as there was no such agreement by which the price of insurance should be controlled or regulated, the transaction was a legitimate one, and in no way inimical to the public welfare.

A copy of this opinion was furnished each fire insurance company doing business in the state of Mississippi, and thereafter a large number of them subscribed for the rates and services of this rating bureau, the first subscription being obtained in October, 1906, the contract between each insurance company and the rating bureau providing that, in consideration of one per cent. of the gross premiums in Mississippi, the rating bureau agreed to furnish to the insurance company and its agents all its advisory rates to be made upon property in Mississippi, and that it was expressly understood that there was no obligation, express or implied, direct or indirect, upon the part of the subscriber to observe or maintain the rates.

This contract between the rating bureau and the insurance companies did not call for general basic schedules, but only for specific rates, and from 1906 until about August, 1908, only specific rates on particular property were furnished by this bureau to local agents and subscribers, and these specific rates were based principally upon schedules of the Southeastern Tariff Association and the Louisana Fire Prevention Bureau, the schedules of the Louisiana Bureau being practically identical with those of the Southeastern Tariff Association. A basic schedule is a division of the fire risks into classifications with a basic rate, together with the charges for deficiencies which tend to increase the hazard, and with credits for improvements or standards of construction which lessen the hazard; and the basic rate entering into the preparation of the schedule is made up of the fire hazard, which is scientific, and also all expenses and contem-

plated profits.  A specific rate is arrived at by a simple application of the basic schedules to a particular piece of property and this involves a mere inspection and application of the fixed charges to the condition and location of the property.

On January 1, 1908, the Southeastern Tariff Association issued a revised book of basic schedules, which contained rules for construction, rules for classifying towns, classifying and inspection of buildings and manufacturing establishments, all kinds of rules and forms used or required in carrying on the fire insurance business, and a division of property into classes, such as dwellings, mercantiles, cotton risks, refineries, cotton seed oil mills, etc.; the book containing some five hundred classifications with a basic rate, each including charges for deficiencies and credits for improvements or high or improved standards of construction.

About June, 1908, the Mississippi Inspection & Advisory Rating Bureau, acting through its secretary, applied to the Southeastern Tariff Association to purchase copies of their basic schedules for 1908, and the association, acting through its secretary, refused to sell the books or schedules to the Mississippi Bureau.  Thereupon, on June 10, 1908, the Mississippi Bureau entered into a contract with the Lester Printing Company, a publishing house which had originally printed the 1908 book of schedules for the Southeastern Tariff Association, to print for the Mississippi Rating Bureau one thousand copies of these books for which the said rating bureau paid one dollar per volume.  When these books were delivered to the office of the rating bureau at Vicksburg it first had printed all of the amendments to the schedules which had been adopted by the Southeastern Tariff Association since the original publication of the book, and attached all of these amendments to the book.  It then cut out of these books clause 4 on page 2 thereof, which reads as follows:

"Any agent who shall write, place or cause to be placed a risk, or who shall bind or issue a policy, at less than the

rates herein authorized, or in violation of these rules, will be required to cancel the same and will not be permitted to write on said property for one year thereafter."

These books were then numbered, and upon the flyleaf of each of them was stamped the following:

"This book is the property of the Mississippi Inspection & Advisory Rating Company, of Vicksburg, Mississippi, and same is loaned subject to recall, as general information on standards for construction, equipment and protection. The contents of this book must be considered as advisory information only, and no part of the book shall be considered as obligatory or binding on the part of any one. [Signed] Mississippi Inspection & Advisory Rating Company, Vicksburg, Mississippi.

One of these books was then furnished to each local agent in Mississippi, and a copy furnished to the home office of each insurance company which was a subscriber to the said rating bureau, the book being identical with the book of schedules and amendments of the Southeastern Tariff Association, with the exception of the stamp on the flyleaf, the number, and the paragraph cut out of page 2 thereof. The local agents were required to sign a receipt in the following form:

"Number ——. Copy of Standards for Construction and Equipment," issue of January 1, 1908, has been received. The book shall be considered as containing advisory information, and will be held subject to recall, it being understood that same is not transferable, nor obligatory."

It further appears from the evidence that the rating bureau never at any time contracted to furnish schedule rates to the insurance companies, and that this bureau was not able to make schedule rates; that it did not and could not make basic rates, but adopted and applied the Southeastern Tariff Association schedules and rates bodily, and these basic rates were sold to the appellants, who had been, and were then, using these rates by agreement elsewhere; that, after the rating bureau distributed the Southeastern Tariff Association's schedules, the insurance companies

furnished their agents with no other rates except these schedules and the specific rates which were made by application of these Southeastern schedules to particular property; that when policies were received at the office of these insurance companies the rates were checked by the Southeastern Association's schedules, which had been adopted and promulgated by the rating bureau for use in Mississippi; that from time to time the Southeastern Tariff Association adopted amendments to its schedules, many of which were adopted in whole or in part by the rating bureau at the same time or shortly thereafter; that in the year 1918 the Southeastern Tariff Association, or the Southeastern Underwriters' Association, as it was then called, issued a new book of schedules, while shortly thereafter—that is to say, in the early part of 1919—the rating bureau also had printed a new book of schedules; that, while this book differed in some material respects from that previously issued by the Southeastern Tariff Association, it was based upon and largely copied from the book of the Southeastern Association.

It further appears that the 1908 schedules of the Southeastern Tariff Association, which had been prepared in the councils of the insurance companies by agreement, were applied by the rating bureau in specifically rating property in Mississippi, and, as fast as these specific rates were made, they were furnished to the local agents in Mississippi and to the companies; that a local agent, writing a policy of insurance, would deliver the policy to the assured, and forward to the home office of the company what is known as a daily report; that this daily report contained the amount of insurance carried, the total premium, the name of the assured, the location of the property, the occupancy, the material of which the building was constructed, and other relevant facts to enable the officer of the company who examined the risk at the home office to locate the property on the map and to compare the rate with schedules and specific rates in the possession of the company; that the schedules in the possession of the companies, and with

which these daily reports were compared, were the schedules of the Southeastern Tariff Association, and the specific rates in their possession were rates made by an application of the same schedules; that, in writing policies on property that had not been specifically rated by the rating bureau, the local agents directly applied the schedules to the specific risks, and the same were checked as to correctness by the companies with the book of schedules in their home office; that, when the daily reports of policies from Mississippi were checked with the schedules and the rating bureau's specific rates, as a rule, if the policy was written at a rate less than the rating company's rate, the insurance company required the rates to be raised to the rating company's rates, or the policy canceled.

It further appears that, from and after 1908, the specific rates made by the rating bureau by the application of the Southeastern Association's schedules were used with practical uniformity. Witnesses Yerger, of Jackson, Bourgeois, Roberts, and Miss Benthal, of Canton, and Becker, of Brookhaven, all testified that the only rates furnished them by the companies they represented were the rating bureau's rates; that they had to have rates to go by, and were not capable of making rates themselves; that the rates furnished by the rating bureau were purely advisory as to them, and that in the use of these rates they acted upon their own independent judgment; that they never received any direct instructions from the companies to enforce the rates of the bureau, but that they considered these rates fair rates; that they sometimes corrected a rate where it was apparent that the rating bureau had made an error—that is to say, had charged against a risk a deficiency which did not exist, or failed to credit it with one that had been removed—but that usually they followed the rates of the rating bureau; that when they wrote policies the rates were checked at the home office of the company, and that, as a rule, if policies were not written according to the rating bureau's rates, and the variation was not satisfactorily explained to the company, they would be required to either

cancel the policy or obtain the schedule rates thereon, and it was agreed in the record that all the other local agents in the state who were not introduced as witnesses, several hundred in number, would testify, in substance, to the same facts as testified to by these five witnesses.

Mr. Yerger, of Jackson, a witness for appellee, testified that he never received any direct instruction from any of his companies to enforce the rates of the rating bureau, but that he wrote all of his business at these rates, unless the property was entitled to a correction.

F. V. Becker, of Brookhaven, testified as follows:

"Q. Did they take any of your business or did they ever take off from your books any business through that sort of method? A. I have lost several policies that way, I think. Q. Did you find it out as a fact? A. In one case I did; yes. Q. What did you do in that case? A. Nothing; I let it go. Q. Did you say anything to your companies about it? A. No, sir; the fellow was a friend of mine, and I knew if I made him pay a higher rate he would always have it in for me, so I let it go. For that matter, it might have been an error; but it was not any of my business. It might not have been cutting a rate."

Mr. Bourgeois, a witness for appellee, testified as follows:

"Q. So far as you know has any policy ever been written and taken out of your office because some agent cut the rate? A. I have been told that by others on several occasions. Q. Did you make any complaint? A. I could not get the specific names of the company that it was written in, and the particular rate that it had been written at, but I was told by the assured in several cases. Q. What would you have done if you had gotten the information? A. I would have taken it up with the companies and tried to have it corrected? Q. What companies? A. The companies that lost that business. Q. The companies that you represented would have taken it up with the other companies? A. Sure; that is all I can do. Q. State whether or not it is considered inethical in the insurance business

to absolutely cut a rate?   A. It is considered inethical."

B. L. Roberts, of Canton, a witness for appellee, testi-
fied as follows:

"Q. But is it your custom to complain to some general
agent of one of your companies or to your company when
a rate has been cut and you know it?   A. No; first I take
it up with the agent.   Q. Who is that; the local agent?
A. Local agent whom I had reason to believe at the time
had made such rate.   I take it up with him on the basis
of his possibly having made an error in his making up of
the rate, because all agents who have any intelligence what-
ever know that a case of plain, simple cutting in order to
get business, because they know for themselves it would
be suicide so far as their business is concerned.   Q. Is it
not a fact that it is considered wrong to do that among
some agents, and inethical?   A. It is ridiculous and un-
businesslike, and it is from that point of view that I would
not do it."

Miss Maggie Benthal, a witness for appellee, testified
as follows:

"Q. State from what source you obtained your rates for
your companies.   A. From the rates of the rate book.   Q.
What rate book?   A. Mississippi Advisory Rate Book.   Q.
Did you follow those rates?   A. I followed them as well as
I could; sometimes I stuck to them, and sometimes I
didn't.   Q. In case you didn't, was it by error or by judg-
ment?   A. Yes sir; by error, I reckon; I never did profess
to be a professional insurance agent.   Q. You always fol-
low the rates as near as you could?   A. Yes; I did follow
them as well as I could.   Q. You never cut a rate purpose-
ly?   A. No.   Q. It is considered inethical to cut a rate, is
it not, in agents?   A. I do not know that it is considered
inethical.   Q. It is looked on as bad, is it not?   A. I do not
know that it is looked on as bad; the companies would
check the rates over closely, and sometimes an agent gets
by with a rate and sometimes he don't.   Q. When the com-
panies catch up with them, what do they do?   A. They
might call for an adjustment of the rate.   Q. From whom;

who adjusts the rate?  A. I would.  Q. How would you do that?  A. Just take it up with the assured, and tell him that I would have the company's rates."

R. H. Shackleford, insurance agent and witness for appellee, testified as follows:

"Q. How did you know to go by the book?  A. I dare say after our appointment we received the book from the Advisory Rating Company, and—I will have to search my memory; I know that I have always known we had to follow rates of that kind, that is, the advisory methods of rating buildings in this state.  Q. Have you received instructions at all from your companies with reference to rates?  A. Well, several times I made mistakes in getting the rates, in adding certain charges, and in deducting certain charges.  Q. What happened then.  A. They informed me I must have been mistaken in using a certain rate when making reductions or making certain charges for such things as shown on the map.  For instance, I failed to show a garage and show the proper charge for that garage exposure.  Q. In that event, what was your duty?  In that event, I would add the additional amount, and correct it, and collect from the insured."

L. A. Smith, a witness for appellee, and a former local agent of some of the appellants, testified as folows:

"Q. When if you found one your competitors cutting rates, what would you do?  A. I would sometimes go to the competitor, and tell him he was cutting the rate, and ask him to correct it, or I would complain to the company that lost the business.  Q. What would happen when you did go to the competitor?  A. Well, sometimes it would be redressed, and sometimes it wouldn't.  Q. When it wouldn't be, it would be on what grounds usually?  A. On the ground that the rate was justified.  Q. What do you mean by justified?  A. That some deficiency had been corrected in the schedule, justified reduced rate, and that I didn't know anything about it.  Q. When you would complain to the agent of your own company, who lost the business—to the agent of the company, the special agent, or whoever you

complained to, of the company who lost the business—
that some agent cut a rate, what happened then? A. Some-
times the other agent would advance his rate to the cor-
rect rate, and sometimes I never did find out what hap-
pened. Sometimes the assured would get disgusted on ac-
count of being compelled to go back to the higher rate,
and give me back the business, and sometimes I never did
find out what happened. Q. I will ask you this: Was your
course of business the same with reference to all companies
through the entire time you were in business? A. My
course of business with reference to making rates? Q.
Your method of business yes; with reference to making
rates? A. My course of business was the same from start
to finish; but I never made a rate."

Mr. A. Johnson, of Clarke county, a former member of
the board of supervisors of Clarke county, testified that
while he was a member of the board of supervisors the
board decided to advertise for bids for insurance on the
county courthouse; that Mr. Terral, a local insurance agent
at the county seat, told him it would do no good; that the
bids would all be for about the same; that the board did
advertise for bids, and received one bid at a cheaper rate
than the others; that when the bids were read out Mr.
Terral, the local insurance agent, charged that the agent
filing the lower bid was giving the county a portion of his
commissions, and stated that it was a violation of the law,
and that he was going to have him indicted, and that the
policy, if issued, would be canceled; that the policy issued
at the lower rate was canceled, and thereafter the agent
who secured the business placed the policy in the company
represented by Col. Street in Meridian; that Col. Street
told the witness that, if the board of supervisors let it
be known about the cut rate, the policy would be canceled;
that he was instructed by Col. Street to keep the matter
quiet, and in order that no one would find it out, the pol-
icies were left in the custody of Col. Street; that when this
policy expired the board again advertised for bids, and
awarded the insurance to the same agent who had secured

it before; that this agent suggested to the board not to let the other agents see the policies, and to instruct the clerk of the board not to show them, stating that, if the other agents found out what companies the insurance was in, the policies would be cancelled.

Mr. E. O'Brien, president of the Jackson Lumber Company, a witness for appellee, testified that at one time he gave his entire line of insurance to the agency of Nugent & Pullen in consideration of a rate different from the established rate or the rate that was advised by the rating company; that after a lapse of eight or ten months Mr. Nugent, of the firm of Nugent & Pullen, informed him that he could not carry the insurance any longer at that rate; that he would have to cancel out or increase his rate to the established rate of two dollars and eighty cents or two dollars and ninety cents, as pressure had been brought to bear so strongly upon his company that they were demanding that he either cancel or increase his rates.

Hamilton Sivley, a witness for appellee, testified that the only rates given him were the rates of the rating bureau, and that these rates were not advisory, as far as he was concerned, but the use of them was obligatory, and that, whenever he tried to cut the rate, the rate was invariably raised by the companies he represented to the rate of the rating company.

Mr. A. D. Galloway, a witness for appellee, testified that his companies were all board companies, and that the board companies required the agents to adhere to the rules and rates of the rating bureau.

Mr. Fred Nelson, a witness for appellee, and local agent for some years for a number of the appellants in Jackson, testified that in 1915 the rating bureau changed term policies by requiring the policy holder to pay two and one-half annual premiums for a three-year policy, instead of two, as formerly, and requiring the policy holder to pay four annual premiums for a five year policy, instead of paying three annual premiums therefor, as formerly; that the anticipated slip making these changes was sent to

131 Miss.—26

the agents in Jackson just about the time that, under the rating company's rules, the city was to be raised from a second to a first-class city, which would entitle all the property in the city to a big reduction, and that the local agents of Jackson wrote to the rating bureau asking permission to withhold this increase in term rates until the city went under the first-class classification.

Mr. A. A. Stone, a resident of Bentonia, and witness for appellee, testified that in 1919 he took out a policy of insurance with Barnwell & Barber, local agents at Yazoo City for some of the appellants; that he made complaint to Mr. Barber in reference to the amount of the premium charged him on this policy, and asked if the rate was not exhorbitant; that Mr. Barber admitted that he had some grounds for complaint, but stated that the policy was written at the correct rate for one year, and that he had no authority over the rates, but had to use the rating company's rates on these policies.

Mr. W. C. Wilkinson, a citizen of Jackson, testified that in 1920 he applied to Mr. Isadore Dreyfus, a local insurance agent of some of the companies, for a policy of insurance on a dwelling in the city of Jackson, and that he was quoted a rate which he thought was excessive; that he discovered they were charging him for a deficiency which did not exist, and that he requested Mr. Dreyfus to inspect the property and reduce the rate; that Mr. Dreyfus did inspect the property, and stated that he believed the witness was right, but that he had nothing to do with rates; that the rates were fixed by a concern in Vicksburg, and the agents simply adhered to the rates that were furnished them; that he then applied to Mr. Yerger, a local agent, and was quoted about the same rate as that quoted by Mr. Dreyfus; that he told Mr. Yerger he believed he could get a better rate, and that Mr. Yerger replied that he could not do so, and, if he did, the policy would not be accepted, but would be canceled.

Mr. Thad B. Lampton testified as follows:

"Q. Have you ever attempted during that thirty years to find out if you could get a cheaper rate from one agent than you could from another? A. Oh, yes. Q. Have you ever been able to do it? A. Yes. Q. What companies were they that gave you the cheaper rate? A. They have not done that so much lately. Well, in the later years the rates have been the same—practically the same. Q. How long has it been since you were able to get any competition in the matter of rates? A. Well, I could not get them locally; I would have to do that through other agents. I must say I have been able at different times to get some lower rates, but we had to keep those things more or less confidential."

Mr. J. C. Hood, a local agent for many of the appellants, testified that the agents were supposed to write by the advisory rate of the rating bureau, and that he usually did so; that it was not considered fair business methods among agents to cut rates.

Mr. Ellsworth, a witness for appellants, testified as follows:

"Q. Now, Mr. Ellsworth, when you go and make an arbitrary rate why do you put on these half cents? Why not make it even money if you are making an arbitrary rate, and not trying to find any standard? A. You are more apt to get by the little daily report reader in the office. Q. And that is the reason you do it? A. Yes, sir. Send in a sawmill of five per cent. and they think you have arbitrarily done something; you put it at five and one hundred eighty-three thousands, and he thinks you have found something, and it takes him six months to find out the difference."

Mr. George Wheatley, local agent at Greenville, and witness for appellant, testified that he had never received a letter from any company stating the rates were binding or mandatory, but testified on cross-examination as follows:

"Q. Did the Hartford Fire Insurance Company request you, as a general thing, to collect the rates advised by the

Mississippi Inspection & Advisory Rating Company? A.
I had some correspondence from the Hartford, where I
wrote the rates at variance from the advisory rates, in
which they said that the advisory rating which was be-
fore them called for a certain rate, and, inasmuch as they
had adopted that rate as their own, they asked that I ad-
vance it to that figure."

Colonel Prescott, general agent of the Hartford Fire
Insurance Company, and witness for appellants, testified
as follows:

"Q. Please state what is done in case where your local
Mississippi agents vary from the rates of the Mississippi
Inspection & Advisory Rating Company? A. As a gen-
eral thing we have requested agents to collect the rates ad-
vised by the Mississippi Inspection & Advisory Rating
Company, because these rates were based on actual inspec-
tions. As a general thing the rates advised by the Missis-
sippi Inspection & Advisory Rating Company were too
low; sometimes, when we felt that the rates were not high
enough, we canceled our policies; in other cases we re-
duced the amount of our policies to a comparative nominal
sum. Variations in rates, if immaterial, were accepted;
otherwise corrected. No risks were accepted unless the
rate was satisfactory to us, whether they were bureau rates
or not."

J. J. Scarbrough, a local agent at Poplarville, and a
witness for the appellant, testified that there was no com-
petition in his community between stock companies.

A number of local agents, witnesses for appellants, tes-
tified to variations from the rates advised by the rating
bureau, and that they had never received any instructions
from any company directing them to follow these rates.
However, on cross-examination of several of these wit-
nesses, in response to requests to produce such correspond-
ence, a large number of letters from the companies were
produced and filed which contained instructions to the
agent to change rates to accord with those of the rating

bureau, the tenor and effect of these letters being similar to the following:

January 27th, 1920.

"C. W. Leggett, Agent, Shubuta, Miss.—Dear Sir: Palatine No. 50243. S. H. Floyd. Acknowledging receipt of daily report as of above, we note that you have written this policy at a rate of two dollars and twenty cents. According to rate slip No. 27, dated December 1, 1919, it appeared that the correct rate is three dollars and fifty cents, and we will thank you to advance same accordingly, advising us of the additional premium by indorsement. Yours very truly, Robt. Mable, Agency Superintendent."

It further appears that prior to 1914 it was the general policy of insurance companies to write three-year policies on churches, schools, and dwellings for two annual premiums, and five-year policies for three annual premiums; that between the years 1914 and 1918 this was changed throughout the United States by requiring two and one-half premiums for a three-year policy and four annual premiums for a five-year policy; that this change was adopted and put in force in all of the territory of the Southeastern Tariff Association some time between October 28, 1914, and January, 1915; that this change was adopted and promulgated for Mississippi by the rating bureau on January 26, 1915; the officers of the rating bureau testifying, however, that in making this change they acted upon their own independent judgment that such was necessary to yield an adequate return. It further appears that on June 1, 1918, an amendment to the advisory schedules was issued by the rating bureau, which placed a horizontal raise of ten per cent. upon all classes of property in Mississippi except dwellings, hospitals, schools, hotels, frame mercantiles, churches, and a few other minor classes; that this raise in rates was called a war emergency charge, the secretary of the rating bureau testifying that he advised this charge on account of the increased cost of doing business and that in doing so he acted upon his own independent judgment; that about the same

time the rating bureau promulgated an increased rate on the classes of property which were excepted from the war emergency charge; that this war emergency charge and the companion raise of June 1, 1918, were put on in practically all of the states about the same time; that these changes were put on in the territory of the Southeastern Tariff Association on or about March 28, 1918; that this war emergency charge was withdrawn in many states, including the territory of the Southeastern Tariff Association, on September 1, 1919, and on the same day J. T. Robertson, secretary of the rating bureau, acting upon his own independent judgment, as he testified, withdrew this charge in Mississippi.

It further appears that whenever any one brought to the agent of any of these companies any complaint in regard to rates, or any request for information in regard to proper construction or reduction of fire hazard, they were referred by the agents to the rating bureau, and not to the companies; that the rating bureau maintained a corps of electrical and hydraulic engineers, whose services could be secured by any city, town, corporation, or individual free of cost, the compensation for the services rendered by the bureau to the assured coming from the insurance companies.

The witness Weille, president of the rating bureau, testified that in adopting the schedules of the Southeastern Tariff Association he did so because he believed these schedules were best adapted to conditions in this state, and that he acted upon his own judgment, uninfluenced by any company, agent, or rating organization; that in adopting the amendments promulgated by the Southeastern Tariff Association the rating bureau acted upon the independent judgment of its own officers; that it received no suggestions from and was not influenced by the insurance companies; that the schedules and rates furnished by the bureau were purely advisory, and that it had no contract or understanding with its subscribers, or any of them, that the rates should be used, and that the bureau

had no power or authority to enforce its rates, and that it never attempted to do so.

J. T. Robertson, secretary of the rating bureau, and a witness for appellants, testified that, in adopting these schedules, and amendments thereto, and in disseminating the advisory rates, he acted upon his own independent judgment, uninfluenced by any insurance company or rating bureau, and that the rating bureau never had any agreement or understanding with any insurance company that it would adopt any specific rate, suggestion, or amendment which the bureau sent out.

The officers of the Southeastern Tariff Association of the Southeastern Underwriters' Association testified that this association never attempted to exercise any jurisdiction or control, directly or indirectly, over fire insurance rates in Mississippi after the date of its retirement in 1900.

One or more officers of each defendant insurance company testified that the company had never exercised or attempted to exercise any power or authority in dictating or controlling the acts or services or any other function of the Mississippi Rating Company; that in the conduct of its business in Mississippi it had acted independently and according to its own judgment, without agreement or combination or understanding to influence it in conducting its business, and that such was true in the matter of making or fixing rates or premiums; that it did not make or enter into or become a party to any agreement or combination with each other or either or all of the insurance companies to regulate and fix within the state of Mississippi, or any part thereof, the price or premium to be paid or collected for insuring property against loss or damage by fire; that it had not made or entered into or become a party to, on or since January 1, 1908, any agreement or combination with either or all of the insurance companies named as defendants in this suit, or any other company or companies, to regulate and fix the price or premium to be paid for insuring property within the state

of Mississippi; that it had not made or entered into or become a member of, or party to, any contract, agreement, or combination, express or implied, with either or all of the other insurance companies named as parties defendant under and by which the said insurance company or any other insurance company did appoint and authorize the Mississippi Inspection & Advisory Rating Bureau, or any other company or person, to declare and fix what was the rate to be paid by the public for insuring property against loss or damage by fire in the state of Mississippi; that it had not made or entered into any agreement, combination, contract, or understanding with either or all of the insurance companies, or any company defendant in this suit to charge the public, as the price to be paid for insurance against loss by fire on property in the state of Mississippi, whatever price the said Mississippi Inspection & Advisory Rating Bureau should fix; that it had never given any power or authority, express or implied, to the Mississippi Inspection & Advisory Rating Bureau, or any other company, association, or person, to dictate or control the management of its business in the matter of fixing the price or premium to be paid for insuring property in the state of Mississippi; that it had not made or entered into any contract, agreement, combination, or understanding with either or all of the other defendant insurance companies under and by which either or all of said insurance companies were to maintain the price or premium to be charged for insuring property in the state, after the price to so insure had been determined and fixed by the said rating bureau or by any other company or association; that it had not made, entered into, or become a member of, or a party to, any contract, agreement, combination, or understanding with either of the defendant insurance companies that it or either of them would subscribe for or buy the rates or service of the Mississippi Advisory Bureau; that in the conduct of its business in the state of Mississippi since 1907 it had acted independently, and according to its own judgment, and had not in any

manner or to any extent been a member of or a party to any conspiracy, agreement, combination, or understanding with reference to the conduct of its business, and particularly in the matter of the making or fixing of rates or premiums to be charged or in the matter of maintaining rates or premiums;

Other facts and circumstances will be referred to and commented on in the course of this opinion.

This action was brought under the provisions of chapter 119 of the Laws of 1908 (Hemingway's Code, sections 3281 and 3282), which provide, among other things, the following:

"A trust and combine is a combination, contract, understanding, or agreement, expressed or implied, between two or more persons, corporations, or firms, or associations of persons, or between one or more of either with one or more of the others (a) in restraint of trade; . . . (g) to place the control, to any extent, of business or the products and earnings thereof, in the power of trustee, by whatever name called; (h) by which any other persons than themselves, their proper officers, agents and employees shall, or shall have the power to, dictate or control the management of business; or (i) to unite or pool interests in the importation, manufacture, production, transportation, or price of a commodity; and is inimical to the public welfare, unlawful and a criminal conspiracy.

"Any corporation organized under the laws of this or any other state, or country, and transacting or conducting any kind of business in this state, or any partnership or individual, or other association of persons whatever, who are now, or shall hereafter create, enter into, or become a member of, or party to, any pool, trust, combine, agreement, combination, confederation or understanding, whether the same is made in this state or elsewhere, with any other corporation, partnership, individual, or with any other person, or association of persons, to regulate or fix in this state the price of any article of manufacture, mechanism, merchandise, commodity, convenience, repair,

any product of mining, or any article or thing whatsoever, or the price or premium to be paid for insuring property against loss or damage by fire, lightning or tornado, or to maintain said price when so regulated or fixed, or who are now or shall hereafter enter into, become a member of or party to, any pool, agreement, contract, combination, association or confederation, whether made in this state or elsewhere, to fix or limit in this state the amount or quantity of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or the price of premiums to be paid for insuring property against loss or damage by fire, lightning, storm, cyclone, tornado, or any other kind of policy issued by any corporation, partnership, individual, or association of persons aforesaid, shall be deemed and adjudged guilty of a conspiracy to defraud, and subject to the penalties as provided by chapter 145 of the Code of 1906."

Upon the pleadings and proof offered the chancellor found that the appellant insurance companies had entered into or become a party to a combination, agreement, or understanding to regulate and fix the price or premium to be paid for insuring property in this state against loss or damage by fire and to maintain such price when so regulated and fixed, and the first assignments of error challenge the correctness of this finding of fact by the chancellor on the ground of the insufficiency of the evidence to support the decree. Appellants seek a reversal of the decree of the chancellor on the facts, and, in the consideration of the evidence and the decision of the question thus presented, certain well-established principles should be borne in mind and applied.

It is established by an unbroken line of decisions in this state that a decree of a chancellor based on facts will not be reversed on appeal unless this court is convinced that the chancellor, in the rendition of the decree, made some material mistake in construing the law applicable to the case, or that the decree is opposed to the great weight of

the testimony, or that the decree is without evidence to
support it, or, as most frequently expressed, that the de-
cree is manifestly wrong.  On appeal to this court, on
all questions of fact, the inquiry is not whether the chan-
cellor's decision is right, or whether, on the facts, this
court would have reached a different conclusion, but
whether from all the facts, and the reasonable inferences
to be drawn therefrom, the decree is manifestly wrong.
*Dillard* v. *Wright,* 11 Smedes & M. 455; *Kelly* v. *Miller,*
39 Miss. 17; *Davis* v. *Richardson,* 45 Miss. 499, 7 Am. Rep.
732; *Heard* v. *Cottrell,* 100 Miss. 42, 56 So. 277; *Southern
Plantations Co.* v. *Kennedy Heading Co.,* 104 Miss. 131,
61 So. 166; *Lee* v. *Wilkinson,* 105 Miss. 358, 62 So. 275;
*Evans* v. *Sharbrough,* 106 Miss. 687, 64 So. 466; *Humbler*
v. *Humbler,* 109 Miss. 216, 68 So. 161; *Bank of Lauderdale,
et al.* v. *Cole et al.,* 111 Miss. 39, 71 So. 260; *Johnson* v.
*Yazoo County,* 113 Miss. 435, 74 So. 321.

While it is true that conspiracy denotes concurrence of
intent and concurrence of action between individuals to
effect a common purpose, yet this unity of purpose and
design need not be evidenced by any formal written or
verbal agreement, but may be embodied in some plan or
scheme evidenced by the action of the parties, or by a
mere tacit understanding between the conspirators to
work to a common purpose, and it may be proven by either
direct or circumstantial evidence.

As to the nature and character of evidence admissible
to prove an unlawful agreement or conspiracy, the au-
thorities are uniform, the correct rule being stated in 12
Corpus Juris, p. 633, as follows:

"The fact of a conspiracy may be proven by any compe-
tent evidence.  The conspiracy may of course be shown by
direct evidence, and, it is apprehended should be so proven
if this character of evidence.is attainable.  Direct evidence
is, however, not indispensable.  Circumstantial evidence
is competent to prove conspiracy.  Proof of the combina-
tion charged, it has been said, must almost always be ex-
tracted from the circumstances connected with the trans-

action which forms the subject of the accusation. The nature of the crime usually makes it susceptible of no other proof, and the rule which admits this class of evidence applies equally in civil and criminal cases. Circumstantial evidence if sufficiently strong may outweigh the positive statement of a party or witness."

In 12 R. C. L., p. 1088, the rule is stated to be as follows:

"Conspiracies need not be established by direct evidence of the acts charged, but may, and generally must, be proven by a number of indefinite acts, conditions, and circumstances which vary according to the purposes to be accomplished. The very existence of a conspiracy is generally a matter of inference deduced from certain acts of the person accused, done in pursuance of an apparently criminal or unlawful purpose in common between them. The existence of the agreement or joint assent of the minds need not be proved directly. It may be inferred by the jury from other facts proven. It is not necessary to prove that the defendants came together and actually agreed in terms to have the unlawful purpose, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object often by the same means, one performing one part and another another part of the same, so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object. If, therefore, one concurs in a conspiracy, no proof of agreement to concur is necessary in order to make him guilty. His participation in the conspiracy may be established without showing his name or giving his description."

The rule is stated in similar language in numerous decisions of the United States supreme court as illustrated by the case of *Eastern R. L. D. Association* v. *United States,* 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788, where Mr. Justice DAY used the following language:

"But it is said that in order to show a combination or conspiracy within the Sherman Act some agreement must be shown under which the concerted action is taken. It is elementary, however, that conspiracies are seldom capable of proof by direct testimony and may be inferred from the things actually done, and when in this case by concerted action the names of wholesalers who were reported as having made sales to consumers were periodically reported to the other members of the Associations, the conspiracy to accomplish that which was the natural consequence of such action may be readily inferred."

The burden of proof in this case is on the complainant, and, since this suit is in the nature of a civil action for the recovery of penalties, we think the correct rule as to the degree of proof necessary to sustain a decree for complainant is stated in 12 C. J., p. 639, as follows:

"In order to establish a conspiracy, evidence must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise. Disconnected circumstances, any one of which, is just as consistent with a lawful purpose as an unlawful purpose, are not sufficient to establish a conspiracy. However, the doctrine of reasonable doubt has no place in a civil suit for damages where it is sufficient, if the evidence is full, clear and satisfactory, and the conspiracy established by a preponderance of the evidence. This degree of proof, however, is unnecessary."

In this case the state depends upon circumstantial evidence to establish an unlawful agreement or understanding, and the rule to be applied in the consideration of this evidence is correctly stated in the case of *Banks* v. *Banks,* 118 Miss. 783, 79 So. 841, as follows:

"Where an offense of this kind is sought to be proven by circumstantial evidence, the circumstances must be proven with reasonable certainty, and the circumstances so proven must be such that the conclusion sought to be established follows logically from the facts. If there are

two or more reasonable theories which may be drawn from the facts proven, the proof will be insufficient because, to invest mere circumstances with the force of trust, the conclusion must not only be logical, and tend to prove the facts charged, but must be inconsistent with a reasonable theory of innocence."

Since the relations and connections of the appellant companies with the Southeastern Tariff Association and the Mississippi Inspection & Advisory Rating Bureau have such an important and, as we think, controlling bearing upon the solution of the question here involved, it is important to consider at the outset the conditions which brought about the establishment of these organizations, as well as their objects, purposes, and accomplishments, and the methods by which each of these organizations accomplished the purposes for which they were organized.

The Southeastern Tariff Association was organized in the year 1882, and is an association of fire insurance companies organized for the purpose of establishing, enforcing, and maintaining uniform rates for fire insurance premiums, the members of which bound themselves to observe and enforce the rates established by this association. From a history of this association, which is in evidence, we learn that prior to the time of the organization of this association unrestrained competition in rates, as it is therein denominated, prevailed, but through the efficient and effective work of this association competition in rates was destroyed, and uniform rates established and enforced. In the year 1890, the jurisdiction of this association was extended to this state, and thereafter, for a period of ten years, the agreed rates of this association were enforced in this state. In the year 1900 the anti-trust laws of the state were amended, and shortly thereafter the Southeastern Tariff Association withdrew from this state under an agreement with the attorney-general that certain litigation then pending against it would be dismissed, and after its withdrawal competition in rates again prevailed until the

Mississippi Inspection & Advisory Rating Bureau, which was organized in 1903, began to function.

The objects sought to be accomplished through this rating bureau are not to be left in doubt as it is admitted in the answer of the defendant that—"The primary purpose of this bureau was for the protection of the insured, and for the purpose as far as possible of providing for just, reasonable and uniform rates under similar conditions."

The answer avers that "long experience had shown that uniformity of rates is essential to the conducting and carrying on of the business of fire insurance, "and likewise admits that through this rating bureau practical and general uniformity of rates was accomplished, and the proof shows that this uniformity of rates was maintained for a period of thirteen years prior to the institution of this suit.

Before discussing the controverted point as to the methods by which this uniformity of rates was accomplished, it becomes important to inquire into the origin and source of the rates which were adopted and maintained as the uniform rates in this state.

It clearly appears from the testimony that the Mississippi Rating Bureau only contracted with the subscribing insurance companies to furnish specific rates, which are made by the mere inspection and application of basic schedules to particular property. This rating bureau did not, and could not, make basic schedules, and prior to 1908, in making such specific rates as it issued, it used and applied schedules then in the hands of the local agents and in general use in the state. In the early part of the year 1908, the Southeastern Tariff Association adopted and issued a book of revised basic schedules, which was printed by the Lester Printing Company, of Atlanta, Ga., and shortly thereafter the Mississippi Rating Bureau purchased from this printing company one thousand copies of this book of Southeastern Tariff Association's schedules. After attaching thereto all amendments which had been promulgated by the Southeastern Tariff Association since

the publication of the book, it was then adopted by the rating bureau for use in this state, and issued to be used here by advice, and a copy of this book was sent to each local agent in the state and to each insurance company subscribing to this bureau. These southeastern basic rates, which were adopted in their entirety for use in this state, were made and agreed upon in the councils of certain of the defendant insurance companies for use in the territory served by this association. They were adopted bodily by the rating bureau, and then issued to the local agents as the only basis of rates offered to them by the bureau, and although they came from the companies charged with the impurity of agreement, after being filtered through the rating bureau, and thus purified, they found their way back to the source from whence they came, and were then issued to the agents as the only rates offered them by the companies.

The next inquiry that arises is whether these rates which were promulgated by the rating bureau were enforced. The chancellor found as a fact that they were, and we think this finding is abundantly supported by the facts and circumstances in evidence. It is true that there is evidence from a number of agents of variations from the bureau rates in a small percentage of the business written, but there is also abundant evidence of action on the part of the companies seeking to require adherence to the bureau rates, and it would probably be impossible to devise any method of enforcement that would be perfect in its operations or in the accomplishment of the desired results. Likewise, there is abundant evidence in the record that the companies reserved and frequently exercised the right to refuse to write policies at a rate as low as the bureau rates, but there is no evidence that any one of these companies, during all the years, ever, in the exercise of its independent judgment, exercised a right to require a rate below the bureau rates, and, in so far as any such action on the part of the companies themselves

is concerned, the bureau rates were adopted as an irreducible mimimum. But it is said that, on account of the limited amount of insurance that can be written on a particular risk by one company, it frequently became necessary for two or more companies to write insurance on the same property, and that in such cases the assured demanded of all the companies the lowest rate offered by any of them, and that this necessitated, or at least contributed to, uniformity of rates. Conceding that the assured would demand of all companies the lowest rate offered on any risk, it does not follow that the lowest rate offered must be the bureau rate, if in fixing the rate the various companies and their agents acted upon their own independent judgment. There is also the evidence of hundreds of local agents that these bureau rates were uniformly used by them, and it is expressly admitted by the defendants that practical and general uniformity of rates was attained and maintained, and this uniformity of rates extending over a long period of time is very strong, if not conclusive, evidence of enforcement of rates; for it is undoubtedly true that, if, by the exercise of the independent judgment of each company, many different companies should happen to adopt the same rates, yet, when these rates are used and applied by hundreds of different agents to multiply thousands of different risks, there will be no general uniformity in rates without enforcement.

It is, however, argued with great earnestness and force that uniformity of rates results from the nature and necessities of the business of insurance, and that such uniformity is no evidence to prove or tending to prove an agreement on the part of the companies to fix or maintain rates, and that no inference that such an agreement exists may reasonably be drawn from the fact that uniformity exists. It appears, however, that before the Southeastern Tariff Association assumed jurisdiction in Mississippi, and during the period intervening between its withdrawal and the adoption of the Southeastern Association's rates

131 Miss.—27

by the rating bureau, uniformity in rates did not exist, and we think it is clear from the evidence in this record that the uniformity in rates which existed in this state for many years did not result from the nature and necessities of the business of insurance.

We concede that the mere fact of uniformity of rates, standing alone, might not warrant a conclusion that an agreement to fix and maintain rates existed, but, when it is considered in connection with the methods by which this uniformity was brought about, and the fact that the rates adopted for use here were rates which had been agreed upon by the companies for use elsewhere; that more than sixty different companies adopted the same rates; that these rates were almost invariably used by all the local agents for thirteen years; that during all this period of time these companies furnished their agents with no other rates, but used and enforced the rates that were promulgated by the rating bureau; that the rating bureau controlled in the matter of fixing and declaring the rates to be charged in this state; that the rating bureau was incapable of making basic rates, but adopted bodily the schedules which had been prepared by the companies acting in concert, and the only rates purchased by the companies from the rating bureau were rates based upon schedules prepared by the companies acting in concert; that an admitted purpose of the rating bureau was to provide uniform rates under similar conditions; that the daily reports of policies written were checked by schedules which had been advised by the rating bureau, but which were identical with those which had been made and agreed upon by the companies themselves; that a remarkable concurrence of action between the companies, resulting in the destruction of competition in rates, continued for many years—together with many other facts and circumstances in evidence, we think it may reasonably be inferred that the establishment and maintenance of these fixed rates was by understanding or agreement, and not by accident

or coincidence; and, if this understanding or agreement may be inferred, then it may also be inferred as a fact that the understanding or agreement to use and maintain the rates existed between the defendants from the time when, through the Mississippi bureau, they subscribed for and applied in Mississippi their own agreed rates which had been made for use elsewhere.

In the case of *Carroll* v. *Greenwich Insurance Co.*, 199 U. S. 401, 26 Sup. Ct. 66, 50 L. Ed. 250, the supreme court of the United States says:

"The bill seems to assume that the statute forbids insurance companies to obtain and use each other's experience, or to employ the same person to work up the results. It does not. It simply forbids an agreement between the companies relating to the rates which may be based upon those results. No doubt an agreement between the companies readily would be inferred, if they were found all to charge the same rates; but an agreement between the companies is the only thing aimed at, and if they avoid that they escape the law."

It is said in argument that one or more of the officers of each of the defendant companies testified positively that no agreement existed between the companies to regulate and fix or to maintain rates in Mississippi, and that these witnesses are not impeached or contradicted. It is true that they are not impeached, but they are contradicted by the facts and circumstances in evidence, and it was peculiarly the province of the chancellor, as the trier of the facts, to determine what weight should be given to the facts and circumstances, as well as the positive testimony of the witnesses.

The argument in regard to the evils of competition in insurance, and the benefits to flow to the public from the destruction of competition and the maintenance of uniform rates, and the establishment of rating bureaus for the purpose of securing uniformity of rates, is answered by the fact that, under the law as it now exists, making

it unlawful to enter into any agreement or understanding to regulate or fix, or to maintain when so fixed or regulated, the price or premium to be paid for insuring property, the manifest purpose is to preserve free competition in the matter of fixing insurance rates.

The testimony shows that the rating bureau did not and could not make basic rates; that the rating bureau received from the defendant companies its compensation for the extensive services which, through its engineers, it rendered to the insuring public without cost to the assured; that its services were not salable to the insurance companies until it began to furnish specific rates based upon schedules prepared by the companies in concert; that it bodily adopted for use in Mississippi the basic schedules of the Southeastern Tariff Association, which were schedules made and agreed upon by the defendant insurance companies for use elsewhere; that after the adoption of these schedules the rating bureau controlled in the matter of fixing and declaring rates to be charged for insurance in this state, as shown by the statements and admissions of the company's agents, as well as other testimony; that the rating bureau adopted in whole or in part many of the Southeastern Association's amendments to schedules; that it put on the so-called war emergency charge shortly after it was adopted by the Southeastern Association; that this bureau adopted the increase in rates for term policies, as well as other horizontal increases in a number of classifications, shortly after they were adopted by the Southeastern Association; that it removed the war emergency charge on the same day that it was removed by the association; and, although the officers of this bureau testified that all of these acts of the bureau were the result of the exercise of the independent judgment of the officers thereof, uninfluenced by any insurance company, it was for the chancellor to decide, under all and facts and circumstances in evidence, whether these acts of the bureau were the result of the exercise of in-

dependent judgment or the result of understanding and agreement.

The testimony shows that most of the defendant companies, about sixty in number, subscribed for and used in Mississippi the rates issued by the rating bureau, which were the identical rates that had been previously made and agreed upon by them for use elsewhere; that these were the only rates furnished by the companies to their agents; that they were used by the more than six hundred agents in the states for thirteen years, and during all that time the hundreds of schedules were applied to particular property without material variations in rates; that the daily reports of policies written were compared and checked with the rating bureau's schedules in the offices of the companies; that the rating bureau's schedules, with which these comparisons were made, were identical with those of the Southeastern Tariff Association, which had been made and agreed upon by these companies; that these rates were enforced by the companies, and practical uniformity of rating was maintained throughout the period of thirteen years; that during this entire period there was no real competition in rates between the stock fire insurance companies, but the only competition that existed was competition in service rendered by different agents or agencies; that all the defendant companies ceased to write policies in this state, and withdrew from the state on or near the same date; and, although some officer of each of these companies testified that there was no agreement in reference to rates or other matter, it was for the chancellor to decide whether, under all the facts and circumstances in evidence, this remarkable concurrence of action on the part of these companies and their agents and the results accomplished thereby were all the results of the exercise of independent judgment on the part of the officers of these companies, or the result of understanding and agreement, and we are unable to say that the chancellor was manifestly wrong in reaching the conclusion that this concurrence of action did

not happen by accident or coincidence, but was the result of understanding or agreement.

There are many facts and circumstances in this record which, when taken separately, may be of little evidential value, but, when grouped together, their relevancy is apparent, and they become strong and convincing, and upon the whole evidence we think that, as to those defendants who were members of both the Southeastern Tariff Association and the Mississippi Inspection & Advisory Rating Bureau, reasonable inferences inconsistent with any reasonable theory of innocence may be drawn, or, in other words, that a reasonable inference may be drawn that there existed an understanding and agreement to regulate and fix, and to maintain, the price or premium to be paid for insuring property against loss or damage by fire. *McCann* v. *State,* 13 Smedes & M. 471. This being true, it was the peculiar province of the chancellor to weigh the evidence and draw inferences therefrom, and since, from all the facts and circumstances in evidence, he has found that an agreement existed between all the appellant companies to regulate and fix, and to maintain, these rates, we are not able to say that his dicision is manifestly wrong as to those defendants, which were members of both the Southeastern Association and the rating bureau. However, as to those companies which were not members of the Southeastern Tariff Association, and which did not participate in the agreements of this association, we think the evidence is insufficient to support the decree, and that the decree against these particular defendants should be reversed.

It is next contended that the imposition of cumulative penalties extending over a long period of years is not authorized by the statutes under which this suit is brought, and that the penalties imposed in the decree are so excessive as to deprive the appellants of their property without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States and

section 14 of the Constitution of the state of Mississippi, and also that the penalties imposed on the individual companies are so excessive as to violate section 28 of the Constitution of the state of Mississippi, which provides that excessive fines shall not be imposed.

Prior to the enactment of chapter 222 of the Laws of 1910 (Hemingway's Code, section 3286) the penalties for violations of the anti-trust laws prescribed by our statute (section 5004, Code of 1906) were fixed at the minimum of two hundred dollars and the maximum of five thousand dollars for each offense, and each day that the violation continued was made a separate offense. The act of 1910 reduced the minimum penalty to twenty dollars for each offense, and in the present case the court imposed the minimum of two hundred dollars for each separate offense occurring prior to the passage of the act of 1910 and a penalty of twenty-five dollars per day thereafter.

We do not think the contention that cumulative penalties cannot be imposed under our statutes can be maintained. By the express provisions of the anti-trust statutes each day that the unlawful combine is maintained constitutes a separate offense, and it was within the power of the legislature to so provide, and to prescribe punishment for each separate offense, and it is perfectly clear from the language of the statute that it was the purpose of the legislature to provide a penalty for each and every offense. In the case of *Grenada Lumber Co.* v. *State,* 98 Miss. 536, 54 So. 8, this court said:

"By the express terms of section 5004 of the Code, each person, partnership, or corporation is liable for the penalty provided for its violation. There is no room for construction. Where any number have combined together, in violation of law, each is liable for the full amount of the penalty which the court may see fit to impose, from the minimum to the maximum fixed by the statute; each stands as if he were the only guilty one; and each day the business is carried on is a separate breach of the statute."

It is peculiarly within the province of the legislature to prescribe the fines or other punishment which may be imposed for violations of law. Punishment should be fixed and measured by the grade of the offense and the evil to be corrected, and in the exercise of its judgment in this regard the legislature must be allowed a wide latitude, and its judgment and discretion in this regard will not be restrained or controlled by the courts unless the penalty fixed is so disproportionate to the offense as to shock the conscience.

In this case it is not contended that even the maximum penalty prescribed for one offense is excessive, but it is contended that, on account of the imposition of cumulative penalties extending over a period of years, the penalties imposed against each defendant are so excessive as to operate as a deprivation of property without due process of law. It is true that the aggregate of the penalties imposed against most of these defendants is large, but this is due to the fact that they have been convicted of repeated and long-continued violations of law, and the fact that a person has so persistently and repeatedly violated the law that he incurs large penalties will not render the statute fixing the penalty unconstitutional.

In the case of *Waters-Pierce Oil Co.* v. *State of Texas,* 48 Tex. Civ. App. 162, 106 S. W. 918, the defendant was convicted of violating the anti-trust laws of the state of Texas, and the penalties imposed for each day during a period of seven years aggregated the sum of one million, six hundred and twenty-three thousand, five hundred dollars. This conviction was affirmed by the supreme court of Texas in 107 Tex. 1, 106 S. W. 326, and also by the supreme court of the United States in 212 U. S. 86, 29 Sup. Ct. 220, 53 L. Ed. 417, and in the decision of the case the court of civil appeals of Texas said:

"It is claimed the trial court should have granted appellant's motion for a new trial based upon the ground that the judgment imposes excessive fines and operates

as a deprivation of property without due process of law. It is also contended that the act of 1899 should be declared void, because it authorizes excessive . . . forfeitures. That question has already been decided against appellant's contention in *State* v. *Laredo Ice Co.,* 96 Texas, 467, 73 S. W. 951. The verdict, while large, is . . . mainly attributable to appellant's repeated and long-continued violations of the law; . . . hence we have reached the conclusion that the verdict is not so large as to render it manifest that the jury were actuated by prejudice or other improper motives."

If it should be conceded, however, that a case might arise where the penalties imposed are so grossly excessive as to amount to a deprivation of property without due process of law, we do not think that it can be successfully argued that this is such a case. The penalty imposed against each defendant for each separate offense was practically the minimum fixed by the statute. The largest aggregate amount imposed against any one defendant was one hundred and ninety-five thousand, eight hundred and seventy five dollars, while the smallest was one thousand, three hundred and fifty dollars. In only one instance does the total of the penalties imposed amount to as much as one-half of the surplus of the company, and in most instances it amounts to only a very small percentage of the particular defendant's surplus. The penalties against most of the defendants are large, but they are within the terms of the statute, and were imposed for repeated and long-continued violations of law, and in the imposition of these penalties there was no want of due process of law.

It is next contended by appellants that all recovery in this case should be barred on account of laches in filing the suit. The statutes under which the suit is prosecuted makes each day that the unlawful combination or agreement continues a new, separate, and distinct offense, and the doctrine of laches cannot be applied to bar recent offenses, and we are clearly of the opinion that it cannot

be applied to bar recovery for offenses which have occurred within six years, but we are of the opinion that this doctrine may be and should be applied in this case as to all penalties which accrued more than six years before the institution of the suit.

The doctrine of laches is entirely distinct from the statute of limitations, and entirely different from that of estoppel. In the case before us the rates promulgated by the rating bureau were filed with the Insurance Commissioner, and all amendments and changes made in them were filed with him until he directed this to be no longer done. In addition to this the rates were filed with each insurance agent or agency in the state, and were applied to practically all risks written in the state. The attorney-general in 1900 had a suit filed against the appellants and the Southeastern Tariff Association, and this was settled upon agreement that the Southeastern Tariff Association would withdraw from the state, and that its rates would not be enforced in the state. After this agreement the books containing the basic schedules were left with the agents writing business in the state as a guide in fixing rates. In 1903 the Mississippi Rating Bureau was incorporated for the purpose of fixing and promulgating rates and selling them to all persons or corporations desiring to buy them. These rates could not be sold until an opinion was obtained from the attorney-general holding that the corporate powers were lawful so long as there was no agreement, direct or indirect, that they would be binding, and not merely optional,. After obtaining this ruling the rating bureau adopting bodily the book of schedules and rates of the Southeastern Tariff Association, eliminating therefrom the printed provision that the rates were binding upon each company and agent. The rating. bureau then sold these rates to the companies who composed the Southeastern Tariff Association, and they were thereafter applied in this state with practical uniformity. This was a matter that reasonable investigation

would have disclosed in its true light.  It is true that the
Insurance Commissioner had no power to prescribe rates,
but he was under the general duty to see that the law was
not violated by the insurance companies, and it seems that
investigation would have disclosed the facts which we now
hold constitute a violation of the law.  It would seem that
under the circumstances in evidence, the state authorities
would have made some investigation to see that the agree-
ment made was carried out in good faith.  The principal
officer having to do with the rates adopted by the Missis-
sippi Rating Bureau in 1908 is now dead, and his testi-
mony is not available to the defendants.  Likewise one of
the chief officers of the Southeastern Tariff Association at
the time the 1908 basic rates of said association were
adopted is dead, and a number of important witnesses are
also dead.  Besides, the memory of others is necessarily
impaired by the length of time passing between the adop-
tion of the Southeastern Tariff Association's book of rates,
making it more difficult to obtain the proper evidence and
making it less certain that equity can do full justice to
all the parties because of these facts.

In 21 C. J. 212, the following rule is announced in
reference to laches:

"It is an inherent doctrine of equity jurisprudence that
nothing less than conscience, good faith, and reasonable
diligence can call courts of equity into activity, and that
they will not grant aid to a litigant who has negligently
slept on his rights and suffered his demand to become stale
where injustice would be done by granting the relief ask-
ed.  It is therefore a general rule that laches or staleness
of demand constitutes a defense to the enforcement of the
right or demand so neglected.  This doctrine has existed
since the beginning of equity jurisdiction, independently
of statutes of limitations, although it is more or less af-
fected in its operation by those statutes.  The doctrine is
based in part on the injustice that might result from the
enforcement of long-neglected rights, and the difficulty,

if not impossibility, of ascertaining the truth of the matters in controversy and doing just justice between the parties, and in part on grounds of public policy, its aim being the discouragement, for the peace and repose of society, of stale and antiquated demands. The rule that the enforcement of a right may be barred by laches is an application of the maxims, '*Vigilantibus, non dormientibus, subveniunt leges.*' 'He who seeks equity must do equity,' and 'He who comes into equity must come with clean hands.' . . . The defense of laches is peculiar to courts of equity and is not pleadable in actions at law."

In *Comans* v. *Tapley*, 101 Miss. 203, 57 So. 567, Ann. Cas. 1914B, 307, this court quoted with approval the language of STINESS, J., in *Chase* v. *Chase*, 20 R. I. 202, 37 Atl. 804, as follows:

"Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced. delay becomes inequitable, and operates as estoppel against the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities, and other causes; but when a court sees negligence on one side and injury therefrom on the other it is a ground for denial of relief."

In 21 C. J. the following rule is announced:

"A court of equity will refuse relief after inexcusable delay because of the difficulty, if not the impossibility, of arriving at a safe and certain conclusion as to the truth of the matters in controversy and doing justice between the parties, where the evidence has been lost or become obscured through the loss of documents, or through death or disappearance of one or more of the participants in the

transaction in suit or of the witnesses thereto, or through impairment of the memory of participants or witnesses still living. While the rule requires for its support no element of estoppel, but is founded on public policy, the fact that the delay has tended to defeat defendant's power to prove his right is an additional reason for its application; and relief is more readily denied in case of the death of a party to the transaction than in other cases, since his death usually presents difficulties in procuring evidence and conducting the defense other than those arising from the mere loss of his testimony. To bring the rule into operation, it is not necessary that the court should be convinced that the original claim was unjust or has been satisfied; it is sufficient if the court believes that under the circumstances it is too late to ascertain the merits of the controversy. . . . In any event, loss or obscuration of evidence is a material circumstance to be considered in determining whether the asserted claim shall be enforced."

Laches in a case like this, which involves a continuing series of acts committed daily, may be justly applied to a portion of the daily penalties, and not applied to those of more recent date, since the evidence of acts done long ago might be lost or impaired, while the recent acts are, or may be, easily proven. The question then arises, and is an important one in applying the doctrine of laches, what under the circumstances is a reasonable time, and at what period of the time should the doctrine be applied? In our opinion the statutes of this state have fixed a public policy in such matters which may be resorted to in connection with all the circumstances. Section 4742 of the Code of 1906 (section 7060, Hemingway's Code) limits the powers of the revenue agent in collecting back taxes to six years. The general statutes of limitation fixed a limit for individuals, where no other limit is prescribed, at six years. Statutes of limitation as such do not run against the state and therefore mere delay alone will not affect the state's

right to sue; but we are not dealing with statutes of limitation, nor with mere lapse of time, but we are considering what, in the light of the record before us, is a reasonable time to constitute laches, and we are of the opinion that six years, applied to the facts in the record before us, is reasonable. Each case, however, must stand upon its own peculiar facts in applying the doctrine of laches.

The weight of authority is to the effect that, generally speaking, laches will not be attributed to the state, and especially when it is acting in its sovereign capacity or exercising rights on behalf of the general public; and most of the courts seem to have generally acted upon this theory in administering its laws in suits by the state in its governmental capacity. There are, however, in our opinion, circumstances when equity will apply the doctrine of laches to the state itself. In the case before us the suit does not involve contract or property rights, but is founded in tort, and the penalties are designed to enforce statutes that are punitive in nature, though enforced by civil suit. These penalties accumulate daily, and run through a series of years, making a vast amount of money in the aggregate. Under the circumstances existing in this case, can violations like this run on for a long series of years, and then, when the state has permitted this, or has taken no action after knowledge, may it, after many years, fall on the offender and collect princely fortunes in the way of penalties? We are aware of the fact that in applying the doctrine of laches great caution should be used in applying it to the government, especially to the government when acting in its public capacity. We think, however, that such application should be made in the case before us, and that such application will further justice. There are many authorities which support the view that laches may be applied to the state in a suit brought by it in its governmental capacity. See *State of Minnesota ex rel. Young* v. *Village of Harris,* 102 Minn. 340, 113 N. W. 887, 13 L. R. A. (N. S.) 533, 12 Ann. Cas. 260, and *State*

*ex rel.* v. *Lincoln St. R. Co.,* 80 Neb. 333, 114 N. W. 422, 14 L. R. A. (N. S.) 336, and notes to each case.

In the case of *State of Minnesota, ex rel. Young, Attorney General,* v. *Village of Harris,* 102 Minn. 340, 113 N. W. 887, 13 L. R. A. (N. S.) 533, 12 Ann. Cas. 260, it was held that—"Sound principles of public policy require that the state should be precluded from attacking the franchise of a village which had been permitted to exercise the functions of a village *de facto* for the period of twenty years and had been recognized as an existing village by legislative enactment."

In the course of the opinion, in discussing the decisions of other courts on the question, the Minnesota court said:

"In *State* v. *Town of Westport,* 116 Mo. 582, 22 S. W. 888, it was held that *quo warranto* proceedings will not lie on the part of the state to deprive a city and its officers of their franchise because of irregularities in its organization after the lapse of twelve years, and after repeated recognition of its corporate existence by the courts and legislatures during that time. While the facts upon which some of these decisions rest are stronger, in that the acts of recognition were more extensive, yet the principle is the same, and in no case was the time of acquiescense equal to the period in this case. The question involved is not whether the corporation was void from the beginning by reason of a defective petition, or arose from a defect in some subsequent step of the proceedings. We perceive no difference between the case now under consideration and others cited by the relator, where the defect grew out of some intermediate step in the process of incorporating. Although under the decisions of this court the village of Harris was not legally incorporated, for the reason that it attached territory not authorized under the act of 1885, yet the legislature might have authorized villages to be incorporated with such territory, and whatever the legislature originally had the power to do it also, by its subsequent conduct, had power to ratify. We conclude that, under the circumstances, the state should not be heard to

question the existence of the village. Our decision is based upon sound principles of public policy. No public interest would be subserved in permitting the state, after a period of twenty years, to have the village franchise annulled."

This case is one in which the state was proceeding in its governmental capacity, acting for the public generally in a matter where the state is supreme. Many other cases are cited in the L. R. A. notes to the report of this case, and an examination of them and of the principles upon which they rest will demonstrate the soundness of the views for which we contend in the case before us.

In the Nebraska case of *State ex rel.* v. *Lincoln Street Railway Co.,* 80 Neb. 333, 114 N. W. 422, 14 L. R. A. (N. S.) 336, it is announced in the fifth syllabus:

"The courts, in a proper case, will apply the doctrine of laches to a case in which the state is a party plaintiff. The state, like individuals, may be estopped by its acts or laches, and should not be allowed to oust a corporation of its rights and franchises, where for a long series of years it has stood silent and seen the corporation expend large sums in the acquisition of property and improvements made thereon under a claimed right so to do under its charter."

This case is also a case where the state was proceeding in its sovereign capacity to enforce laws made for the public protection, and but for its laches could have successfully maintained the suit. The L. R. A. report of this case shows additional cases holding similarly, and will be found interesting.

In *State* v. *Livingston, et al.,* 164 Iowa, 31, 145 N. W. 91, the Iowa supreme court held that, while limitations cannot be urged against the state, yet where the state invokes the powers of equity to establish its rights as by an action to quiet title, it may be denied relief on the ground of laches or estoppel. At page 94 of the Northwestern Reporter (164 Iowa, 41), in discussing this question, the court said:

"Whatever may at one time have been the superior rights of others, if there were such, under this state of facts it is quite clear that, if this action were between individuals, the plaintiff would fail as against the plea of adverse possession, as there can be no doubt that for a period longer than ten years the defendants and their grantors have been in possession of this real estate, claiming it as rights resulting from accretion, as well as under their conveyances . . . and have used it for the purposes of husbandry, and made improvements by way of fences. While it is the general rule that the statute of limitations cannot be urged against the sovereign, the right to rely upon an estoppel by acquiescence and the place of laches is recognized by many courts, including our own, and is based upon principles of equity. *State* v. *Des Moines,* 96 Iowa, 534, 65 N. W. 818, 31 L. R. A. 186, 59 Am. St. Rep. 381; *State of Iowa* v. *Carr,* 191 Fed. 257, 112, C. C. A. 477; *State of Indiana* v. *Milk* (C. C.), 11 Fed. 389; *United States* v. *McElroy* (C. C.), 25 Fed. 804; *State of Michigan* v. *Jackson,* 69 Fed. 116, 16 C. C. A. 345."

In *State of Wisconsin ex rel. Attorney General* v. *Northern Pac. Ry. Co.,* 157 Wis. 73, 147 N. W. 219, it was held that, as regards remedies, rights may, by countervailing equities, under some circumstances, be superseded as to the state. The action in that case was to compel by mandamus the Northern Pacific Railway Company to file with the Secretary of State certain papers showing its increase of stock, and to secure a judicial forfeiture of the company's charter for breach of statutory duty. The facts were stated in the opinion, and one of the defenses relied on was laches, and at page 224 of the Northwestern Reporter (157 Wis. 83) the court said on that point:

"The foregoing states, briefly, the whole case as first presented. It does not follow as matter of course, that, because there is ground for forfeiture of a corporate franchise, this court should permit its jurisdiction to be used to that end. Rights as regards remedies may by interfer-

ing equities, under some circumstances, be lost by the
state as well as by individuals. It has no vested or in-
herent right in such matters which it may use unjustly
and oppressively, being dependable, as it is, for vitality
of such rights upon the original jurisdiction of this court
which is said to be 'unlimited in extent' 'undefined in
character' (*Atty. Gen.* v. *Railroad Cos.,* 35 Wis. 425; *State
etc.,* v. *Johnson,* 103 Wis. 591, 79 N. W. 1081, 51 L. R. A.
33), clothed with sovereign authority of the people, so,
necessarily, as limitless as the exigencies of situations re-
quiring judicial interference. Such was the wise purpose
of the framers of the Constitution (*State, etc.,* v. *Helms,*
136 Wis. 432, 118 N. W. 158) to create a power equal to
all emergencies, to be used as sparingly as should com-
port with its dignity and the importance of the matter
to be dealt with, and always to the end that justice might
be done—justice in the broadest sense, judicially cognizable
which may, and often does, rise above and render dormant
remedies for vindication of strict legal rights. . . .
Time may be so characterized by circumstances as to
estop the state from enforcing legal rights and require
the court, in the exercise of sound judicial discretion, to
refuse to open its door to an effort to that end." ;

The rule for which we contend in this case is well stated
in (C. C.) 17 Fed. 36, in the headnotes to the case of the
*United States* v. *Beebe et al.,* as follows:

"When the lapse of time has been so great as to afford
a reasonable presumption that the witnesses are dead, and
the proofs lost or destroyed, a court of equity will refuse
to undertake the task of ascertaining the facts and af-
fording a remedy; and this, not because of any statutory
limitation, or because of laches merely, but upon grounds
of public policy for the peace of society."

In the case of *Pittsburg Rys. Co. et al.* v. *Carrick,* 259
Pa. 333, 103 Atl. 106, the court held that "laches may be
imputed to the commonwealth as well as to an individual."
See, also, *In re Bailey's Estate,* 241 Pa. 230, 88 Atl. 428;
*Commonwealth* v. *Turnpike Co.,* 153 Pa. 47, 25 Atl. 1105.

In the case of the *State of Missouri ex rel.* v. *Westport,* 116 Mo. 582, 22 S. W. 888, which was a proceeding by the state in its governmental capacity against a municipality, the court applied the doctrine of laches to the state, and in discussing the question said at page 595 of the official report (22 S. W. 890):

"We do not think that this proceeding comes within the statute of limitations, nor are we disposed to place the result of our deliberations strictly on the ground of estoppel, but rather because of laches on the part of the state."

We are aware of what is said on this subject in *Josselyn* v. *Stone & Matthews,* 28 Miss. 753, but we think that case ought to be limited to its facts, as it is clearly the rule that this must be done in applying the doctrine of laches. The Josselyn case is one more of limitations than of laches. No facts there appear which would make it inequitable or unjust for the state's claim to prevail. It is true that greater caution should be used in applying the doctrine of laches to the state on account of the fact that in the administration of the law there are manifold duties occupying the officer's time and attention, and often the state has not equipped any officer with necessary funds and assistants to properly take care of its business with the same care and caution that a private citizen or private corporation would exercise; but, after all, the doctrine of laches is designed to prevent injustice; and, where there is delay for a long period on one side, and injustice and hardship on the other, unless laches is applied equity will and should apply it, and the state should not be allowed to inflict injustice in enforcing rights that should have been asserted long ago. It is better for the state to suffer, where it has been neglectful, than to permit citizens to suffer injustice in such case, and, upon the facts in the particular case before us we think the doctrine of laches should be applied to bar recovery of all penalties incurred by reason of offenses committed more than six years before the institution of the suit.

We do not think any reversible error is presented by any of the assignments based upon the admission or exclusion of evidence.

On the cross-appeal, the complainant assigns as error the action of the court below in discharging certain defendants, but we are of the opinion that this assignment is without merit.

For the views of each of the judges on the several questions presented, and for the final disposition of the cause, reference is made to the *per curiam* opinion this day filed herein.

HOLDEN, J. I concur generally in the opinion that the evidence in the case was sufficient to sustain the finding of fact by the chancellor. From the admissions of appellants and the facts and circumstances disclosed in the thousands of pages of this record, considered together, and the reasonable inferences deducible therefrom, I cannot say the finding of fact by the lower court is manfestly wrong and wholly unsupported by the evidence. The settled rule is that this court will not disturb or set aside a finding of fact by the trial court unless manifestly wrong. And, when the proof in any case is reasonable, substantial, and positive, and is reasonably convincing to the ordinary mind, and which may find support in the logic and reasoning of the layman of ordinary intelligence, the determination of the disputed fact is not to be overturned by this appellate court upon its review of the case.

What conclusion the judges of this court might have reached in the trial of the facts is not the question before us, but the inquiry is: Was the trial judge, the trier of fact, the sole judge of the weight and credibility of the testimony manifestly wrong in his finding of guilt upon the evidence heard by him when the witnesses testified in his presence? Could the trier of fact have reasonably believed and decided that the testimony was sufficient to support the charge that an understanding between the insurance companies existed in the regulation and maintenance of

a fixed rate charged for insurance?   After a long and
thorough consideration of the question I am convinced in
the affirmative.

The anti-trust statute was intended to prohibit the sup-
pression of free competition; and, when the fixing and
maintaining of rates by agreement results in suppressing
competition, then the statute is violated regardless of
whether such fixed rates are inimical to the public in-
terest.   A uniform rate, which appellants say is essential
to the insurance business, and which they purposed to
bring about, is prohibited by the law if such uniformity
or fixation results from an expressed or implied under-
standing between the parties.

It is not unreasonable to believe and infer that such
exact uniformity of the rates agreed elsewhere and their
maintenance and enforcement in this case for thirteen
years was by common understanding, and not by mere ac-
cident or chance.   Whether the law is wise or full of evil
is a question for the legislature, not this court.

It is stated in R. C. L. that: "Conspiracies need not be
established by direct evidence of the acts charged, but
may, and generally must, be proved by a number of in-
definable acts, conditions, and circumstances which vary
according to the purposes to be accomplished.   The very
existence of a conspiracy is generally a matter of infer-
ence deduced from certain acts of the persons accused,
done in pursuance of an apparently criminal or unlawful
purpose in common between them.   The existence of the
agreement or joint assent of the minds need not be proved
directly.   It may be inferred by the jury from other facts
proved.   It is not necessary to prove that the defendants
came together and actually agreed in terms to have the un-
lawful purpose, and to pursue it by common means.   If
it be proved that the defendants pursued by their acts the
same object, often by the same means, one performing
one part and another another part of the same, so as to
complete it, with a view to the attainment of that same

object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object." 5 R. C. L., section 37, p. 1088.

And at page 190, section 146, 19 R. C. L., the rule is stated that: "As unlawful combinations of insurance companies may exist without formal agreement and rest upon common understanding and practice, so the proof of their existence may be of the same circumstantial character, as where a combination to regulate premiums is maintained under the guise of an 'Underwriters' Social Club.' "

I specially concur in the conclusion that the amount of the penalties assessed should be reduced on the ground that the laches of the state justifies a bar of recovery of all penalties assessed for those years prior to the six years immediately preceding the suit, as set out, and for the reasons given in the affirming opinion. But I further urge the special view that no recovery of the penalties should be allowed for any of the years prior to the two years immediately preceding the suit. I put this conclusion upon the ground of laches of the state, warranting an equitable reduction of part of the penalties assessed, and not upon the ground that the prior penalties are barred by the two-year statute of limitation against criminal prosecutions. Section 1414, Code of 1906 (section 1169, Hemingway's Code). But I consider the two-year limitation statute in an analogous sense only in order to reach a just proportion of time in which the penalties should be recoverable. The two-year statute cannot be invoked as a bar because of the contrary holding of this court in *Grenada Lbr. Co.* v. *State,* 98 Miss. 536, 54 So. 8, and *Nugent & Pullen* v. *Robertson,* 126 Miss. 419, 88 So. 895, which would have to be overruled to so hold in this case. But these cases do not deal with the doctrine of laches, but only with the statute of limitation.

In applying the doctrine of laches to the state in this case I realize that I am not in accord with the general rule here and elsewhere that ordinarily laches cannot be

imputed to and invoked against the state, as held seventy years ago in *Josselyn* v. *Stone & Mathews,* 28 Miss. 753, but I think an exception to this general rule may be made in an exceptional and remarkable case like the one before us. I know of no other case in judicial history or literature that is similar to the one before us in regard to the amount of cumulated penalties for a period of thirteen years in which each day is a separate offense. It is exceedingly exceptional, too, in the fact that many revenue agents, attorneys-general, district attorneys, legislatures, and insurance officers have come and gone for thirteen years without prosecuting the suit, although the daily conduct and actions of the insurance companies now prosecuted were of common knowledge to the officers and many citizens of the state. And now the penalties are assessed for each day separately for the thirteen years.

It is not a suit to recover property claimed by the state, nor to collect taxes or revenue, but is to inflict a penalty for an offense to deter future acts; and it would appear at first sight that the offense is barred by the two-year statute of limitations, but held otherwise in the cases *supra.* I think this is one case that justifies the application of the principle of laches against the state to prevent a recovery of penalties for more than two years next preceding the filing of the suit. This view is that of natural justice applied to the exceptonal case; it is moral rightness in the difficult premises. My position may be viewed by some as being contrary to well-established views on the subject, but I prefer to stand the criticism of overriding technical rules in order to render manifest justice in the particular case; provided always that in doing so no statute or constitutional law is violated.

SYKES, J. (dissenting).

In this case the learned chancellor found these appellant Insurance Companies guilty of violating the anti-trust

laws of the state. The penalties imposed upon them amount in the aggregate to over eight million dollars. The highest penalty assessed against any company is over one hundred ninety-five thousand dollars. This amount was assessed against several companies. In view of the importance of the decision in this case, not only to these appellants, ( because of the large amount of these penalties assessed against them, and the fact that by this decision of the chancellor they have been found guilty of violating the anti-trust laws of Mississippi, and therefore cannot continue business in the state in the manner transacted by them in the past, but also of the importance of the decision to the citizens and property owners in this state who necessarily must insure their property against loss by fire—in fact, practically every resident and property owner in the state is vitally interested in the decision in this case—for these reasons I shall set forth as briefly as possible the reasons why I think the court erred in finding these appellants guilty of violating this law.

Though the record is very voluminous, the material facts are uncontroverted. The law governing this case is not difficult to be understood. The difficulty, if there be any, is in finding what legitimate inferences a court may infer from the uncontradicted proven facts. Before these penalties could be assessed against these appellants the testimony must warrant a finding that they have entered into a combination, contract, understanding, or agreement, express or implied, among themselves to fix or maintain the price of fire insurance within the state of Mississippi; or, have delegated to the Mississippi Rating Bureau the power to fix these rates in Mississippi, and have agreed to be bound by the rates as fixed by this bureau, or that the agents of these companies have entered into any such combination, contract, or agreement. It will be unnecessary to discuss the question of an agreement or combination among the agents, because the testimony of all of the agents denied any such agreement or combination, and the chan-

cellor decided that no such agreements were entered into by the agents.

The theory of the appellee is that the testimony in the case warrants the finding of the chancellor that the Mississippi Rating Bureau was but the agent of the Southeastern Tariff Association, a voluntary association of insurance companies with headquarters in Georgia; that the Southeastern Tariff Association agreed in advance in the state of Georgia upon the rates of insurance to be charged in Mississippi; that these rates were then sent to the Mississippi Bureau with instructions to be sent out and enforced in this state. There is no direct evidence of any such agreement or understanding, and, if it is to be inferred at all, it must be inferred from circumstances. The testimony in the case shows that for practically fourteen years in ninety-five per cent. out of every one hundred per cent. fire insurance rates were uniform; that these rates were the rates advised to be charged by the Mississippi Bureau. This ninety-five per cent. of uniformity of rate, in connection with other facts contained in the record, and which will be more fully discussed hereafter, constitutes the direct testimony in the case. There is no direct testimony of an agreement directly among the insurance companies, or of an agreement to delegate the rate-making power to the Mississippi Bureau. In other words, the only testimony in the case relating to the violation of this law is circumstantial testimony. The important question, therefore, is whether or not, from this circumstantial testimony, in the absence of direct testimony, the chancellor was warranted in penalizing these appellants.

Before entering upon the discussion of the facts in this case I deem it advisable here to set out the law with reference to circumstantial testimony, as well as the law with reference to the presumption of honesty, innocence, and fair dealing, which must both be applied in this case. In my opinion, when these appellants have been given the presumption of honesty and fair dealing, and that their acts and conduct are presumed to be legal and proper until the

circumstantial testimony in the case has shown otherwise, and is inconsistent with legality and fair dealing, then this presumption is never overthrown, because the circumstantial testimony in no wise controverts the direct testimony and is not inconsistent with the legality and honesty of these appellants. The theory of innocence and legality is not only the more reasonable theory to be drawn from the testimony, but is the theory supported by the uncontradicted direct testimony in the case, and in no wise is contradicted by any circumstantial testimony.

In the case of *U. S. Mutual Ass'n* v. *Barry,* 131 U. S. 100, 9 Sup. Ct. 755, 33 L. Ed. 60, the giving of the following instruction was approved by the court:

"Mere possibilities, conjectures, or theories should not be allowed to take the place of evidence; where the weight of credible testimony proves the existence of a fact, it should be accepted as a fact in the case. Where, if at all, proof is wanting and the deficiency remains throughout the case, the allegation of fact should be deemed not established."

Though this is a civil proceeding, it is to recover penalties, and therefore is akin to a criminal prosecution. The duty rests upon the state to satisfy the court, at least by a preponderance of the testimony, of the violation of the law by the accused.

In 12 C. J., p., 639, par. 234, the rule is thus correctly stated in reference to circumstantial testimony:

"In order to establish a conspiracy, evidence must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise. Disconnected circumstances, any one of which, or all of which, are just as consistent with a lawful purpose as with an unlawful undertaking, are insufficient to establish a conspiracy. However, the doctrine of reasonable doubt has no place in a civil suit for damages where it is sufficient if the evidence is full, clear, and satisfactory, and the conspiracy estab-

lished by a preponderance of the evidence.    This degree of
proof, however, is necessary.    The evidence must do more
than raise a suspicion."

Again, in 12 C. J., p. 639, par. 231: "Conspiracies can-
not be established by a mere suspicion, nor does evidence
of mere relationship between the parties or association
show a conspiracy."

Again, in 22 C. J., p. 144: "It is a well-established prin-
ciple that the presumption is always in favor of innocence,
and this presumption, although rebuttable, remains good,
and must be acted on until it is disproved.    While this prin-
ciple is most important in criminal cases, it is frequently
invoked and relied on in civil cases, in which it restates
the alleged presumption against illegality, etc., as a reg-
ulation of the burden of evidence, and applies whether the
question of innocence or guilty is directly or only collat-
erally involved."

In 17 Cyc., p. 817, the rule is thus stated: "A conclusion
is not supported by circumstantial evidence unless the
facts relied on are of such a nature and so related to each
other that no other conclusion can fairly or reasonably be
drawn from them, and this requirement is strictly en-
forced where decisive direct evidence is probably obtain-
able, but is not produced.    *A fortiori* the circumstances
must agree with and support the hypothesis which they
are adduced to prove.    A fact cannot be established by cir-
cumstances which are perfectly consistent with direct, un-
contradicted, and unimpeached testimony that the fact
does not exist.    Where circumstantial evidence is relied
upon the circumstances must be proved and not them-
selves presumed."

In considering this case it must be borne in mind that
a violation of this anti-trust law by these companies is
by law made a felony.

The law relating to circumstantial testimony and the
presumption of honesty, fair dealing, and the legality of
conduct is elementary and uniform in this country.    This

court has announced these rules in many cases, from some of which we will briefly quote.

In the case of *Wilkins* v. *Riley,* 47 Miss. 306, it is stated: "It seems to us that public policy and the justice of this case concur in leading to the conclusion that the judgment ought to be affirmed. It is a rule that every presumption of law is in favor of the legality of a contract, and it is incumbent on a party alleging its illegality to show everything to render it so. *Brown* v. *Freeland,* 34 Miss. 181. So, when contracts of doubtful import are susceptible of two interpretations, one legal and the other illegal, that construction will be adopted which will make the agreement legal. *Riley's Adm'rs.* v. *Vanhouten,* 4 How. 428; *Merril* v. *Melchoir,* 30 Miss. 516. If these rules as to the interpretation of contracts be applied to the notice accompanying the plea in the case at bar, it falls far short of invalidating the note sued on."

In *Wilkie* v. *Collins,* 48 Miss. 496, it is said: "There is always a presumption that every individual conforms his conduct to the requisitions of duty, as prescribed by law. It belongs to universal jurisprudence, that innocence of an act which the law forbids and denounces as criminal shall be presumed."

In *Clay* v. *Allen,* 63 Miss. 426, it is said: "The illegality of the dealing was alleged by appellant, and it is certainly no new doctrine in this state to say that it was incumbent on him to prove it, and to show everything necessary to make it so. The presumptions of law are in favor of, rather than against, the validity of contracts, and if a contract of doubtful import is susceptible of two interpretations, the one legal and the other illegal, that construction must be adopted which renders it lawful."

The following quotation from *Orrell* v. *Bay Mfg. Co.,* 87 Miss. 632, 40 So. 429, is here set out: "Where a contract is susceptible of two interpretations and capable of being fulfilled in two distinct ways, one permitted and the other condemned by the law, that construction will be placed

upon the contract which will validate it.  The law presumes a lawful intent, instead of an illegal one, on the part of all contracting parties.  These considerations are decisive of the case at bar; though we adhere in every particular to the propositions of law announced upon the previous consideration of this case, as reported in 83 Miss. 800, 36 So. 561."

In *Wherry* v. *Latimer,* 103 Miss. 524, 60 So. 563, 642, it is said: "The law presumes that every man is sane and honest; that all his acts are dictated by correct motives, and are the result of his own independent, intelligent, and unaided judgment.  It also presumes that all his contracts are valid, and were entered into freely and voluntarily in the exercise of an intelligent discretion.  It never presumes dishonesty, mental incapacity, fraud, undue influence, or any other matter tending to vitiate a contract; but always requires proof of facts from which such dishonesty, mental incapacity, fraud, undue influence, or other matter may be reasonably inferred.  And, whenever any person seeks to cancel or overturn a contract on the ground of fraud or undue influence, he must clearly establish by his testimony such fraudulent acts or the exercise of such undue influence as will vitiate the contract, or else a state of facts from which the reasonable and natural inference is that the contract was the result of such fraudulent acts or undue influence."

Relating particularly to circumstantial testimony, the law is thus stated in 10 R. C. L., p. 1007:

"A theory cannot be said to be established by circumstantial evidence, either in a civil or a criminal case, unless the facts and circumstances shown are not only consistent with such theory, but absolutely inconsistent with any other rational theory."

This rule was lately announced by this court, speaking through my Brother ETHRIDGE in the case of *Banks* v. *Banks* (a civil suit), 118 Miss. 783, 79 So. 841, as follows:

"Where an offense of this kind is sought to be proven

by circumstantial evidence, the circumstances must be proven with reasonable certainty, and the circumstances so proven must be such that the conclusion sought to be established follows logically from the facts. If there are two or more reasonable theories which may be drawn from the facts proven, the proof will be insufficient because, to invest mere circumstances with the force of truth, the conclusion must not only be logical, and tend to prove the facts charged, but must be inconsistent with a reasonable theory of innocence."

An agreement or understanding either express or implied in violation of the anti-trust law may, of course, be proven by circumstantial testimony, but, in the language of the *Banks case, supra*:

"The circumstances must be proven with reasonable certainty, and the circumstances so proven must be such that the conclusion sought to be established follows logically from the facts. If there are two or more reasonable theories which may be drawn from the facts proven, the proof will be insufficient because, to invest mere circumstances with the force of truth, the conclusion must not only be logical, and tend to prove the facts charged, but must be inconsistent with a reasonable theory of innocence."

In this case we have specific denials of agreements, understandings, or combinations to fix the price of insurance on the part of the companies, either themselves or through their agents; and we have the comprehensive denials of any delegation of the power to fix rates to the rating bureau. In the testimony we have the direct testimony of all of the local agents that they made no such agreements and had no such understandings among themselves; that they had never been informed by the companies of any agreement among themselves, neither had they been instructed or informed of any agreement to delegate the rate-fixing power to the rating bureau; that, so far as they knew, the rates furnished them by the Mississippi Rating Bureau were advisory rates, are not obligatory or binding, either upon the agents or upon the companies.

The various officers of the Insurance Companies who had charge of the rating department of their respective companies each and every one testified that there was no agreement among the insurance companies to fix or maintain the rates of insurance within the state of Mississippi. Neither had they delegated to the rating bureau of Mississippi any such authority; that, in passing upon the insurance policies sent to them by their agents in Mississippi, each and every company acted independently in accepting or rejecting the policies as written and the rate as fixed by the local agents. Many of these companies checked these insurance policies by the advisory rates sent them by the Mississippi Bureau. Some of these officers testified that they did not even check or compare the policies with the advisory rates of this rating bureau, but that they accepted the rate as fixed by their local agent as being a proper rate; that, if, upon comparison with the advisory rate of the Mississippi Bureau, they found it was lower than this rate or higher than this rate, and if in their judgment they thought the advisory rate was a proper rate, in that event the company would advise its agent to write the policy in accordance with this rate, or to cancel the policy. It is shown that in many instances a company would not think the advisory rate proper, in which event it would order the policy canceled or written at a different rate. The testimony further shows that there were certain hazards or risks upon which certain companies were not willing to issue policies at all. All of which testimony will be discussed more in detail later on in this opinion.

We will attempt briefly to state the material facts upon which the appellee relies for an affirmance.

There was introduced in evidence a book published by the Southeastern Tariff Association, called "Quarter-Centennial History of the Southeastern Tariff Association, 1882-1907." As its name indicates, it is a history of this association. This book shows that prior to 1880 there was some association of fire insurance companies with head-

quarters in New York, the object and purpose of which was to fix and maintain fire insurance rates throughout the United States; that in 1880, because of fire losses, this board was practically abandoned, and the rate-making power left to the local agents over the country; that this policy became unwise, and resulted in the formation in 1882 of the Southeastern Tariff Association. This association was a voluntary organization of these insurance companies, or of certain insurance companies by which the power to make and maintain rates of insurance within the territory covered by the organization was delegated to this association. It seems that at first the state of Mississippi was not included within the jurisdiction of this association, but was in the year 1890 included therein. From that year until 1900 the Southeastern Tariff Association fixed the rates of insurance, as well as maintained them, in this state. In 1897 these companies which were members of the Southeastern Tariff Association were indicted in this state for a violation of the anti-trust law. A demurrer was overruled in the circuit court to this indictment. The case was appealed to the supreme court, and the court held that the demurrer should have been sustained. This case (*Fire Insurance Companies* v. *State*) is reported in 75 Miss. 24, 22 So. 99. It is unnecessary to set out the facts or the decision of the court in that case. After this decision the Southeastern Tariff Association, through its proper officer and the attorney-general of Mississippi, agreed that this association would withdraw from the state of Mississippi, and the state would not further prosecute it for a violation of these laws. The testimony of this officer of the Southeastern Tariff Association is to the effect that this association has kept this agreement; that it withdrew from the state of Mississippi, and has never since, either directly or indirectly, controlled or attempted to control the rate of insurance in Mississippi, or in any way operated within this state. Returning, however, to this history counsel for appellee quotes the following from it:

"The fire insurance companies of the entire country, with full conviction of the absolute necessity for co-operation in rates and practices as means to an end, to-wit, the life and perpetuity of their corporations, had formed a national board with head offices in New York City, where every department of fire hazard had received skillful consideration and rates were promulgated on this technical and wise review."

He then refers to the organization in 1882 of this association, and makes the following quotation from this book:

"To organize, yes, and to maintain local boards; to establish, yes, and to enforce adequate rates; . . . and then they piled 'Ossa upon Pelion' by adding uniform commission to agents."

Reference is then made to a meeting of this association held in 1901. The proceeding of this meeting show that the association was then operating only in four states, "for inimical legislation had forced retirement from Louisiana and Mississippi in 1900." We now quote from this meeting:

"The president refers to the resolution introduced, at the last annual meeting, . . . providing for inspection bureau for noncompact states; and he reports that, while no action has been taken on that line specifically, yet the agitation of the subject has resulted in the formation of an inspection bureau, and this will perform such service for compact and noncompact states alike. The association ratified what had been done on this line, and amplified the work, but prescribed specifically that it should not be undertaken in Mississippi until allowed by the officers of the law. It seemed very unfortunate that the people should be denied the benefits resulting from expert inspection of property for the prevention of fires, but it was unavoidable under existing conditions in that state."

Counsel refers to that part of the answer of the appellants which reads as follows:

131 Miss.—29

"Defendants would show that the rates advised by said Advisory Rating Company are not provided alone for the benefit of the defendants or other insurance companies, but are provided for the general public; in other words, for all parties interested. Defendants are informed and believe and so charge the fact to be that the primary purpose of the establishment of the said rating company was to protect the public against unjust discriminations in rates and to prevent, as far as possible, waste and expense, and to reduce the price of insurance for all parties interested to its actual value. In other words, the primary purpose of this rating company was for the protection of the insured and for the purpose, as far as possible, of providing for just, reasonable, and uniform rates under similar conditions, and that the services of said rating company are to a large extent used by the public, the insured, and have been largely instrumental in harmonizing the dealing of the insurance companies, your defendants, with the insured, and reducing rates and lessening risks.

"The defendants would show that in order to meet the requirements of the insuring public it is necessary for them, and each of them, to use the rates and information furnished by the said Advisory Rating Company, and that their rates should be practically uniform. This arises from the necessity of the case, and not from any agreement, combination, or conspiracy on the part of the defendants to use said rates or have uniform rates. And the fact that the agents of many of the defendants throughout the state of Mississippi have been using rates advised or information given by the said rating company has resulted in the fact that the rates are practically and generally uniform, as they should be under similar circumstances and conditions, but the defendants aver that the use of the rates by them or their agents was not by reason of any agreement, combination, or conspiracy on their part to fix rates or price or premium to be paid on insurance, but they were acting at all times upon their independent judgment and discre-

tion, and not to defraud the public or anybody else, but simply for the purpose of adjusting their rates to a fair and proper standard, and stabilizing, as far as possible, the insurance business, and giving to the public the protection for which it paid a fair and reasonable price, and to place the small property owner on the same footing, as to rates, with the large insurers of the same class of property."

There is nothing in this history that shows that the Southeastern Tariff Association intended to violate the laws of the state of Mississippi by attempting to regulate the rates of insurance therein. It shows that these companies thought it important to have an inspection bureau to operate in all states, but that such bureau would not be put into Mississippi until allowed by the officers of the. law. In other words, if it shows anything it merely shows that the companies did not intend knowingly to violate the laws of the state of Mississippi. Right here, however, I might digress sufficiently to state that an inspection bureau of these insurance companies could legally operate within this state. An inspection bureau is merely a bureau which inspects insurable property, and makes a detailed report as to its condition, surroundings, construction, equipment, etc. Such a bureau is in no sense a rating bureau. The inspection is one thing and the rating of the inspected property another. An inspection bureau solely will not even attempt to advise the rate of insurance to be charged. An inspection and rating bureau both inspects the property, and either advises or fixes the rate of insurance to be charged thereon. It is not controverted by the appellee that a purely inspection bureau maintained by the insurance companies jointly would violate this law. In fact, the only violation of the law is the agreement or understanding, either expressed or implied, to fix or maintain rates of insurance or delegate to the rate-making bureau this power. This is the plain language of the act, and this, as we understand, is the only contention of coun-

sel for appellee. Consequently there could have been nothing illegal in the maintaining of a purely inspection bureau by these companies had they done so. However, there is not one particle of testimony in the record to show that they even did this.

Neither is there any admission of any agreement or understanding to fix or maintain rates or to delegate this power to the rating bureau by the statement above quoted contained in the answer. This statement is practically a self-evident truth. By reference to the charter of the Mississippi Rating Bureau it will be seen that it was not chartered solely for the interest of insurance companies, but for the interest of the insuring public as well, to protect the public against "unjust discrimination in rates, and to prevent, as far as possible, waste and expense, and to reduce the price of insurance for all parties interested to its actual value," and that, "in order to meet the requirements of the insuring public, it is necessary for them, and each of them, to use the rates and information furnished by the said Advisory Rating Company, and that their rates should be practically uniform. This arises from the necessity of the case, and not from any agreement, combination, or conspiracy on the part of the defendants to use said rates or have uniform rates." In other parts of the answer these agreements and combinations are expressly denied. This part of the answer merely shows what, in the judgment of the insurance companies, is the effect of the use of these rates. Unless the rating company is an illegal organization of the state of Mississippi, or unless it has not in good faith lawfully exercised the powers granted it under its charter, then, though the practical results of the use of its rates is a uniformity of rates, no insurance company has violated the anti-trust laws by the use of these rates.

The answer in the *Miller case,* 126 Miss. 301, 88 So. 711, contained practically the same statement as that above quoted.

The history of the organization of this Mississippi Bureau is uncontradictedly as follows: After the Southeastern Tariff Association withdrew from the state of Mississippi in 1900, the insurance companies continued in business in the state. There were left in the hands of the agents some of the old rate books of this association. In addition thereto the agents had copies of the rates charged on specific pieces of property by them. In some instances an insurance company would adopt as its rate in the state the rate formerly used here by the Southeastern Tariff Association. The local agents upon this information wrote insurance. There was no inspection bureau to inspect property, and, unless different agents of companies did this work, the local agents arrived at the rates as best they could. Without going into the details as to the insurance business conducted during this time, it is characterized as having been in a chaotic condition. A. A. Weille organized in 1903 the Mississippi Inspection & Advisory Rating Company. He seems to have been its president, and the dominating factor in this company since its organization until the present time. The testimony shows that he had been engaged in the insurance business for many years in Mississippi, and also in Texas; that he was conversant with the conditions existing in Mississippi; that while in Texas he had observed similar conditions, and the organization in that state of a similar bureau; that he believed there was a demand in Mississippi for the organization of such a bureau. He interested with him three other citizens of the city of Vicksburg, and these four gentlemen were granted a charter. Section 2 of the charter of this bureau reads as follows:

"The purposes for which said corporation is formed are as follows: To inspect risks, classify and promulgate advisory rates of insurance for the public on all classes of property subject to insurance, both fire and marine, and to suggest a proper means of construction and maintenance, and protection to buildings, so as to prevent as far as possible waste from fires, and to reduce the price of insurance

on same for the benefit of all parties interested, and for said purposes, shall be authorized to print and sell in printed form the rates and suggestions so made and to otherwise charge reasonable fees for its services."

This company, however, until 1906 was unable to sell its advisory rates to insurance companies. It seems that these companies were doubtful as to whether or not the use by them of these rates would be violative of the Mississippi Anti-Trust Laws. In 1906 the then insurance commissioner of Mississippi wrote a letter to the attorney-general of the state, inquiring whether or not a purchase and use of these rates by the insurance companies would violate these laws. The attorney-general answered this letter as follows:

"I do not think that the purchase by insurance companies of the information to be compiled and printed by the Mississippi Inspection & Advisory Rating Company can be construed into a violation of the Mississippi statute against trusts and combines. In order to bring the several insurance companies purchasing this information within the condemnation of the statute, there must be some combination, contract, understanding, or agreement expressed or implied, among such companies, either directly or through the medium of said rating company, or between the company so purchasing and the said rating company, to adopt and use the rates and data so purchased as an agreed basis upon which the cost of insurance shall be regulated. As long as there is no such agreement by which the price of insurance shall be controlled, the transaction is a legitimate one, and cannot be in any way inimical to the public welfare. This opinion is written with full knowledge of the provisions of chapter 145 of the Code of 1906 and applies to the Code of 1906, as well as the law as it existed previous to October 1, 1906."

Thereafter the rating company sent to each fire insurance company doing business in the state a copy of this opinion of the attorney-general, also a copy of its charter

of incorporation.   In order to show the nature of these letters, I quote in full that written to the Hanover Fire Insurance Company as follows:

"Vicksburg, Miss., Sept. 28, 1906.

"The Mississippi Inspection & Advisory Rating Company, chartered under the laws of the state of Mississippi and domiciled at Vicksburg, will begin active operations under date of October 1st, prox.   We herewith inclose certified copy of correspondence between the insurance commissioner's and attorney-general of Mississippi's office, which fully explains and sustains the right of this company to make advisory insurance rates, and the right of any insurance company doing business in Mississippi to purchase and use same.   In addition to the attorney-general's opinion, we have the concurring opinion in writing of Messrs. King, Spaulding & Little, of Atlanta, Ga., and Messrs. McLaurin, Armistead & Brien, of Vicksburg, both of which firms are well and favorably known in insurance circles. Several capable, trustworthy men are in consideration for the position of secretary (who will have entire charge of the management), and a careful selection will be made.

"We would be pleased to sell you our rates for Mississippi, and herewith inclose you a blank form of contract in duplicate, which we will appreciate if you will sign and return, whereupon the signature of this company will be affixed, and one of said copies returned to you.   You will note that the contract explicitly states that there is no obligation, expressed or implied, upon the part of the purchasers of our rates to observe same.   Our terms are one per cent. of your annual gross premiums in Mississippi, less cancellations, payable for six months in advance, minimum charge not less than fifty dollars for any one company.

"We feel it proper to advise that no ratings furnished by company representatives will be issued by us, but any information relative to the condition of risks will be appreciated.   Requests for advisory ratings should be made

direct to this office, or through the medium of the local correspondent. A list of same will be furnished later. Below will be found a list of subscribers to date, and we would advise, further, that we have assurances from a large number of companies, not named in the list, of their intention to subscribe at an early date."

Up to October 1, 1907, 40 companies subscribed for this information. The agreement, made between the rating company and the insurance companies, was as follows:

"In consideration of one per cent. of the gross premiums in Mississippi, less cancellations, of the undersigned insurance company, as returned to the insurance commissioner for the year ——, amounting to $——, the receipt of one-half of which is hereby acknowledged, the remainder to be paid April 1, ——, the Mississippi Inspection & Advisory Rating Company does hereby agree to furnish to the undersigned insurance company and its agents all of its advisory rates to be made upon property in Mississippi, from October 1, ——, to October 1, ——; it being especially understood that there is no obligation, expressed or implied, direct or indirect, upon the part of this subscriber to observe or maintain said rates."

No insurance company owned any stock in this Mississippi Rating Company. Mr. Weille was not a rate expert, but he employed as his assistant or secretary a Mr. Taylor, now dead. Taylor was an engineer of experience. He had formerly been employed by the Southeastern Tariff Association. He was with this company until his death, several years ago. He was succeeded as secretary by Mr. Robertson, also an experienced engineer. The first work of this company was only that of making specific rates. It first classified, made maps of, and specifically rated all of the towns in Mississippi. The result of this work, namely, the specific rating of these towns under this contract, was sold to the insurance companies for this one per cent above shown by its agreement with them. Later on in 1911 it undertook also inspection work, and the re-

sult of these inspections was furnished the companies, at which time it charged a rate of one and nine-tenths per cent.

It is contended by the appellee that neither Weille, Taylor, nor Robertson could make a basis rate and that this of itself is an evidence of the fact that this company was but an agent of the Southeastern Tariff Association. The testimony shows that during the year 1908 the local agents of the insurance companies insisted that the Mississippi Bureau furnish them with a book of basis rates. There was a great deal of property in the country upon which insurance was written which was not included in the specific rates for the cities and towns. Mr. Weille testifies that when his company first began doing business in Mississippi he made an examination of the different rates of insurance in force in a number of states, especially in the Southern States, where the conditions were practically similar to those existing in this state; that he examined and once thought of adopting as the advisory rate in Mississippi the Deans schedule, used in Arkansas, but that this was different from the rates previously used in Mississippi, and because it would be difficult for the agents to understand this rate he discarded same. He examined the rates of the Louisiana Fire Prevention Bureau, an organization under the control of the state of Louisiana. He also examined the rates in use by the Southeastern Tariff Association. The testimony in effect shows that the Louisiana rates under the control of that state were the same as the rates of the Southeastern Tariff Association. Mr. Weille said he did not think it was a good idea to try to revolutionize insurance rates in the state of Mississippi, and that, after considering all of the different rates of these different states, his company, after a conference of its stockholders and directors, concluded that the rate of the Southeastern Tariff Association as promulgated by it in 1908 was a proper basis rate to be used in Mississippi; that in arriving at this conclusion they did not confer or

consult with any of the insurance companies doing business in the state of Mississippi, but that this was the deliberate result of the independent judgment of the stockholders of the Mississippi Bureau; that they thought these rates were proper and reasonable rates both for the insured and the insurer in the state of Mississippi. Acting upon this conclusion, this bureau sent to Atlanta, Ga., its then secretary, Mr. Taylor, to procure one thousand copies of this basis rate book of the Southeastern Tariff Association. The facts relating to the securing of these books as testified to by the secretary of the Southeastern Tariff Association are uncontradicted, either by direct or circumstantial testimony. He testified that Mr. Taylor came to him and asked him to sell to this Mississippi Bureau 1,000 copies of this book. He declined to do so, giving as his reason therefor that the Southeastern Tariff Association had withdrawn from the state of Mississippi in 1900, and had not since this either directly or indirectly operated in the state of Mississippi, or in any wise attempted to interfere with the rates of insurance in this state. Mr. Taylor then went to the Lester Book & Stationery Company, a printing company organized and doing business in Atlanta, Ga. This company had printed the book of the Southeastern Tariff Association. This book, was however, uncopyrighted, and no instructions by this association had been given to this printing concern not to print other copies or to sell them to other parties. This concern is a corporation of the state of Georgia, a separate and distinct entity from the tariff association. Its only connection with the tariff association was to print for it this book. Upon the completion of that work its relationship with that association ceased. Taylor made a contract with this book company to print and ship to the rating bureau at Vicksburg, Miss., one thousand copies of this book. This was done. When this book reached the Vicksburg bureau it had printed therein:

"Any agent who shall write, place or cause to be placed a risk, or who shall bind or issue a policy, at less than the rates herein authorized, or in violation of these rules, will be required to cancel the same and will not be permitted to write on the said property for one year thereafter."

This section was cut out of the Mississippi Inspection & Advisory Rating Company's book. Also there was stamped on the first page of the book the following:

"This book is the property of the Mississippi Inspection & Advisory Rating Co., of Vicksburg, Miss., and same is loaned, subject to recall, as general information on standards for construction, equipment and protection.

"The contents of this book must be considered as advisory information, only, and no part of the book shall be considered as obligatory or binding, on the part of any one. Mississippi Inspection & Advisory Rating Co., Vicksburg, Mississippi."

These books were then sent by the Mississippi Bureau to the home offices of the insurance companies, and also copies were sent to the local agents over the state for their use.

It is the contention of the appellee that this conduct was in effect the re-entry of the Southeastern Tariff Association into the state of Mississippi, and that these rates adopted by the rating bureau as advisory rates, having been previously agreed upon to be used and maintained by the Southeastern Tariff Association in the states wherein it operated, was a bringing back into the state of Mississippi of the agreement to use and maintain these rates within this state.

It is the agreement to fix and maintain rates which is prohibited by our anti-trust law. It was this agreement that was condemned by this court in the *Insurance case* in 75 Miss. 24, 22 So. 99. It is this agreement which is condemned in the case of *Miller* v. *Insurance Co.*, 126 Miss. 301, 88 So. 711. By reference to the decisions of the supreme court of the United States, as well as to other de-

cisions of this court, it will be readily seen that it is the
agreement that is always condemned. The agreement be-
tween the state through the attorney-general and the in-
surance companies was to withdraw the agreement to fix
and maintain insurance rates in the state of Mississippi
from Mississippi. In other words, it is not the rate itself
that violates the anti-trust law, but it is the agreement to
fix and maintain the rate which violates the law. The rate
itself may be reasonable or unreasonable, but, in the ab-
sence of an agreement, however unreasonable it may be,
it does not violate the law. Consequently the only thing
violative of the law was the agreement of the Southeast-
ern Tariff Association, and the day after that agreement
with the attorney-general was entered into each Insur-
ance company, though they were members of this As-
sociation, had a perfect right, acting independently, with-
out an agreement, to instruct its agents to continue to
use the rates of the Southeastern Tariff Association as the
rate of that company. The use of this rate in the absence
of any agreement does not, and could not, in any way
violate the anti-trust law of this state. This fact was ex-
pressly decided by this court in the *Miller case, supra,* in
which decision all of the members of this court concurred.
This decision is neither modified nor overruled by the
three members of this court who are voting to affirm the
case at bar upon the question of liability. In fact, since
it takes four members of this court to either overrule or
modify a decision, the decision in the *Miller case, supra,*
stands unmodified as the law in Mississippi today. This
opinion explicitly holds that, in the absence of any agree-
ment, any insurance company has a right to adopt any rate
of insurance it pleases in the state of Mississippi as its
rate. It further holds that each and every insurance com-
pany holding business in the state of Mississippi, acting in-
dependently, without any agreement with any other in-
surance company or with the rating bureau, can adopt as
the rate to be charged for insurance in Mississippi the
rates promulgated by the rating bureau. It is always the

agreement that is condemned, and never the rate of insurance. Consequently these rates of insurance were not outlawed in Mississippi, and the Mississippi Bureau, acting independently, and using its own judgment, aside from any agreement with any insurance company, had a perfect right to adopt as its basis rate within the state of Mississippi these rates of the Southeastern Tariff Association, or any other basis rate wherever found in the United States, provided it did so without making any agreement with any insurance company so to do. There is no testimony, either direct or circumstantial, to contradict the fact testified to by Weille, who by the way was put upon the stand, and was a witness for the appellee. Being appellee's witness, his veracity is necessarily vouched for by the state of Mississippi, and the state at no time expressed any surprise at his testimony, or asked to contradict or impeach it in any manner. Neither is it contradicted by any direct or circumstantial testimony in the case as to why and how and the manner in which these rates were adopted by this bureau. This company was under no contract with the insurance companies to furnish them with a basis rate. Its only contract was to furnish them with specific rates, and this it had already done. It is further shown by the uncontradicted testimony in the case that the 1908 basis rate book of the Southeastern Underwriters' Association was gotten out by this association for use only in the four states in which it operated. Mississippi was not one of those states.

Neither can there be anything in the contention of the appellee that, because none of the agents or officers of this rating bureau was competent to originate in the first instance a basis rate, this fact shows that the bureau was but a sham and a fraud, and the agent of the Southeastern Tariff Association. The direct testimony in the case, which is uncontradicted, shows that the basis rates for fire insurance companies are merely the results of the experiences for years of all of the companies. Entering into

this rate is the fire loss, the fire hazard, to which is added the cost of doing business and a reasonable profit. That the data from which a rate is made from time to time shows that a change is necessary in the rate. Sometimes the fire losses for a period of years upon certain classes of business will show that the rate for this class has been too low. Therefore the result will be a raising of this particular rate. Conversely, the fire losses of another class will have been so small that the rate should be lowered. The basis rate over the entire country is based upon the experiences of the companies practically from the time they began doing business. It would therefore be impossible for any man or set of men to originate at this time a basis rate. The only proper way to arrive at a basis rate, as shown by the uncontradicted testimony in the case, is to take the experiences of the companies relating to the fire losses of all classes of insurable property, considered with the average cost of doing business and allowing a reasonable profit to the companies. It is shown that every basis rate referred to in this case, either made by an association of the insurance companies or where this rate is under the supervision of a state, is arrived at in this way. These facts were ascertained by the Mississippi Bureau when it began business. Mr. Weille, the president of this bureau, testified that, after an examination of the basis rates of the various states whose conditions were similar to those of Mississippi, his company concluded that the basis rate as shown by the 1908 rate book of the Southeastern Underwriters' Association was a proper and reasonable basis rate book for conditions existing in Mississippi. The secretary of the Southeastern Underwriters' Association and other witnesses testified about basis rates. This testimony in effect shows that these basis rates are compiled from records, data, and experience contained in old basis rate books, to which is added, of course, the experience obtained from data between the compilation of the last book and to the time of the getting out of the new book. In other

words, these basis rates are based on experience, and were changed from time to time as conditions demanded.

The record does not show that the officers of the rating company were not competent to adopt a proper basis rate for the state of Mississippi. On the other hand, it shows that they were very careful in making an examination of the different rates, and exercised their own judgment as to what was a proper basis rate for this state. And, so far as this record shows, they were thoroughly competent to decide this question, and it is not intimated or contended that their decision was not a correct and a wise one. The testimony shows that Weille was an experienced insurance man, that his secretary Taylor, was an experienced engineer, who had previously been in the employ of the Southeastern Tariff Association, and was thoroughly competent and efficient to inspect and classify the various risks of insurance in the state of Mississippi. The same may also be said of Robertson, who became the secretary of the rating company upon the death of Taylor. The uncontradicted testimony shows all this. It may be true that the rating company could not originate basis rates. By its charter it was not expected to originate basis rates, but merely to recommend advisory rates in Mississippi. The uncontradicted testimony shows that the agents and officers of the Mississippi company were competent and capable and efficiently exercised the charter powers granted them by the state.

However, if they were incompetent or inefficient, these companies could not be convicted in this case because of these reasons. The rating company is not a party defendant to this suit. It is not shown to be the agent or a mere branch of the Southeastern Underwriters' Association, but is shown to be a Mississippi corporation. Consequently, if its work was improperly or inefficiently done, this fact would not alone warrant the penalizing of these defendants. Before these defendants can be penalized in this case the testimony must show that the Mississippi Rating

Bureau was the mere agent of the Southeastern Underwriters' Association to enforce within the state of Mississippi the rates of this association previously agreed upon to be enforced and maintained in Mississippi by this association acting for the Southeastern Underwriters' Association in Atlanta, Ga., and this is the real contention of the appellee in this case.

The appellee further contends that the Mississippi Bureau should not have advised a specific rate or a basis rate which contained anything except the data relating to the fire hazard; that necessarily the cost of doing business and a reasonable profit to each company is different, and for this reason the advisory rate of this bureau should not have contained any part of a rate based on the cost of doing business and a profit.

The charter of the rating bureau authorizes it to sell advisory rates. This necessarily means a completed rate into which enters every element necessary to make the whole. In making a rate there is included therein the average cost of doing business, plus a reasonable profit, and this data is obtained from this experience for a number of years. In other words, it is but an average gathered from the experience, just as the fire hazard is. However, a complete answer to this contention is that the rating bureau had a perfect right under its charter to sell as advisory rates what it thought was a proper rate to charge for insurance, which means a complete rate. I find, however, from an examination of other basis rates and specific rates, that they are completed rates, including the cost of doing business together with a reasonable profit, as well as the fire hazard, just as the rates sold by the Mississippi Bureau were. In fact, so far as we know, every rating bureau in the United States gets out complete rates, just as the Mississippi Bureau does.

The appellee contends that, since the insurance companies did not furnish their local agents with any other rates except those promulgated by the rating company, and

since it is necessary for an agent to have some rates to go by, this is an evidence of an agreement among the Fire Insurance Companies to adopt and maintain the rates of this bureau, or as evidence that the bureau was but the agent of the tariff association to enforce previously agreed upon rates.

I have already discussed the conditions existing after the withdrawal of the tariff association from the state. The insurance companies, after being informed by the attorney-general that they had a legal right to subscribe to the rates of the Mississippi Bureau, and use them in the absence of an agreement, received these rates at their home offices, as well as knew that they were put in the hands of their agents. Necessarily they had a perfect right, in the absence of an agreement among themselves, or with the rating company, to leave it with their agents in the first instance to use these rates in writing policies. These policies were then sent to the home offices, where they were examined, and, if the companies thought the rate reasonable, the insurance was allowed to remain in force. If for any reason they thought the rate unreasonable, or did not like that character of insurance, they would have the policies canceled so far as the testimony shows, each company acted independently in passing upon each policy of insurance written by its local agent, either accepting or rejecting it as it saw fit without any understanding or agreement of any character whatever with any other company or with the rating bureau. Any company acting independently had the right, if it so desired, to use as its rate of insurance in Mississippi the advisory rate recommended by the Mississippi Rating Bureau. Every company doing business in the state of Mississippi, acting independently, upon its own initiative, in the absence of any agreement or understanding with any other company, or with the rating company, had the right to adopt as its rate of insurance in Mississippi the advisory rate as promulgated by the rating bureau of Mississippi. In this

131 Miss.—30

event there would be no agreement or understanding, and, as stated before, the statute only condemns the agreement or understanding. *Miller* v. *Insurance Co., supra,* discusses and expressly decides this point.

The establishment of a rating and inspection bureau in a state naturally tends to a uniform rate of insurance. The companies who subscribe for these advisory rates necessarily do so because they believe that the rates are reasonable and proper, and based on accurate data and information. If they did not believe this, they would not subscribe for them. The work of a rating bureau relieves the insurance companies either jointly or separately from gathering this information for themselves. The record in this case shows that the Mississippi Rating Company at great expense specifically rated every city and town within the state, making maps thereof, and showing the true condition of all of the insurable property within these municipalities. In addition thereto it has advised and recommended proper construction of buildings, both public and private, in order to prevent fire waste, reduce this fire danger, thereby lessening the price of insurance, and lessening the dangers from fires. This service it performs gratuitously to the people of the state. This is done both for the benefit of the property owners and the insurance companies. The insurance companies had a perfect right to furnish no other rate than this advisory rate to their agents, and no inference except that of legality in the conduct of their business can be drawn from this fact.

The appellee insists that the amendments adopted from time to time by the Mississippi Bureau were practically all amendments previously adopted by the Southeastern Tariff Association, and that this fact is an evidence that the rating bureau is but an agent of the tariff association. These amendments are elaborately discussed in the briefs of counsel for appellee and appellants. It is impossible to consider and compare these amendments in this opinion, though these comparisons have been made by the

writer. With reference to them I wish to state, first, that the uncontradicted testimony of Weille and Robertson shows that all amendments adopted by the rating bureau were done so by them upon their own independent judgment, without any suggestion or dictation from any outside source; that they were adopted because they thought them proper on account of existing conditions. If this testimony is not contradicted by other direct or circumstantial testimony, it would not be an evidence of guilt in this case. The Mississippi Bureau has a perfect right, if in its judgment it is proper, to adopt any and every amendment promulgated by the Southeastern Tariff Association. During these fourteen years the Southeastern Tariff Association adopted three hundred fifty-two amendments; the Mississippi Bureau adopted one hundred sixty-five— not quite half. Some of these amendments are identical, some were similar, and some different. In some instances the Mississippi Bureau adopted an amendment before the Southeastern Tariff Association adopted a similar amendment. The testimony shows that it was a custom of rating bureaus to exchange information for the benefit of the bureaus. In this case the testimony shows that the Mississippi Bureau received the information, amendments, and tariffs of other rating companies; that, in addition to this, it kept in touch with the conditions in Mississippi, and from insurance journals and other papers kept in touch with the general insurance business over the United States, and that it acted upon all of this combined information in the promulgation of its various amendments. Various amendments adopted by the Southeastern Tariff Association and by the Mississippi Bureau were adopted by various other bureaus of this character throughout the United States. In other words, these bureaus attempted to keep in touch with the times, and amended their rates and schedules as conditions warranted. The fact that the Mississippi Bureau sometimes adopted an amendment before the tariff association did so, and also the fact that it had

different amendments in some instances from the tariff association, and also had similar amendments in some instances, and in some instances identical amendments, tends rather to show that it was acting upon its independent judgment, instead of merely following the dictation of the tariff association. The testimony as to why these amendments were adopted, and that they were adopted upon the judgment alone of the Mississippi Bureau, is voluminous and uncontradicted, and the similarity and identity of some of these amendments in no wise controverts this direct testimony.

Certain local agents of the insurance companies testified on behalf of the appellants. It was agreed that other local agents in the state would testify to the same effect. I believe it is stated that this testimony will be equivalent to either that of six hundred or eight hundred local agents within the state of Mississippi. The testimony of these agents is to the effect that there was no agreement among them to write insurance according to the advisory rates of the Mississippi Bureau; that in most instances each agent in writing insurance wrote it at the rate advised by the bureau because he thought the rate was proper and reasonable. I might go a step further, and say that, in addition to this fact, these agents may have thought that their companies would be more apt to accept business if written in accordance with this advisory rate. They all testified, however, that they considered the rate as advisory only, and not as obligatory upon them. Though there were variations from the rate of the Mississippi Bureau, I shall assume that in ninety-five out of every one hundred policies this rate was followed. The agents further testified that they knew of no agreement among the companies to maintain these rates. Many policies written below the advisory rate were accepted and remained in force during their life. Sometimes policies written below the advisory rate were returned to the agents; the company so returning the policy would instruct the agent, in

effect, that the policy was not written at the advisory rate, and that the company believed the advisory rate was proper, and to write the policy at that rate. The testimony shows that the policies when written were sent directly to the home office of the company issuing the policy. There was no central bureau either within or without the state where all insurance policies were sent and checked to see that a uniform rate was followed. None of the general or special agents of one company had a right to inspect the books of any other company in the office of the local agents. The testimony of the officers of the different insurance companies showed no agreements or understandings whatsoever on their parts to fix or maintain rates in this state; that each company had its own particular way of examining, accepting, or rejecting policies written in Mississippi, that they absolutely acted upon their own independent judgment in doing this, without regard to any other company. In short, there was no concert of action whatsoever among local agents or among insurance companies about writing, examining, accepting, or rejecting the policies. There is no direct testimony to contradict these facts. There is no circumstantial testimony that tends in any wise to contradict these facts.

There is certain testimony contained in the record which counsel for appellee contends contradicts this direct testimony which we will now briefly analyze:

Mr. Becker, local agent for some of the different companies, testified that he followed the advisory rates of the Mississippi Bureau because he considered them fair and correct; that he was perfectly free to cut the rate if he desired to do so. He did not consider it good business policy to cut the rate as advised by the bureau. He knew of other companies writing below the advisory rate. He did not report them to any agent of his companies. He lost several policies in this way. In one case he knows as a fact that he lost a policy. He said nothing about it. The man was a friend of his, and he knew that if he made him

pay a higher rate he would "have it in for" him. He made no report of it; consequently what might or might not have been done was merely the expression of opinion. Of course he did not know and could not say what would have been done about the policy. This tends to prove nothing.

Another agent, Mr. Bourgeois, testified that he never reported any other agent for writing below the advisory rate. He was once reported by some competitor for writing below this rate, but on examination it was found he had written by the rate. The competitor reported him to the company that lost the business, and he supposes his company was informed of the fact by the other company. Upon objection the witness stated he did not report it, and the matter was dropped. Another instance of what he supposed was done. As a matter of fact he did not know whether the matter was reported to his company by any other company or how his company found it out—all hearsay testimony, which proves nothing. Right here it might be remarked that the suit was for penalties for fourteen years, and the various incidents enumerated and to be enumerated cover this period.

Roberts and other local agents testified in effect that they used these rates of the Mississippi Bureau as advisory; that they wrote below them when they desired. Ordinarily they followed the suggestions of the bureau. No company instructed them to do so. That when he (Roberts) knew of another agent writing below this advisory rate he would occasionally take up with the company that lost the business. He does not state that his company ever did anything about it. It is perfectly consistent to assume that agents in explaining to their companies why they had lost business would give as a reason a lower rate written by some other agent. There can be nothing inconsistent with the theory of the proper transaction of this business in the state to be drawn from such testimony.

Miss Benthal never reported a competitor for cutting a rate. On one occasion she complained to the rating bureau about it, and was informed by it that it had nothing to do with enforcing rates, and was not interested in the matter.

Smith never had any instructions from his companies what to do when he found competitors writing below the advisory rate. He sometimes complained to his companies about agents getting business from him by writing below this rate. Sometimes the rate would be raised to the advisory rate, sometimes he did not know what happened. Of course he did not know, and there is no testimony to show, that the company losing the business made any complaint to the company getting the business. There is no testimony to show whether the company that would subsequently raise the rate did it or not of its own independent will. Therefore, applying the rule that the transaction was legal and proper, it is to be assumed, in the absence of any testimony to the contrary, that, where a rate was raised to the advisory rate, this was done by the company acting independently in the absence of an agreement with any other company.

Another incident mentioned is the insuring of the Clarke county courthouse. The president of the board of supervisors was told by an insurance agent that there was no necessity to advertise for bids, as there would be no competition in the price for the insurance. Advertisements were made, different bids were submitted, and the lowest bid accepted, at which time an unsuccessful bidder, a local agent, stated that the policies would be cancelled. The policies were canceled. The local agent who was the successful bidder, however, got the insurance written in another company. The board was requested not to say anything about the premiums paid on this policy. The dissatisfied agent who lost the insurance testified that he did not make any report of this matter to any one. I do not therefore know why the first policies written were can-

celed.  It must be presumed that the company or companies in which they were written acted according to the law, and, using their own judgment, without any agreement, declined this risk.  In fact we do not even know whether this policy or policies were written by any of these defendants.  This testimony is entirely too vague, and is absolutely of no probative value whatever.

Mr. O'Brien, of the Jackson Lumber Company, insured his plant with the local agency of Nugent & Pullen, obtaining from them a rate below the advisory rate.  Some time thereafter Mr. Nugent informed him that he would have to cancel these policies and write at the rate advised by the Mississippi Bureau, because ' pressure had been brought to bear upon the companies to do so.  Mr. Nugent is dead, and we have not the benefit of his testimony.  His partner testified that he knew nothing about any pressure being brought to bear on his companies.  The record is silent as to who brought to bear this pressure, whether it was brought to bear on these companies collectively or individually, whether it was brought to bear on them by other insurance companies, or by their stockholders, or by some other corporations or individual.  The record is silent as to what the pressure was.  This testimony is entirely too vague, general, and indefinite to show anything.  We must presume, in the absence of testimony to the contrary, that these companies were not violating the law of Mississippi; that this pressure was not brought to bear upon them by other insurance companies by virtue of any unlawful agreement to fix or maintain rates within the state of Mississippi.  Another instance of testimony with no probative weight whatever.  This testimony, however, was admissible.  No *prima-facie* case to fix or maintain these rates was ever made out at any stage of the case.  Consequently, at no point in the stage of the proceedings were the admissions of any coconspirator evidence against the other alleged conspirators.

Mr. Sivley wrote insurance from 1906 to 1914. He considered that the advisory rates were obligatory upon him. He was never told of any agreement of the companies to use or maintain these rates. He might have been individually instructed by some of these companies to follow these rates. To the same effect is the testimony of Mr. Galloway. We have elsewhere stated that, in the absence of an agreement, these companies had a right to adopt these rates as their own in Mississippi. The thing to be proven is the agreement; not the uniform use of the rate.

Practically all of the fire insurance written in the city of Jackson was written according to the advisory rate of the bureau. Mr. Nelson, a local agent, ascertained that the bureau was going to recommend a higher rate in Jackson on certain classes of property; also that the bureau at some future period would recommend that Jackson be rated as a first-class instead of a second-class city, which would reduce the rates of insurance within the city. He and other agents requested the bureau not to advise a raise in rates until Jackson was put in the first class. This was a very commendable act upon the part of Mr. Nelson and other insurance agents. These agents were also following the advisory rate. They had no agreement to do so, but thought these rates were proper and reasonable. These policies were being accepted by their companies. The testimony showed no agreement on the part of the agents, and the chancellor so held. Neither does this testimony show any agreement upon the part of the companies or the agents. It in no way controverts the direct testimony of Mr. Nelson that the agents had no agreement, and that he used the rates as advisory, and knew of no agreement among the companies.

Mr. Stone, an insurer, was informed by his local agent that he had to write his policy in accordance with the advisory rate. I therefore assume that this agent's company without any agreement with any other company had independently adopted this rate of the bureau as its rate. It

had a right to do so, and I must assume that its act in doing so was legal in the absence of testimony to show its illegality.

The same applies to the testimony of Wilkerson, Savage, Brough, Ryals, Harris, and other testimony which merely tends to show a uniformity of rates.

Another incident referred to is the adoption of the amendment about insurance on cotton. In Texas insurance rates are made and governed through state officials. In the year 1915 there had been lots of cotton throughout the cotton belt destroyed by fire. The Insurance Commissioner of Texas called a meeting of the rating bureaus throughout the cotton territory for the purpose of discussing conditions and trying to devise means by which the fire hazards on compresses and warehouses in which cotton was stored could be reduced. Various officials of the rating bureaus of the Cotton States attended this meeting, among whom was Mr. Robertson, the secretary of the Mississippi Bureau. At this meeting a schedule of rates was gotten out, which was considered reasonable by those attending the convention. Mr. Robertson, the secretary of the Mississippi Bureau, did not agree at the meeting that he would put this rate into effect in Mississippi. He returned from the meeting, made an inspection of the compresses and warehouses in the state, and tested out the reasonableness and the applicability of the schedules suggested at the Galveston, Tex., meeting, and, after deciding that it was a reasonable and proper schedule, the rating bureau promulgated an advisory rate to this effect. This amendment was gotten out upon the independent judgment of the rating bureau without any agreement or understanding whatever that it would do so, and only gotten out after it had been tested out in the state, and after the bureau was satisfied that it was applicable to conditions in Mississippi. Instead of being any evidence of any agreement with any one to promulgate this rate, the uncontradicted testimony shows that it was gotten out upon the independent judgment of the rating company.

The appellee further insists that the testimony shows that the insurance companies, after being sued by agreement withdrew from the state of Mississippi, and this should be considered as an evidence of previous unlawful agreements to fix' and maintain rates in the state of Mississippi. The record shows that not only were these companies sued for large penalties for a period of fourteen years, each day being by the statute denominated a separate offense for which a fine was imposed, but all of the assets of these companies within the state of Mississippi were attached, and receivers were appointed to collect and take charge of these assets. So far as their funds in Mississippi were concerned, they had none upon which to continue business. If they were violating the law a continuance of business would each day have been considered a separate offense. The companies under their policies could have canceled all existing policies in force within the state. This was not done. The testimony of each company shows that, after a lawyer was sent to Mississippi to investigate the situation, and after his report was made to the companies, each company, some probably upon the same date and others upon different dates, acting separately and individually, concluded not to write any new business within the state of Mississippi. They testified that there was no agreement among them to withdraw from the state. With all their funds within the state in the hands of a receiver, and the possibility of future penalties for violation of the law being assessed against them for continuing in business within the state, we do not see how they could have done otherwise than discontinue writing new business. Neither does the fact that they discontinued doing so contradict the direct testimony that each company decided for itself, without any agreement with the others to cease writing new business within the state. Their funds being in the hands of a receiver, they, of course, could not do business within the state upon those funds. Usually when a business is put in the hands of a receiver it ceases to be a going

business so far as the owners of the business are concerned. It may or may not be operated by the receivers in accordance with the orders of the court. In view of this situation, it seems to me that prudence demanded of each company that it cease doing business in Mississippi, at least until the receivers were discharged and these funds restored to them.

When the anti-trust laws were enacted by the legislature, and when the amendment to them making these laws applicable to fire insurance companies was enacted, it is to be presumed that the legislature was cognizant of how the business of fire insurance was carried on in the state. It knew that these rates were made by agreement of these companies through the Southeastern Tariff Association, and that this agreement fixed and maintained these rates in Mississippi. It also knew that this insurance was written by local agents scattered all over the state: That a local agent represented not only one, but a number of different insurance companies. There is nothing in this law prohibiting an insurance agent from representing more than one company. In fact, it is necessary, in order for a local agent to continue business that he represent more than one company. This is due to several reasons. There are certain hazards or buildings that some companies will not insure. There are large mercantile and manufacturing establishments, all of whose insurance one company is not willing to write. Some insurance companies will only write a certain amount of insurance within certain limited territory—say within a business block. Consequently it frequently becomes necessary for a local agent in order to write the amount of insurance desired to place parts of this insurance in several different companies. It also frequently happens that the insurer will not give all of his insurance to one local agent, but will give a part to one local agent and a part to another local agent. This was the condition which existed when these laws were enacted.

Another thing, the business of insurance is not like the business of buying or selling personal property. The transaction is not completed when the insurance policy is written. The insured is vitally, necessarily, interested in the solvency of the company in which he is insured. This interest continues as long as the insurance policy is in force. For this reason we have elaborate laws providing for a supervision of these insurance companies, requiring certain things to be done by them in order that they may do business in the state. These laws in the main require that they satisfy the Insurance Commissioner that they are solvent and able to pay the losses incurred by them for the benefit of the insuring public. The insurance business is clothed with a public interest, and for this reason the supreme court of the United States has upheld the constitutionality of state statutes providing for state supervision and control of the insurance rates and the conditions upon which these companies could do business within the various states. Very many of the states have state rating bureaus, whose rates are obligatory and binding upon the insurance companies. While there is nothing in our law to prevent it, it would be unfair and unjust for an insurance company to charge one insured one rate on a piece of property and charge another a different rate on a separate piece of property where the fire hazard in both instances was identical. In this case the man paying the higher rate, as soon as he found it out, would naturally demand that his property be written at the same rate given his neighbor. If there were no rating bureau in the state of Mississippi, a fair and honest insurance agent would naturally for every company which he represented fix the rate of insurance the same on every identical hazard. If his competitor who represents a number of other companies were writing at a higher rate on this hazard, as soon as his customer found out this fact he would naturally demand of him this lower rate written by his competitor. Where several policies of insurance are written

upon a large building by several different local agents, naturally the rates for these policies would be the same. Otherwise the insurer would place all of his insurance with the companies offering the lowest rate. The natural tendency of all of this necessarily would lead to a uniform rate, at least in each locality. Through their various associations merchants and others who are insured would naturally obtain knowledge of the various rates obtaining in the localities, and the localities finding that they were being charged a higher rate on the same hazard under similar conditions would naturally insist upon the lower rate of the other locality. This would probably tend to uniformity of rates throughout the state. In other words, the manner of conducting the insurance business through local agents representing several insurance companies, in the absence of rating boards, in the course of time naturally tends to a uniform rate brought about by competition. The period covered by this suit (fourteen years) in the absence of a rating board might have shown a uniformity of rates thus brought about by competition.

These anti-trust laws only prohibit an agreement or understanding to fix or maintain rates. Naturally they do not prohibit a uniformity of rates, and a uniformity of rates is not violative of this statute unless it results from an agreement or understanding.

Aside from the testimony in the case, what is the natural result of the use by insurance companies of the advisory rates promulgated by the Mississippi Bureau? The companies subscribing for these rates naturally expected to get something for their money. They expected to get an advisory rate that was a reasonable and just rate. They naturally expected that, if, in their opinion, the rates were reasonable and just, they would allow their local agents to write insurance at these rates. The testimony shows that these companies, or most of them, checked these policies by these advisory rates, and, if written in accordance with the rate, generally accepted the business. In some

instances, however, they did not, because they considered the rate on that particular risk too low, and therefore undesirable. The use of these advisory rates in this way—that is to say, in the absence of any agreement or understanding among themselves or with the rating company as to them—is perfectly legal. Each company had a perfect right to do this. This custom necessarily tends to, and would within a short time, bring about a practical uniformity of rates. This uniformity thus brought about is the natural result of perfectly legal acts, and is brought about in a perfectly legitimate way. We think the testimony in this case uncontradictedly shows that this is exactly what happened in this case. Such is the uncontradicted testimony of all of the officers of the insurance companies and of all of the local agents. There is no direct testimony to contradict any of these facts. There is no act or series of acts, there is no incident or series of incidents, proven in this case which in any wise inferentially contradict this direct testimony. It is to be remembered that, if two reasonable inferences might be drawn from the testimony, the one that the act is legal and the other that the act is illegal, the court must, as a matter of law, adopt that theory which comports with honesty and fair dealing and legality. In other words, the court must find as a matter of law that the act was legal. Every man is presumed to be honest until the contrary be proven. Every act of a man, and even every act of a corporation, is presumed to be legal until the contrary be shown. While I do not think that any inference of guilt or of illegality may have been justly drawn from this testimony I am sure that the legality of these acts was directly proven, and, as I view it, no other finding can be made in this case.

This suit covers a period of fourteen years. There are within this time perhaps eight or ten particular transactions alluded to as tending to show a system of maintaining these rates. I have attempted to analyze briefly these various incidents. Each one in itself was lawful. Since

each is lawful, each inference to be drawn therefrom must necessarily be that of legality. You cannot from one hundred lawful acts draw an unlawful inference.

The defendants in this case are insurance companies. The Mississippi Rating Bureau is not a party defendant. Throughout this trial, however, the rating bureau has really been on trial. It is contended that it was a mere subterfuge, a sham, and a fraud, and but the agent of the Southeastern Tariff Association, through which its agreement to enforce and maintain rates in Mississippi was enforced. That these rates were agreed upon beforehand at the headquarters of this association, and then sent to the rating bureau with orders to be promulgated in Mississippi. I think I have demonstrated that the rating bureau was an independent corporation; that it in good faith exercises the powers granted it under its charter. Much was made of the claim that this bureau could not in the first instance evolve or originate a basis rate of insurance. The testimony does not show that this bureau could not have done this if it had so desired. Its first secretary, Mr. Taylor, was shown to be an efficient man, who had had experience in the rate-making department of the Southeastern Tariff Association. There is no testimony to show that he and Mr. Weille, who was a practical insurance man, could not have taken the experience of the insurance companies as shown by their various data and worked out a different basis rate for Mississippi. However, if it be a fact that this could not have been done by these men, could they not have employed whatever experts they wanted to do this work if they had thought it necessary? The important thing, however, is that under their charter they are not required to originate any specific or basis rate. All they had to do was to advise a rate. They could have, if they had thought best, originated a rate of their own. They had a right, however, to examine and accept the rate of any other rating bureau that they thought reasonable for conditions in Mississippi. Louisiana has a state rate-

making bureau. Yet the state of Louisiana through its officials adopted for use in that state this identical rate of the Southeastern Tariff Association. This if it shows anything, would indicate that Louisiana thought that a reasonable rate to be charged in that state.

The explanation of Mr. Weille, the witness for appellee, and for whose credibility and veracity the appellee vouches, fully explained the circumstances surrounding the adoption of the basis rate book of the Southeastern Tariff Association as a basis rate book for Mississippi. He did not think it would be well to try to revolutionize the system of rate making in the state. He examined the basis rates of various states, some under state supervision and others not, and after a full discussion with his stockholders, they concluded that the basis rates of the Southeastern Tariff Association were reasonable and proper for use in Mississippi, after buying these books from the Lester Company, an independent company, which was in no way the agent of the Southeastern Tariff Association, and in no way connected with it, it having been employed to print these books for the Southeastern Tariff Association in the first instance, which it did, and after which its connection ceased with the association. When these books were shipped to the Mississippi Rating Bureau, that part relating to an agreement was cut out of them. In all of its communications with the insurance companies and with the local agents the Mississippi Rating Bureau was careful always to let it be known that these rates were advisory. In no instance did the rating bureau ever arrogate itself to do more than promulgate advisory rates. The operations of this bureau were shown to have been open and above board. For a long while it filed with the Insurance Commissioner all rates and data of every character promulgated by it. This was done until the Insurance Commissioner informed it to quit doing so—in effect, that he did not have room in his office to store all of the information gotten out by the bureau. The testimony in

131 Miss.—31

the case, in my opinion, shows that the rating bureau in good faith legally complied with the powers granted it under its charter, and that there is no testimony whatever tending to contradict the testimony of Weille and others that it was not the agent of the Southeastern Tariff Association or of the insurance companies in any way.

From the decree of the chancellor I infer that he held the companies guiltless from January, 1908, to June 15, 1908. I also infer from the testimony that during this period these companies were using the specific rates gotten out by the Mississippi Rating Bureau, and that the chancellor held that the use of these specific rates only was not a violation of the law, but that they became guilty when they began to use the basis schedule rates sent out by the Mississippi Bureau. When these companies received these basis rates they necessarily knew by an examination of them that they were the same rates used by the Southeastern Tariff Association. This independent knowledge of each company could not constitute a violation of the law. They further knew, of course, that the Southeastern Tariff Association rates were not made for Mississippi, and that they had no agreement to use and maintain these rates within the state of Mississippi. The mere carrying of the book into the state of Mississippi and the adoption of it by the Mississippi Rating Bureau, as I have before stated, did not carry into the state of Mississippi an agreement made in another state to enforce rates in states other than Mississippi. Nothing was carried into Mississippi except the basis rate book, and this was sent out with instructions to all agents and insurance companies that it was merely advisory. The insurance companies therefore knew from this that the Mississippi Bureau thought a reasonable rate for Mississippi, which it advised, was the same rate enforced by the Southeastern Tariff Association in the states in which it operated. Nothing more. There was nothing clandestine in the way the Mississippi Bureau operated. There was nothing clandestine in the way these defendants

conducted their business in the state of Mississippi. They complied with the law, filing information required of them with the Insurance Commissioner, paid the taxes required of them, and otherwise obeyed the laws of the state of Mississippi in order that they could do business here. Their business has been conducted openly during all of this time, and now, at the end of fourteen years, they are convicted of having violated the law during all of this time. Before they subscribed to the rates of the Mississippi Bureau they also had before them a letter of the chief law officer of the state of Mississippi, telling them that they could subscribe for these rates and use them, provided they had no agreement either among themselves or with the rating company to enforce them. The attorney-general of the state of Mississippi gave the Insurance Commissioner a correct interpretation of the anti-trust law, and from all of the testimony in the case, as I view it, the conclusion is inescapable that no illegal agreement has been proven. Neither is there any testimony in the record which intimates that the advisory rates of the Mississippi Bureau were not reasonable and just. The reasonableness of the rates would not prevent an agreement to enforce them from being a violation of the law. In the absence of any proof of an agreement, however, the reasonableness of the rates would indicate the good faith of the rating company in complying with its charter.

In my opinion there is no conflict whatever in the testimony with reference to the material or controlling facts in the case. There is merely a diversity of opinion as to what those facts mean. The facts are undisputed. Does the inference of guilt preponderate over that of innocence? While I believe that the finding of the chancellor is against the overwhelming weight of the testimony, and that there are no facts upon which this finding can be sustained, yet the application of this rule to the finding of facts by a chancellor can have little or no weight in a case of this character because this court should be as capable of drawing inferences from undisputed facts as the chancellor.

Among other cases the appellee relies upon that of *Carroll* v. *Insurance Co.*, 199 U. S. 401, 29 Sup. Ct. 66, 50 L. Ed. 246. The question before the court in that case was the constitutionality of a law of the state of Kansas giving the Insurance Commissioner authority over rates. The court held the act constitutional. There was no question before the court of how an agreement to enforce could be proven. Among other things the court used this language: "No doubt an agreement between the companies readily would be inferred, if they were found all to charge the same rates."

This question was not before the court for decision. This language is *dictum.* In the case before us the testimony is not silent as to why there was a uniformity in rates, the reason being that the insurance companies, acting individually, thought the rates of the rating bureau just and reasonable. Even if an agreement could be inferred from the uniformity of rates, this inference is completely dissipated in this case by the direct testimony.

In the later case of *Frey & Son* v. *Cudahy Packing Co.*, 256 U. S. 208, 41 Sup. Ct. 451, 65 L. Ed. 892, this charge was given to the jury in the trial of the case:

"I can only say to you that if you shall find that the defendant indicated a sales plan to the wholesalers and jobbers, which plan fixed the price below which the wholesalers and jobbers were not to sell to retailers, and you find defendant called this particular feature of this plan to their attention on very many different occasions, and you find the great majority of them not only expressing no dissent from such plan, but actually co-operating in carrying it out by themselves selling at the prices named, you may reasonably find from such fact that there was an agreement or combination forbidden by the Sherman Anti-Trust Act."

It will be noted that the court in effect instructed the jury that, if the defendant indicated a sales plan which was uniformly followed, the jury could reasonably find

from that fact an agreement. The court held that this charge was erroneous, and that from those facts alone an agreement could not be inferred. This was the point in issue in that case, and in my judgment announces the correct rule, which is really in conflict with the dictum above referred to, and which also is in accord with the decision of the court in the *Miller case,* 126 Miss. 301, 88 So. 711.

The case of *Hartford Insurance Co.* v. *Raymond,* 70 Mich. 485, 38 N. W. 474, is also cited by appellee as authority to sustain his contention. In that case it will be noted that the insurance company and the rating company expressly agreed that the insurance companies were to adopt and maintain the rates as promulgated by the rating company. This, of course, was an agreement with the rating company to allow it to fix rates of insurance in the state, and was violative of the statute. Such an agreement would also be violative of the Mississippi statute.

Another case relied upon by the appellee is that of *State ex inf. Crow* v. *Insurance Co.,* 152 Mo. 1, 52 S. W. 595, 45 L. R. A. 363. From an examination of that case, however, it is readily seen that the local agents at St. Joseph, Mo., entered into an agreement which is set out in detail for the maintenance and enforcement of the rates of insurance. This, of course, would also be violative of the Mississippi statute, and no such agreement among local agents was shown in this case. In fact the chancellor expressly found that there was no agreement among local agents. In fact, after a careful consideration of all of the testimony in the case, I find no testimony except that as to a uniformity of rates. Why this uniformity existed is amply shown by the testimony, and that it resulted from perfectly legal action. This case is therefore, in my opinion, controlled by the decision of this court in the case of *Miller* v. *Insurance Co.,* 126 Miss. 301, 88 So. 711, and, in my opinion, with greatest deference to the learned chancellor who decided otherwise, I unhesitatingly say that no inference of guilt or illegality could have been drawn from the tes-

timony in this case, and that a judgment should be entered in this court in favor of the defendants.

I do not think that the state should be denied a recovery in this case because of laches.

"Laches is neglect to do what should have been done for an unreasonable and unexplained length of time under circumstances permitting diligence; mere lapse of time before bringing suit without change of circumstances will not constitute laches; . . . but it must appear that by reason of the delay some change has occurred in the condition or relations of the property [or of the claim sought to be enforced] which would make it inequitable to enforce the claim." 2 Bouvier's Law Dictionary, 1820 (3d Rev.) ; *Comans* v. *Tapley,* 101 Miss. 203, 57 So. 567, Ann. Cas. 1914B, 307; 1 Pomeroy's Equitable Remedies, section 21.

In the language of Stiness, J., in *Chase* v. *Chase,* 20 R. I. 202, 37 Atl. 804, quoted in *Comans* v. *Tapley, supra*:

"Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no steps to enforce them until the condition of the other party has in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable and operates as estoppel against the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities and other causes, but when a court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief."

The elements of laches, therefore, are: First, unreasonable delay in asserting a claim; second, negligence in not sooner asserting it; and, third, such a change in the condition of the party against whom the claim is sought to be asserted, brought about without fault on his part, as

renders it inequitable to permit the assertion of the claim, all of which must concur before it can be invoked as a defense. The second of these elements is missing, as is probably the third also; but whether they are present or absent is immaterial, for laches cannot be invoked against the government, state or national, in a suit "brought by the government in its sovereign capacity to enforce or to protect a public or governmental right." 21 C. J. section 216, p. 217. Or, as stated by Mr. Pomeroy in his Equitable Remedies, vol. 1, section 25, it cannot be invoked against the government "when it has a direct pecuniary interest in the subject of the litigation." *Josselyn* v. *Stone,* 28 Miss. 753; *U. S.* v. *Beebe,* 127 U. S. 338, 8 Sup. Ct. 1083, 32 L. Ed. 121; *U. S.* v. *Dalles Military Road Co.,* 140 U. S. 599, 11 Sup. Ct. 988, 35 L. Ed. 560; *Mattox* v. *U. S.,* 146 U. S. 140, 13 Sup. Ct. 50, 36 L. Ed. 917. For additional authorities, see 21 C. J. 217, note 94. The language in which this rule was announced in *Josselyn* v. *Stone, supra,* is:

"It is a universally recognized rule that no laches is to be imputed to the state and against her; that no time runs so as to bar her rights. This is a great principle of public policy, intended to secure the rights and property of the public against loss or injury by the negligence of public officers and agents."

And in *U. S.* v. *Beebe, supra:*

"The principle that the United States are not . . . barred by any laches of their officers, however gross, in a suit brought by them as a sovereign government to enforce a public right, or to assert a public interest, is established past all controversy or doubt."

Cases wherein laches can be invoked as a defense against the government are those in which it "is a mere formal complainant in a suit, not for the purpose of asserting any public right, or protecting any public interest, title, or property, but merely to form a conduit through which one private person can conduct litigation against another private person" (1 Pomeroy's Equitable Remedies, section

25), and in some jurisdictions in cases in which it sues "for the enforcement or the protection of a private and proprietory right, rather than a public or governmental right" (21 C. J. 217). But three of our brethren say that laches may be here invoked as a defense to a part of the penalties sought to be recovered. If the defense of laches could be here invoked at all, it would necessarily bar the collection of any penalties, and not simply of a part thereof, for the change in the appellants' condition on which the defense is based is the death of witnesses whose testimony, if they were living, would relate to the making of the agreement by the appellants upon the making of which the right of the state to collect any penalties at all depends. To hold that, because of delay in the bringing of the suit, all penalties that were incurred by the appellants prior to two or six years before the bringing of the suit would violate both section 104 of the state Constitution and section 3096, Code of 1906 (Hemingway's Code, section 2460), which provide that "statutes of limitation in civil causes shall not run against the state," and would in effect overrule *Grenada Lumber Co.* v. *State*, 98 Miss. 536, 54 So. 8, and *Nugent* v. *Robertson*, 126 Miss. 419, 88 So. 895, a branch of the case at bar, wherein it was expressly held that no statute of limitation can be invoked against the state to bar the collection by it of penalties for the violation of the anti-trust laws.

There is no principle of equity under which a claim for the penalties here sought to be recovered can be considered as "stale" and a limitation placed thereon analogous to that provided by statutes of limitation, even if such a principle could be applied in a suit by the state, for, whatever the rule may be elsewhere, the rule in this state is that "a claim not barred by the statute of limitations is not a stale claim." *Taylor* v. *Chickasaw County*, 70 Miss. 87, 12 So. 210; *Westbrook* v. *Mounger*, 61 Miss. 329; *Houston* v. *Building & Loan Ass'n*, 80 Miss. 31, 31 So. 540, 92 Am. St. Rep. 565; *Comans* v. *Tapley, supra.*

In this connection it may not be amiss to say that the appellee would not be deprived of any substantial right which he here has by limiting him to the collection of the penalties which accrued within six or even two years prior to the beginning of the suit, for the amount thereof which could and should be imposed within either of these limits, assuming that the appellants are guilty as charged, would more than consume the money belonging to them in the hands of the receivers, and the appellants have withdrawn from the state leaving no other property belonging to them therein.

This brings me to the contention of counsel for the appellants that the aggregate of the penalties imposed on each of the appellants is so great as to violate the due process of law clauses of the state and federal Constitutions, and section 28 of the state Constitution which provides that excessive fines shall not be imposed. In determining this question the judgment against each appellant must be separately considered, for the penalties imposed on one of them can have no bearing in this connection on the penalties imposed on any other, and, when each judgment is so considered, it will appear that as to some of them no such question as is here presented can arise, for it cannot be seriously contended, for instance, that the judgment for one thousand three hundred fifty dollars rendered against one of the appellants is excessive.

The statutes which fix the amount of the penalties that can be imposed here are section 5004, Code of 1906, and chapter 222, Laws of 1910, approved on the 2d day of April, 1910 (Hemingway's Code, section 3286), by which section 5004 was amended. The former provides that:

"Any person, corporation, partnership, firm, or association, or any representative or agent thereof, violating any of the provisions of this chapter, shall forfeit not less than two hundred dollars nor more than five thousand dollars for every such offense, and each day such person, corporation, partnership, or association shall continue to do so shall be a separate offense," etc.

The latter reduces the minimum penalty to twenty dollars a day. Section 5004, Code of 1906, was held to be valid in *Grenada Lumber Co.* v. *State*, 98 Miss. 536, 54 So. 8, which holding it would seem would dispose of the question here under consideration, for the amount of the penalties imposed on each appellant is not only within the limits of the statutes, but is made up of the minimum penalties for the time that section 5004 was in effect, and of practically the minimum penalties for the time subsequent thereto. If the judgment rendered against any of the appellants violates the state and Federal Constitutions because of the amount of the penalties therein imposed, then it may be that no judgment whatever can be rendered against that appellant, for the reason that the smallest judgment permitted by the statute would be void, and that appellant would escape punishment altogether, not because it is innocent, but because it has continued to violate the law for a great length of time.

If the appellants are guilty of the offense with which they are charged, and in determining the question here presented this court must proceed on the theory that the court below committed no error in holding that they are guilty, the penalties imposed are not excessive within the constitutional sense, for the agreement which the court below held they had made affected not a small area of territory, or a few individuals, but was state-wide—affected and was intended to control the entire fire insurance business of the state, and was deliberately made in flagrant violation of the state's laws. That the power of control over the business of fire insurance which the agreement, if such was in fact made, vested in the appellants seems not to have been misused by them, and not to have resulted in material injury to the state, is material in this connection only in determining the amount of the penalties which within the terms of the statute should be imposed on them, and full weight thereto is given upon the penalties imposed, which are the smallest which the statute permits.

The legislature must be given the widest latitude in determining the punishment to be inflicted for the violation of a law enacted by it so as to accomplish the object and purpose it thereby had in view, and—"In determining whether a fine authorized by statute is excessive in the constitutional sense, due regard must be had to the object designed to be accomplished, to the importance and magnitude of the public interest sought to be protected, to the circumstances and the nature of the act for which it is imposed, and, in some instances, to the ability of defendant to pay. In order to justify the court in interfering and setting aside a judgment for a fine authorized by statute, the fine imposed must be so excessive and unusual, and so disproportionate to the offense committed, as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." 16 C. J., p. 1358.

Smith, C. J., and Anderson, J., concur in these views.

Opinion on Suggestion of Error.

Smith, C. J. Except as it may be hereinafter set forth, each of us adheres to the views expressed by him when the decree herein appealed from was affirmed. As will appear from our former opinions, that decree should be reversed as to all of the appellants who were not members of the Southeastern Tariff Association; but in the enumeration of the appellants who were not members of this association we omitted the National Liberty Fire Insurance Company, so that in so far as that company is concerned the suggestion of error must be sustained, the decree reversed, and the cause as to it must be dismissed.

Counsel for the appellee in their reply to the suggestion of error say that we erred in reversing the decree as to the Union Insurance Company of Canton as that company was a member of the Southeastern Tariff Association. Con-

ceding for the sake of the argument that this is true, the error was invited by counsel for the appellee, for one of their original briefs contains a list of the companies they then admitted were not members of this association— one of which is the Union Insurance Company of Canton. But if the error was in fact committed, it is too late now to ask for its correction. That should have been done, under rule 14 of this court (72 So. viii), by a suggestion of error filed within fifteen days after our judgment was rendered. It may be we could treat the brief of counsel as a suggestion of error had it been filed within the required time, but it was not filed until more than thirty days after the judgment was rendered.

One of the contentions of counsel for the appellants is that the differences of opinion among us as to the existence *vel non* of error in the decree appealed from requires that the decree should be reversed, either *in toto,* or as to the amount of the penalties imposed by it.

Under the practice of this court a judgment or decree may be affirmed in so far as it adjudges liability and reversed as to the amount of the recovery allowed thereby, and since we are equally divided on the question of liability, that portion of the decree must be affirmed. So that we come to the real question on this suggestion of error, which is whether or not the decree should be reversed in so far as it imposes penalties.

The statute imposing the penalties here sought to be recovered for the alleged violation of our Anti-trust Law prior to April 2, 1910, was section 5004, Code of 1906, which provides that— "Any person, corporation, partnership, firm, or association, or any representative or agent thereof, violating any of the provisions of this chapter, shall forfeit not less than two hundred dollars nor more than five thousand dollars for every such offense, and each day such person, corporation, partnership, or association shall continue to do so shall be a separate offense."

This statute was amended by chapter 222, Laws of 1910, approved April 2, 1910, Hemingway's Code, section 3286,

by reducing the minimum penalty therein from two hundred dollars to twenty dollars per day.

The court below found that thirty-three of the appellants had been members of a trust and combine formed for the purpose of controlling the fire insurance business in Mississippi, from the 15th day of June, 1908, and the other appellants from various dates subsequent thereto, to and including the 2d day of December, 1920, and imposed on each appellant a penalty of two hundred dollars for each day, excluding Sundays, of its membership therein, from June 15, 1908, to the 2d day of August, 1910, and a penalty of twenty-five dollars for each day thereafter to and including the 2d day of December, 1920. The thirty-three appellants held to have been members of the trust and combine from June 15, 1908, were penalized therefor in the sum of one hundred ninety-five thousand eight hundred seventy-five dollars each; the aggregate of the penalties imposed on all of the appellants being eight million fifty-five thousand seventy-five dollars.

As will appear from our former opinions herein, Judges ANDERSON, SYKES, and SMITH are of the opinion that the court below erred in imposing any penalties at all on the appellants. Judge HOLDEN is of the opinion that it erred in imposing any penalties other than for the two years next preceding the 2d day of December, 1920. Judges COOKS and ETHRIDGE are of the opinion that it erred in imposing any penalties other than for the six years next preceding the 2d day of December, 1920. In other words, the three judges first named are of the opinion that the appellee is not entitled on the evidence to recover any penalties at all from the appellants. Judge HOLDEN is of the opinion that he is entitled to recover penalties for the two years next preceding the 2d day of December, 1920, and Judges COOK and ETHRIDGE are of the opinion that he should be permitted to recover penalties for the six years next preceding the 2d day of December, 1920. The ground on which the opinions of Judges ANDERSON, SYKES, and

SMITH rest is that the evidence is not sufficient to support the finding of the court below that the appellants had violated the state's Anti-Trust Laws, and the ground on which the opinions of Judges COOK, ETHRIDGE, and HOLDEN rest is that the state is barred by its laches from collecting the penalties except, according to Judge HOLDEN, for two, and according to Judges COOK and ETHRIDGE, for six years.

It thus appears that all of the judges of this court are of the opinion that the court below erred in imposing penalties on the appellants for each day prior to and including the 2d day of December, 1914; and that four, a majority thereof, are of the opinion that it erred in imposing penalties for each day prior to and including the 2d day of December, 1918. Consequently if the decree of the court below is to remain in force, the appellants will have to pay to the appellee several millions of dollars which every judge of this court has said they do not owe—a result so shocking to every sense of justice as to suggest that a judgment permitting it is without warrant in the law.

'The judgment to be rendered by an appellate court is determined automatically by operation of law from the votes of its members on the question of error *vel non* in the various rulings in the trial court that have been assigned for error, and each judge thereof should vote to render it, although it may not be the judgment to which his views on any of the assignments of error would have led. Were the law otherwise, no judgment could ever be rendered when the judges are equally divided on the various assignments of error, for no judgment can be entered on the minutes of the court unless its entry is directed by a majority of the judges thereof. This is the course uniformly pursued by the members of this court as evidenced by the *per curiam* memorandum filed herein when the decree now under consideration was affirmed. The duty which here devolves upon us, therefore, is simply to ascertain what judgment under the law should be ren-

dered because of the differences of opinion among us as to error *vel non* in the decree of the court below, and then to render that judgment.

The rule that must here govern was first clearly announced by this court, or rather by its predecessor, the high court of errors and appeals, in *Browning* v. *State*, 33 Miss. 47. The assignment of error on which the three judges then composing the court divided was that "the court erred in not sustaining the motion for a new trial." Two of the grounds upon which counsel for the appellant sought to sustain the assignment of errors, were:

First, "that the verdict finding the prisoner guilty was not sustained by the evidence; and, second, that the jury, during the four days of the trial, took their meals at the public table in the town of Lexington, and were . . . exposed on such occasions to improper influences."

The court was then composed of Judges HANDY, FISHER, and SMITH (COTESWORTH PINCKNEY). Judges HANDY and FISHER were of the opinion that the evidence was sufficient to support the verdict, but Judge SMITH was of the opinion that it was not sufficient therefor, and for that reason the motion for a new trial should have been sustained. Judges HANDY and SMITH were of the opinion that the jury had not been exposed to improper influences, but Judge FISHER was of the opinion that the jury had been so exposed and for that reason the motion for a new trial should have been sustained. Two of the judges, FISHER and SMITH, therefore concurred, but for different and unrelated reasons, in holding that the court below erred in overruling the motion for a new trial. In reversing the judgment the court held that in order for an appellate court to reverse the judgment of a trial court, a majority of its members must concur in holding that there is error in a ruling of the trial court, "which could, under proper rules of practice, be assigned as error," in the appellate court, but that it is not necessary that this majority should concur in the reasons which led each of

them to the conclusions that the assignment of error should be sustained. In other words, an assignment of error must be sustained if a majority of the judges concur in so holding, though each of them bases his decision on a ground different from that on which each of the others is based. Among the cases decided by this court pertinent hereto and illustrating the rule announced in the *Browning case, supra,* are *McNutt* v. *Lancaster,* 9 Smedes & M. 570; *Lipscomb* v. *State,* 75 Miss. 559, 23 So. 210, 230; and *Howie* v. *Brantley,* 113 Miss. 786, 74 So. 662, Ann. Cas. 1917E, 723. The last named of these cases was finally disposed of without reference to the question of practice here under consideration, and the opinion thereon was in effect, though not in fact, withdrawn, and while it would fully support the judgment we shall here render, we have reached the conclusion hereinafter announced without reference thereto, as we do not regard it as a precedent.

The question then for our determination is whether a majority of us concur in holding that the court below erred in a specific ruling which can be here assigned for error. Since a majority of us concur in holding, though for different reasons, that the court below erred in imposing penalties on the appellants for each day other than the two years next preceding and including the 2d day of December, 1920, the only real question for us to determine is whether or not the ruling of the court below necessarily made when rendering its decree that the appellants are liable for penalties for each day of the time intervening between the 15th day of June, 1908, and the 2d day of December, 1918, can be here assigned for error.

One of the usual assignments of error on appeal to this court from the chancery court is that the court below erred in rendering a (or the) decree against the appellant, and one of the assignments of error here is in this form. Under such assignment any ruling necessarily made when rendering the decree is usually reviewed without objection from the appellee; but under rule 6 of this court (72 So.

vii) it may be that such an assignment is too general, but, if so, it can easily be made specific enough to cover the error here in question, as hereinbefore set out, and the holdings of Judges COOK, ETHRIDGE, and HOLDEN are predicated upon the fact that each day of membership in a trust and combine is a separate offense for which a separate penalty is to be imposed. If the error in the judgment imposing penalties for membership in a trust and combine is that it imposes penalties for a day or days for which the appellant claims not to be liable therefor, that fact can be assigned for error, otherwise the court would be powerless to grant relief therefor, and if the assignment is sustained the judgment can be set aside and the error corrected either here or on a remand to the trial court. It is unnecessary for us to determine whether any of the various assignments of error here filed are pointed specifically at the error of the court below here under consideration, for the test of this court's right to review a ruling of the trial court is not whether such ruling is, but whether it could have been, assigned for error. In rule 6 of its rules of practice this court expressly reserved the right to review a ruling of the trial court not assigned for error.

It follows from the foregoing views that the decree of the court below should be reversed as to the amount of the penalties imposed by it.

The next question that arises is: Should final judgment be rendered here, or should the cause be remanded to the court below?

Counsel for both the appellants and the appellee say that under section 4919, Code of 1906, Hemingway's Code, section 3195, final judgment should be rendered here, so that, without determining this question of practice, the decree of the court below will be set aside in so far as it imposes penalties, and a final judgment will be rendered here in accordance with this opinion imposing a penalty of $25, as did the court below, on each of the appellants, ex-

cept those hereinbefore ordered to be discharged, for each day, excluding Sundays, for the two years next preceding and including the 2d day of December, 1920.

ETHRIDGE, J. (dissenting).

In the third syllabus to the original opinion the rule was laid down by all the judges agreeing thereto as follows:

"Before a judgment or decree of a trial court can be reversed by a supreme court, a majority of the judges thereof participating in the decision must concur in holding that a specific ruling of the trial court on which the judgment or decree is based is erroneous."

This to my mind is an absolutely correct statement of the proper rule, and the anomalous and, as I think, mischievous rule now announced, that on a suggestion of error a judgment will be reversed where a majority of the court does not concur on any common reason for reversal, must inevitably lead to mischief and will hereafter embarrass the court very greatly, as I shall point out more in detail, in this opinion.

Before dealing with this question further, I desire to make some statement with reference to my reasons for voting to affirm on the question of liability. I had hoped that we would be able to say conscientiously that the evidence did not support the charge made because of the great interests affected in the state by the suit, and because I always feel gratified when we can say from a record that a charge against a person or a corporation charging wrongdoing is not supported by the evidence. I have no desire, and never had any desire, however, to see either party to a suit win unless his contention was supported by the evidence, and when this cause came up for hearing before us I gave very studious and thoughtful attention to the record and to the points of law involved. I searched the record, searched the books, and searched my conscience in the case, and after the most thoughtful consideration of the questions involved, I reached the conclusion that there

was enough evidence to warrant the chancellor's finding of fact in the case under the rulings of law governing us in deciding such questions. *Dillard* v. *Wright,* 11 Smedes & M. 455; *Kelly* v. *Miller,* 39 Miss. 17; *Davis* v. *Richardson,* 45 Miss. 499, 7 Am. Rep. 732; *Heard* v. *Cottrell,* 100 Miss. 42, 56 So. 277; *Southern Plantations Co.* v. *Kennedy Heading Co.,* 104 Miss. 131, 61 So. 166; *Lee* v. *Wilkinson,* 105 Miss. 358, 62 So. 275; *Evans* v. *Sharbrough,* 106 Miss. 687, 64 So. 406; *Humbler* v. *Humbler,* 109 Miss. 216, 68 So. 161; *Bank of Lauderdale et al.* v. *Cole et al.,* 111 Miss. 39, 71 So. 260; *Johnson* v. *Yazoo County,* 113 Miss. 435, 74 So. 321.

On the suggestion of error it is urged with earnestness that we have misconceived the evidence and that the evidence does not warrant a judgment against the appellants on liability. In view of the fact that three members of this court entertained that view on the original hearing and still entertain it, I re-examined my position and reconsidered the case from every angle to see, in my own mind, if I was mistaken in the original opinion. My reflections have confirmed my former opinion, and it is rather strengthened than weakened by a re-examination of the arguments made, together with the views advanced by Judges ANDERSON, SYKES, and SMITH in their dissenting opinion on this proposition. I think my Brethren are unconsciously influenced by the conviction that they would, if deciding it, as an original proposition, have reached a contrary conclusion from what the chancellor reached, and that they have not given weight to certain facts in the record that are entitled to weight in reviewing the decision of the chancellor. As the record contains thirty-five volumes of stenographic notes, with many exhibits, it would be impossible to set out in the space of an opinion all of the facts which appear in the record and which are entitled to some consideration.

The arguments of the appellants proceed upon the idea that the state's case rested entirely on circumstantial evidence and that the denials of the officer of the companies

who testified in the case of any agreement or any under-
standing or combination among the several companies in-
volved, whatever force these circumstances may have had
standing alone, are dispelled by this positive evidence, and
the opinion of the three dissenting judges in the original
opinion proceeds along the same idea.

The case does not stand wholly upon circumstantial
evidence, and, if it did, the mere denial of the conclusions
established by the circumstances and denied by the indi-
viduals involved would not necessarily and as a matter of
law prevent a finding in accordance with the deductions
to be drawn from the circumstances.

There are numerous admissions in the record, made by
numerous different agents of the different companies, to
the effect that the Mississippi Rating Bureau fixed the
rates, and that the general agents of the companies had
nothing to do therewith and had no power to change them.
It is true this admission is denied by the chief officers of
the several companies, and it is also denied by a number of
agents. Nevertheless, the admission of the agent, made
within the scope of his authority, and about the business
of his principal, is the admission of the principal himself,
and is to be considered as evidence just as though the com-
pany itself had made the admission. There is much tes-
timony in the record that when this Rating Bureau made
a rate, it was practically unanimously followed; the proof
showing that it was followed in ninety-five per cent. of
the business written by the companies. The proof also
shows that a part of the variation from the fixed rate was
caused by fixing the rate in such figures and fractions of
figures that it was not easy to discover the variation. That
the companies would assume that there was some reason
in the physical situation or location of the property that
justified the departure from the book rate. The proof fur-
ther shows that the Mississippi Rating Bureau was au-
thorized by its charter granted by the state, in section 2
thereof, as follows:

"The purposes for which said corporation is formed are as follows: To inspect risks, classify and promulgate advisory rates of insurance, both fire and marine, and to suggest a proper means of construction and maintenance and protection to buildings so as to prevent as far as possible waste from fires, and to reduce the price of insurance on same for the benefit of all parties interested; and for said purposes shall be authorized to print and sell in printed form the rates and suggestions so made and to otherwise charge reasonable fees for its services."

Notwithstanding it was incorporated for these purposes and had power to sell this information, that as a matter of fact it only charged fees for its services to the companies and not to the property owners, notwithstanding the proof shows that its engineers made surveys of many business houses and institutions, and, in some instances, spent several days in such work, using skilled engineers, that it made no charge to the property owner, but that its sole compensation for any and all services was one per cent. of the gross premiums received by the companies on the risks written in the state. In other words, the services rendered were rendered the property owner and, if followed, resulted in diminishing the rate of insurance to the property owner; yet the property owner, the beneficiary, was not charged for these services, but a charge for the service was made to and paid by the several companies. It would be unnatural for a person or corporation acting as a disinterested arbiter or functionary between the insurer and the insured to charge the party who did not receive the service the fees earned by the service rendered.

It is further shown in proof that the Rating Bureau as a matter of fact did not make insurance rates, though its charter, which is its contract with the state, empowered and authorized it to do so, and that was the chief purpose of the state in approving its charter. Under its charter it had the power and it was its duty to have competent persons to make rates upon a proper, scientific, and expert

basis. Instead of doing that, it bodily took the Southeastern Tariff Association rates, or the Southeastern Underwriters rates (the name being different at the different periods of time, but being the same institutions), and brought these rates into Mississippi and issued them as though these rates had been prepared by its own officers and employees.

We find further that the appellants who have been held liable under the judgment had entered an agreement as to the rates involved in the territory known as the Southeastern Tariff Association territory, and that they had solemnly agreed not only to use those rates uniformly, but to punish and discipline their agents if they failed to adhere to these rates or varied from them. Each company which was a member of that Southeastern Tariff Association had a copy of its book of rates in its home office, and many of them in the hands of their agents in this state. They bought from the Mississippi Bureau and agreed to pay for these same rates one per cent. of their gross premiums in Mississippi. It certainly does not stand to reason that a company would pay one per cent. of its gross income for a book which it already had and any number of copies of which could be secured for a mere nominal consideration. It is unbelievable that a company would buy a book of rates for use in this state without comparing it to the book of rates which it had in use in the adjoining states to this, and without comparing it with their own data collected by whatever rate-making agency it had. If it did compare it, it was bound to know that it was the same rate which it already had, and if it was under no obligation to use the rate, but could promulgate its own rates, why would it not use the rates it already had in its office?

The proof further shows that there were numerous cancellations because of variances from the rates, and taking all things together it was logical at least to assume that the agreement made in the Southeastern States was brought into Mississippi in disguise, and that the Mississippi Rating

Bureau was a mere agency of the companies whose rates it was using in Mississippi.

In reading the evidence in this case in so far as conclusions were to be drawn from circumstantial evidence, we followed the rule announced in *Banks* v. *Banks,* 118 Miss. 783, 79 So. 841, which is as follows:

"Where an offense of this kind is sought to be proven by circumstantial evidence, the circumstances must be proven with reasonable certainty, and the circumstances so proven must be such that the conclusion sought to be established follows logically from the facts. If there are two or more reasonable theories which may be drawn from the facts proven, the proof will be insufficient because, to invest mere circumstances with the force of truth, the conclusion must not only be logical, and tend to prove the facts charged, but must be inconsistent with a reasonable theory of innocence."

This rule, however, when the party proves the necessary circumstances to support his conclusion, does not have to yield to the mere statement of the adverse party that the facts sought to be proved are not true. Where a party produces facts necessary of themselves to prove his conclusion, and these facts are disputed by the adverse party, or where the adverse party swears that the conclusion sought to be proven is not true—in this case that there was no argument or understanding—then a question of fact arises for the trier of facts to decide.

The decision proceeded also in harmony and accord with the case of *Miller* v. *Insurance Co.,* 126 Miss. 301, 88 So. 711, by which decision the law is established upholding the legality of the scheme contemplated in the charter granted under the laws of this state to the Mississippi Rating Bureau and in accordance with the opinion of the attorney-general advising the Insurance Commissioner that it would not violate the law for the Mississippi Rating Bureau to advise, publish, and sell a rate or rates of insurance in this state, so long as there was no agree-

ment, expressed or implied, between the companies that such rates would be binding or obligatory or adhered to by the several companies. The liability was not imposed out of disregard for this decision, but the rule announced in the decision was borne in mind and adhered to in reaching a conclusion on the facts in this case.

It is not necessary for me to say or intimate what opinion I would have arrived at had I been the original trier of fact. I think the chancellor could have decided the cases either way, depending upon his view of the credibility of the witnesses, and I am not prepared to say that we would have reversed him on some of the cases in which he discharged the defendants had he held them guilty. It seems to me that it was a case where necessarily the chancellor had to decide some of the issues of fact and that some of the evidence was contradictory of other parts of the evidence. The chancellor had most of the witnesses before him. His opportunities for judging of their creditibility were much greater than ours, for we have nothing but the printed page containing the words of the witnesses without the advantage of their demeanor, appearance, and a thousand and one things that in the course of a trial may shed light upon the probabilities of a case.

If I could yield my own opinion conscientiously and without stultification and loss of my self-respect, I would rather see the case disposed of by releasing the companies, if necessary, from any liability, rather than see the doctrine established in this court that a majority may reverse a judgment though each judge voting to reverse stands with the minority on each particular question involved in the case. This view is so fraught with mischief and with future embarrassment to the court that I have felt called upon to express my opposition to it in as vigorous a fashion as I can without exceeding the limits of proper discussion.

The majority opinion does not state my position with clearness in the present opinion. It states that—

"Judges COOK and ETHRIDGE are of the opinion that it erred in imposing any penalties other than for the six years next preceding the 2d day of December, 1920."

In the former *per curiam* opinion my position was stated as follows:

"Judges COOK, ETHRIDGE, and HOLDEN are of the opinion that the state can be charged with laches, and should be charged therewith here to the extent that the appellee should not be permitted to collect penalties for the full period of time that the court below found the companies had been doing business under the agreements alleged in the bill of complaint; Judges COOK and ETHRIDGE being of the opinion that he should be permitted to collect penalties for the last six years," etc.

—which was a correct and accurate statement of my position.

The court in the first opinion held that laches could not be applied to the state and the majority of the court has not taken the position now that it can be.  I feel bound by the decision unless at least one other judge would join Judges COOK, HOLDEN, and myself in holding that the doctrine of laches is applicable.  The doctrine of laches is a thing apart from the judgment.  The chancellor held that the companies violated the law throughout the number of years involved in the judgment and imposed penalties for each day, or at least a sufficient penalty to cover each day during that period, and that judgment was affirmed by this court, and no judge has changed his position with reference to the rightfulness of the legal questions then involved.  Four judges do not now concur on any specific legal question involved in reversal.  The judges who believe there was no liability have based their vote in the present cast upon that ground, although the court had solemnly decided that there was liability, and that decision has not been overruled, but stands.  That being

true, the judgment cannot be limited to penalties occurring within two years of the filing of the suit, because there are no statutes of limitation applicable, and laches 'is the only basis which could legally warrant the court in cutting down the judgment to that extent.  Disguise it as we may, the effect of the decision is that although the court has declared the law to be that there is liability throughout the thirteen years, and has declared that the doctrine of laches is not available, yet three judges vote contrary to that part of the judgment and decision which held there was liability, and one judge votes contrary to that part of the decision which held that laches is not available in a suit against the state, or where the state is a party.  The judges are not controlled by the law as thus announced in their voting, but adhere to the opinion which the court condemned in the former case and it stands unreversed.

If the entering of the judgment may be assigned for error and every separate and distinct reason which could be urged against the legality of the judgment can be voted separately by each judge for the purpose of procuring a reversal, it may easily follow that a trial judge would be reversed even though on every single specific proposition relied on for error five judges might agree that he was right and only one judge agree that he was wrong.  Suppose there were six instructions assigned for error, each of which, if well taken, would reverse the judgment.  On No. 1 I would vote to reverse, we will say, and the other five judges vote to affirm.  On No. 2 Judge COOK would vote to reverse and the other five judges vote to affirm.  On No. 3 Judge SYKES would vote to reverse and the other five judges vote to affirm.  On No. 4 Judge ANDERSON would vote to reverse and the other five judges vote to affirm.  On No. 5 Judge HOLDEN would vote to reverse and the other five judges vote to affirm.  On No. 6 Judge SMITH would vote to reverse and the other five judges vote to affirm.  And on a general vote as to whether the judgment should be reversed all should vote unanimously for

reversal—we would have the anomalous situation of a chancellor being reversed though five out of six judges agreed he was right on every single proposition put up to him. With due deference that is not the action of the court, but is the act of each judge placing himself without the pale of the law and voting arbitrarily his views, enforcing a reversal on the basis of adding minorities when the majority of the court thinks the judgment ought to be affirmed on each specific proposition. As said by one of the distinguished counsel in this case on a suggestion of error in the Brantley case:

"It is in this court and not in the judges who compose it that this great and solemn power rests. The court speaks and acts through the majority of its members. The voice of that majority is the voice of the state. A dissenting judge no more speaks with authority than would the marshal or janitor giving expression to his opinion. It is the organized entity—the court—which exercises judicial power, and that power is an entity and not divisible. . .

"Each judge must determine for himself what course to pursue. There is no power which can constrain him. Because the power is final and not subject to control admonishes to prudence and restraint in its exercise.

"The number of judges in the minority upon each of the questions involved added together constitute a majority of the court. They are ranked together because, and because only, each stands in opposition on some point to the majority of the court. Each may be of opinion that opinion which his associates may all think to be erroneous, but in order to carry into effect his own dissenting option which his associates may all think to be erroneous, joins with them in obstructing and preventing the declaration by the court of its opinion as entertained by the majority of each question decided.

"As a mere matter of plain common sense, aside from the learning of the books, does it not seem that any rule which prevents the declaration by decision of the con-

clusion reached by the majority of the court on each of
the questions involved, and which gives effect only to the
view of the minority cannot be sound;"

If a minority can unite and by sheer personal force enter
a judgment not sanctioned by the law previously declared,
what certainty can there be in courts or legal proceedings?
A judge may rightfully challenge any decision of the court
which he thinks unsound in the conference room and urge
his fellows to join with him in overruling it, but unless
it is overruled it ought to be binding upon him and ought
to control his vote.  To refuse to vote in accordance with
the law as previously announced by the court, when the
court will not overrule its decision, is nothing more nor
less than the judge placing himself in rebellion against the
law.  Judges are selected for the purpose of enforcing and
declaring the law as it exists, with the right, whenever the
court as a court decides that a decision is wrong and mis-
chievous, to overrule it and declare that to be the law
which a majority of the judges decide is the law, but they
have no right to disregard the law.  A judge of this court
is one of the highest judicial officers of the state, at the
head of one of the great departments of the state, and,
above all men, ought to conform to and obey the law.

If a majority of the court would agree upon a common
ground of reversal of the former opinion I would be satis-
fied.  In other words I feel like the other members of the
court are as desirous of reaching a correct result as I am,
and that they are capable of doing so.  I would simply satis-
fy myself by saying that I thought the correct period to
apply laches would be the six-year period because that
period has been fixed to govern all cases not otherwise
provided for under the general statute of limitation, and
also because the statute has limited the revenue agent to
six years in collecting back taxes, indicating with reason-
able certainty that six years is the most reasonable period
in which to draw the line.

I cannot conceive of how we can properly travel under
the rule that minorities may unite and control the ma-

jorities, or that the judges of this court can refuse to follow the law announced in its decisions when they are unable to overrule them. Quoting again from the brief on the suggestion of error in the Brantley case:

"When we think of a supreme court, its members exercising the judicial power of the state, our conception is of a body gravely and with anxious diligence seeking to discover truth and to administer justice according to settled principles.

"It is the thoughtful investigation, the calm deliberation, the cheerful and full subordination of private opinion to settled principles which is the very essence of the administration of law by such tribunal. Whether the particular point under investigation is ruled by prior decision, or is then for the first time ruled by the court, it is nevertheless the law. As such in the very nature of things it binds with equal power the judges who constitute the effective majority of the court, and those who, in minority, may be of the opinion that the law in that particular is not properly ruled. If the minority is not bound, it is because they are above the law; or being within its lawful influence have the will and power to sit and maintain themselves in opposition.

"This court does not make the law by its decisions; it only decides what the law is and has been. Decision in the very nature of things must precede its promulgation. The thought and its expression must agree, or the one is false. Utter confusion must arise if the thought of the court is sought to be expressed so as to give expression and effect to the views of certain of its members, which are not only opposed to the opinion of the court as an entity —an ideal corporate body—but are in direct conflict with each other."

I will not undertake in this opinion to review the numerous opinions in other states, some of them decided one way and some the other, but the greater number and the best-reasoned opinions hold that a majority of the judges

must agree on a common ground or a common legal reason before reversing a case. See *Legal Tender cases,* 52 Pa. 9; *Grogan* v. *Wisconsin Sugar Co.,* 156 Wis. 406, 146 N. W. 491; *Harland* v. *Wisconsin Sugar Co.,* 156 Wis. 407, 146 N. W. 492; and the masterly dissenting opinion of Justice HANDY in *Browning* v. *State,* 33 Miss. at page 88, which reasoning has been commended in other courts, and also in this state in *Lipscomb* v. *State,* 75 Miss. 559, 23 So. 210, 230, though the court in that case agreed on one instruction as being the ground for error and did not therefore have to decide between Judges HANDY and FISHER.

In *Robertson* v. *Mississippi Valley Co.,* 120 Miss. 159, 81 So. 799, this court announced that, where a judgment was affirmed by this court by an equally divided court, the principle of law established by the affirmance would be followed thereafter as law unless and until overruled, and that such a decision is a judicial precedent.

In such cases it must necessarily be so, because where this court is equally divided the trial court constitutes the arbitrating judge and his decision stands, and inasmuch as it would be a lamentable thing to have one case decided one way where the judges are divided upon the question, and another case arising from the court of a different judge to be decided a different way, it would create endless confusion, and it was to obviate this and to have the law settled that the rule in *Robertson* v. *Mississippi Valley Co., supra,* was established.

COOK, J., concurs in this dissent.